# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **PUBLIC WAREHOUSING COMPANY K.S.C.,** | § § § | |
| **v.** | § § | **CIVIL ACTION NO. _____** |
| **DEFENSE SUPPLY CENTER PHILADELPHIA, THE DEFENSE LOGISTICS AGENCY, and THE DEPARTMENT OF DEFENSE.** | § § § § § | |

---

## MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING

---

Plaintiff Public Warehousing Company K.S.C. ("PWC") moves this Court for a preliminary injunction and expedited hearing (the "Motion") against Defendants, Defense Supply Center Philadelphia ("DSCP"), the Defense Logistics Agency, and the U.S. Department of Defense ("DoD"), pursuant to Rule 65(a) of the Federal Rules of Civil Procedure. On February 28, 2007, PWC discovered that DSCP has been refusing and continues to refuse to provide government procurement agencies which currently are evaluating PWC for contract awards, with past performance evaluations and information on PWC's largest contracts. Such past performance evaluations and information are vital to PWC in the source selection process; past performance is typically the most important evaluation criterion for award, the absence of past performance information from PWC's largest customer effectively eliminates PWC as a competitive bidder for government contracts work. DSCP has based its refusal to provide this vital information on the sole and unreasoned basis that there is a pending investigation of PWC's (1) failure to return to the government prompt payment discounts PWC received from its vendors, and (2) relationship with a preferred supplier to the DSCP contract, The Sultan Center

("TSC"). DSCP has taken this draconian action despite its written position that PWC was not required to return the prompt payment discounts to the government in the first place. DSCP's arbitrary and capricious actions have caused and will continue to cause PWC to be irreparably harmed if this Court does not issue a mandatory injunction requiring DSCP to provide procurement agencies, at their request, with past performance evaluations and information related to PWC and its contracts with DSCP. The preliminary injunction will require DSCP to comply with the Federal Acquisition Regulation (the "FAR"), 48 C.F.R § 42.1502-.1503, by providing other procurement agencies with past performance evaluations and information related to PWC.

PWC respectfully requests that this Court's consideration of  PWC's motion for preliminary injunction and its Complaint for Declaratory Judgment and Injunctive Relief ("Complaint") be combined into one hearing in the interest of judicial economy.

## STANDARDS FOR RELIEF

In considering Plaintiff's request for a preliminary injunction, this Court must weigh four factors: (1) whether the plaintiff has a substantial likelihood of succeeding on the merits; (2) whether the plaintiff would suffer irreparable injury were an injunction not granted; (3) whether an injunction would substantially injure interested parties; and (4) whether the grant of an injunction would further the public interest. *Art-Metal USA, Inc. v. Solomon*, 473 F. Supp. 1, 3-4 (D.D.C. 1978) (citing *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)).  As set forth in this Motion, the Complaint, the Memorandum of Points and Authorities in Support of the Motion, and the declarations of Mr. Toby Switzer and Ms. Pamela Cooper, Plaintiff meets all of the requirements for the issuance of a preliminary injunction. *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent

injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.").

## REQUEST FOR AN EXPEDITED HEARING

Plaintiff respectfully requests an expedited hearing before the Court to present arguments and evidence in support of this Motion for Preliminary Injunction.

## REQUEST FOR DISCOVERY

Plaintiff respectfully requests that this Court permit Plaintiff to propound Requests for Discovery on Defendants in preparation for such an expedited hearing.

## REQUEST FOR COMBINED HEARING

Plaintiff respectfully requests that the hearing on its motion for preliminary injunction be combined with its hearing on its Complaint for Declaratory and Injunctive Relief.

## SUPPORT FOR THIS MOTION

The grounds for this Motion are set forth in the Complaint, the supporting declarations of Toby Switzer and Pamela Cooper, the supporting Memorandum of Points and Authorities, this Motion, and on arguments and evidence presented at the hearing on this Motion.

## REQUEST FOR RELIEF

WHEREFORE, for the reasons stated in this Motion, PWC requests that the Court grant its Motion for Preliminary Injunction and Expedited Hearing and require that DSCP provide past performance evaluations and information related to PWC to requesting procurement agencies.

Respectfully submitted,

Michael R. Charness
D.C. Bar No. 289322
VINSON & ELKINS, L.L.P.
The Willard Office Building
1455 Pennsylvania Ave. Suite 600
Washington, D.C. 20004
Telephone:  (202) 639-6780
Facsimile:  (202) 639-6640

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **PUBLIC WAREHOUSING COMPANY K.S.C.,** | § § § | |
| **v.** | § § | **CIVIL ACTION NO. _____** |
| **DEFENSE SUPPLY CENTER PHILADELPHIA, THE DEFENSE LOGISTICS AGENCY, and THE DEPARTMENT OF DEFENSE.** | § § § § § | |

---

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING

---

Michael R. Charness
VINSON & ELKINS, L.L.P.
The Willard Office Building
1455 Pennsylvania Ave. Suite 600
Washington, D.C. 20004
Telephone: (202) 639-6780
Facsimile: (202) 639-6604

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **PUBLIC WAREHOUSING COMPANY** | § | |
| **K.S.C.,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **DEFENSE SUPPLY CENTER** | § | |
| **PHILADELPHIA, THE DEFENSE** | § | |
| **LOGISTICS AGENCY, and THE** | § | |
| **DEPARTMENT OF DEFENSE.** | § | |

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING**

---

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff, Public Warehousing Company K.S.C. ("PWC"), has filed the accompanying Complaint for Declaratory and Injunctive Relief ("Complaint"), Motion for Preliminary Injunction and Expedited Hearing ("Motion"), and Motion for Leave to Take Expedited Discovery ("Discovery Motion") against Defense Supply Center Philadelphia ("DSCP"), the Defense Logistics Agency, and the U.S. Department of Defense ("DoD") (collectively, "Defendants"). PWC seeks an injunction requiring Defendants, specifically DSCP, to comply with the Federal Acquisition Regulation (the "FAR"). DSCP's continued refusal to do so improperly and illegally interferes with PWC's property rights, and such refusal will irreparably harm PWC's business. DSCP has informed PWC that it has refused to provide other government agencies that are evaluating PWC for contract awards with information and evaluations relating to the parties' contracts—by far, the largest PWC has performed—while PWC is being investigated by the Department of Justice, through the U.S. Attorney's Office in Atlanta, GA (the

"AUSA"). The evidence, which includes DSCP's own written assessment of the central issue in the investigation, demonstrates that these charges are without merit. Regardless, DSCP's decision to not provide this past performance information was arbitrary and capricious and, thus, violative of the Administrative Procedure Act (the "APA"), 5 U.S.C. § 706(2)(A). Moreover, DSCP is <u>required</u> to provide past performance reviews for completed contracts (of which there are two) and to share past performance information with requesting procurement agencies, and its failure to do so is in violation of the FAR and is unconstitutional. Moreover, given the critical importance of past performance in the source selection of all government contracts, DSCP's insupportable conduct will irreparably harm PWC.

DSCP informed PWC on February 28, 2007 that it has refused and will continue to refuse to provide past performance information and/or evaluations to requesting procurement agencies solely on the basis of the Department of Justice's (the "DOJ") investigation of PWC. (*See* E-mail from Linda Ford dated 2/28/07 (hereinafter "Ford E-mail"), submitted as Exhibit I), and this refusal was later confirmed by DSCP's counsel. (*See* E-mail from Marlene Surrena dated 3/6/07 (hereinafter, "Surrena E-Mail"), submitted as Exhibit A.) DSCP's refusal to provide past performance information would, in effect, be treated by agency source selection panels as a "neutral" grade of PWC's performance on its largest and most profitable government contracts. (Declaration of Toby Switzer (hereinafter "Switzer Decl."), submitted as Exhibit B, ¶ 19; *see also* Declaration of Pamela Cooper (hereinafter "Cooper Decl."), submitted as Exhibit H, ¶ 10.) Not only would such a neutral rating be entirely inaccurate and inappropriate given PWC's highly praised performance of its DSCP contracts, but this undeserved neutral rating, on what is typically the most important factor for award, means that PWC will be left at a distinct disadvantage relative to its competitors which will receive accurate assessments of their

performance by their government customers. PWC would effectively be downgraded for its "neutral" rating and this unfair rating would prevent PWC from being awarded most, if not all, government contracts for which it is competing for the foreseeable future.[1] PWC is facing the real danger of being constructively debarred from the U.S. government contracting. A neutral rating would, therefore, cause PWC to be irreparably harmed by causing financial losses, preventing business contracts with third parties, and damaging PWC's reputation.

PWC is entitled to declaratory and injunctive relief for two reasons. First, DSCP's refusal constitutes a violation of the FAR, 48 C.F.R. §§ 42.1502(a) and 42.1503(c), which *requires* that U.S. government departments and agencies share past performance evaluations and information with other departments and agencies when requested to support these agencies' evaluation of PWC for contract awards. The FAR has "the force and effect of law," as it was issued under statutory authority and published in accordance with statutory procedures. *Davies Precision Machining, Inc. v. United States*, 35 Fed. Cl. 651, 657 (1996).

Additionally, DSCP's decision to not provide this information and rely solely on the existence of a recently convened investigation, in which no wrongdoing has been proved, was arbitrary and capricious, and therefore DSCP's action was illegal under the APA, 5 U.S.C. § 706(2)(A).

Second, DSCP's refusal to provide such past performance information to procurement agencies will result in a *de facto* or constructive debarment of PWC from U.S. government contracting. As discussed herein, a "neutral" rating, i.e., the grade that will result from DSCP's

---

[1] As most companies have experienced with government investigations, the investigations do not reach a formal "end" unless there is a settlement or a court decision. The Justice Department rarely, if ever, notifies a contractor that it has concluded its investigation without prosecution. Thus, PWC is facing the real prospect that it will never receive another past performance review from DSCP. This is emblematic of constructive debarment by a government agency.

refusal to provide past performance information, on PWC's largest contracts will effectively make PWC noncompetitive with other offerors whose best customers are producing past performance reviews and information for their work. This refusal by DSCP will result in a constructive debarment of PWC as it will be unable to win government contracts given its default "neutral"—and decidedly lower than deserved—rating on its largest contracts. PWC has a constitutionally protected property interest in its business and it cannot be deprived of its property interest without due process of law. For due process to be satisfied, PWC is entitled to an expedited hearing in which it can contest such an unconstitutional taking. Furthermore, PWC is entitled to a mandatory injunction against DSCP, under which DSCP is required to provide past performance information and evaluations related to PWC to requesting procurement agencies, as is required under federal law and regulation.

PWC's performance of its contracts with DSCP has been exemplary, and PWC has received praise and accolades for its work on these contracts. (*See* Switzer Decl., Ex. B, ¶ 8.) This magnifies the unfair and arbitrary treatment PWC is receiving from its best customer. What is more galling is that DSCP has made a determination to withhold this vital information when it knows and has already opined that PWC's position on the central issue in the DOJ's investigation is correct. It would be unjust for this Court to countenance DSCP's refusal to provide past performance information and evaluations, a refusal that violates the FAR, constitutes an unconstitutional taking and will result in irreparable harm to PWC.

## II. FACTUAL BACKGROUND

PWC's government entity, PWC Logistics Services Company K.S.C.(c), is largely dependent on its U.S. government contract work. (*See* Switzer Decl., Ex. B, ¶ 5.)   PWC is currently engaged in negotiations with DSCP to novate several U.S. government contracts to

PWC Logistics Services, however this process has not yet concluded. (*Id.* ¶ 4.) Therefore, PWC is the party currently named in the contracts with DSCP.

U.S. government contracts represent the majority of PWC's revenues and the majority of its anticipated future revenues. (*Id.* ¶ 5.) PWC's largest contract, SPM300-05-D-3128 ("PV2") is with DSCP, and it represents $14 billion in revenues for the company (*id.* ¶ 7)— approximately 90% of the company's overall revenues from government contracts. In addition to the PV2 contract, PWC has successfully completed both Contract Nos. SPO300-03-D-3061 ("PV1") and SPM300-05-D-3119 ("PV Bridge") for DSCP (*Id.* ¶ 6). In addition, PWC is currently bidding or anticipating to bid on approximately fifty additional U.S. government contracts, which are worth approximately $ 2 billion in annual revenues to PWC (*Id.* at ¶ 9.)

## A.    The Parties' Contracts

PWC and DSCP have entered into three Subsistence Prime Vendor contracts, pursuant to which PWC provides food to the dining facilities of the U.S. Military in the Middle East. To provide this subsistence support, PWC contracts with third-parties for food products and other related services. In 2003, PWC and DSCP executed PV1 (which expired on February 15, 2005); subsequently, PV Bridge (which expired on December 4, 2005) and PV2 which were executed in July 2005. While technically referred to as a "bridge" contract, PV Bridge was anything but insignificant. In fact, PV Bridge amounted to an estimated $1.5 billion, an even larger figure than PV1 ($1.4 billion estimated maximum value), and it expanded PWC's scope of work significantly. (*See id.* ¶ 6.)

PV1 and PV Bridge both incorporated by reference Solicitation No. SPO300-02-R-4003 (the "PV1 Solicitation"). PV2 incorporated by reference Solicitation No. SPM300-04-R-0323 (the "PV2 Solicitation"). Both Solicitations include a clause entitled "REBATES/DISCOUNTS." This clause requires PWC to return to DSCP rebates and discounts

<u>directly attributable to sales</u> resulting from orders exclusively submitted by DSCP or its customers. (*Id.* ¶ 13.)

All three Contracts have the same pricing structure. PWC charges DSCP a "Unit Price" for each item purchased. (*Id.* ¶ 14.) The Unit Price is the sum of the "Delivered Price" and the "Distribution Price." (*Id.*) The Delivered Price is defined in the Contracts and Solicitations as the supplier's actual invoice price to deliver the product to the Prime Vendor, i.e., PWC. (*Id.*) The Distribution Price is a fixed amount reflecting PWC's additional costs, plus profit. (*Id.*)

PWC's performance of these contracts has been exemplary. Throughout 2006, PWC consistently achieved fill rates (i.e., the ratio of cases accepted to cases ordered) of over 99%. (*Id.* ¶ 8.) These rates, achieved in a war zone, exceed those even for vendors on domestic Prime Vendor contracts. (*Id.*) PWC also achieved record scores in two food audits conducted by the U.S. Department of Agriculture on behalf of DSCP. In the first audit, conducted in February 2006, PWC received a 97% item acceptability score, the highest first-time score ever. (*Id.*) In the second audit, conducted in February 2007, PWC received a perfect 100%. (*Id.*) This was the first time a Prime Vendor had achieved a perfect score on a non-domestic contract. (*Id.*)

PWC has also been recognized several times for the high quality of service it provides. In 2004, the Defense Logistics Agency awarded PWC the "New Contractor of the Year" award. (*See id.*) DSCP recognized PWC for outstanding customer service in 2004, 2005 and 2006.[2] PWC and Toby Switzer, CEO of PWC, have also received numerous letters of appreciation from DSCP and its customers within the Armed Forces. (*See id.*)

---

[2]     *See DSCP Recognizes PWC Logistics for Superior Customer Service for Second Consecutive Year*, AME Info, June 27, 2005, *available at* http://www.ameinfo.com/63169.html.

**B.**     **Prepayment Rebates**

It is common practice in the food industry for a food supplier and its customer to negotiate a discount if the customer pays the supplier's invoice earlier than required under the contract. (*See id.* ¶ 12.) Such discounts are completely unrelated to the prime vendor's contract with the procurement agency because the rebate is not tied to the products procured but rather to the prime vendor's efforts to pay its bills earlier than required by the contract. (*Id.*) PWC did negotiate prompt payment discount terms with many of its vendors and endeavored to pay its third party vendors promptly to earn such discounts from time to time. (*Id.*) Notably, PWC often purchased products in bulk and had them shipped to their warehouse in Kuwait for storage until a government entity made an order for these products. PWC would pay its suppliers upon receipt and acceptance of the goods, but it could not bill the government unless and until the government ordered and received the products. The duration between the time PWC ordered the goods from its suppliers, and the government's subsequent ordering of the products could often reach months or even years. By paying its vendors early, PWC effectively increased its carrying costs and expenses—costs that it alone bore and did not pass on to the government. (*See id.*)

PWC's PV1 Price Proposal submitted on or about August 14, 2002 included the following statement: "Delivered Price is not reduced by cash discounts for prompt payment available to PWC or its supplier." (*See* Price Proposal, submitted as Exhibit C, at 12.) In addition, PWC did not list prompt payment discounts among the types of rebates and allowances it promised to pass on to DSCP. (*See id.* at 14-15.) At no point did DSCP object to these elements of PWC's Proposal.

During the PV2 Solicitation process, DSCP provided potential offerors the opportunity to ask questions about the PV2 Solicitation. These questions and answers were published in PV2 Solicitation Amendment No. 0002, which was incorporated by reference into the PV2 Contract.

One potential offeror requested "more clarity" as to the REBATES/DISCOUNTS clause.  DSCP replied: "Based on the volume of product a PV purchases from a manufacturer, the manufacturer will offer rebates and discounts to the PV.  These rebates and discounts must be passed on to DSCP and their customers."  (*See* PV2 Solicitation Amendment No. 0002, submitted as Exhibit D, at 35.)  At no point did DSCP mention prompt payment discounts in its discussion of the REBATES/DISCOUNTS clause.

PWC's PV2 Price Proposal submitted on or about November 16, 2004 included the following statement: "Delivered Price is not reduced by cash discounts for prompt payment available to PWC or its supplier."  (*See* PV2 Price Proposal, submitted as Exhibit E, at 6.)  In addition, PWC did not list prompt payment discounts among the types of rebates and allowances it promised to pass on to DSCP.  (*See id.* at 9-10.)  At no point did DSCP object to these elements of the Proposal.  This Proposal was incorporated by reference into the PV2 Contract.

On October 24, 2006, PV2 Contracting Officer Timothy Dlugokecki asked PWC, via e-mail, how it tracks prompt payment discounts.  (*See* E-mail from Dlugokecki dated 10/26/06 (hereinafter "Dlugokecki E-mail"), submitted as Exhibit F, at 1.)  On October 26, 2006, Mr. Dlugokecki rescinded his question.  He wrote:

> I was informed the following:
>
> Discounts or rebates received by the prime vendor from its suppliers as a result of a prompt or early payment made by the prime vendors to such suppliers are not required to be passed to DSCP or its customers.

(*See id.* at 1.)  Given the different fonts, it was evident that the portion of his response following the colon had been cut and pasted from another document.

Notably, recent solicitations for Prime Vendor Support issued by the DSCP Directorate of Subsistence include a revised version of the REBATES/DISCOUNTS clause.  While this version and the version appearing in the PV1 and PV2 Solicitations are substantially similar, the

new version includes the following text, appearing at part E, that illustrates prompt payment discounts are still not meant to be passed on to DSCP:

> As described in this section, the terms "rebates" and "discounts" do not include any discounts or rebates by the Prime Vendor due to early or prompt payments to its suppliers. Discounts or rebates by the prime vendor from its suppliers as a result of a prompt or early payment made by the prime vendor to such suppliers are not required to be passed to DSCP or its customers.[3]

The DOJ recently commenced an investigation into whether these early or prompt payment discounts were improperly withheld from DSCP. Consequently, in January 2007, the Department of Defense Office of Inspector General, working in concert with the AUSA, issued a subpoena to PWC, requesting documents related almost exclusively to the prompt payment issue. PWC denies any wrongdoing with respect to these early payment rebates because the evidence, including DSCP's own written position on the matter, demonstrates that DSCP is not entitled to share in these prompt payment discounts. Importantly, given the very early stage of the investigation, PWC has not been charged with any wrongdoing.

## C.    <u>The Sultan Center</u>

The DOJ is also investigating PWC's relationship with a preferred supplier to the DSCP contract, The Sultan Center ("TSC"). TSC is a Kuwaiti company that provides many local market items to PWC under the Prime Vendor contracts. The investigators appear to be interested in whether PWC and TSC are affiliated companies, and if so, whether this should have affected the prices charged by TSC for its products. In PWC's proposals for both the PV1 and PV2 contracts, it notified DSCP that TSC would be a preferred supplier. (*See* Switzer Decl., Ex. B, ¶ 15.) However, the two companies are separate entities. (*Id.*) PWC has provided the AUSA

---

[3]    *See* DSCP Solicitation, *available at* www.dscp.dla.mil/subs/pv/regions/se/60019.pdf, page 43 of 242.

with a signed, notarized statement from the PWC corporate secretary stating that TSC is neither a parent nor a subsidiary of PWC. (*See* Letter of Elaine Richardson, submitted as Exhibit G.)

**D.    Past Performance Information Is Central to the Source Selection Process and Must Be Shared With Requesting Procurement Agencies Evaluating Prospective Offerors.**

As part of its evaluation of prospective offerors for government contracts, government source selection panels and individuals are required to consider and evaluate the past performance of these offerors on similar projects. *See* 48 C.F.R. § 15.304(c)(3); *see also* the Federal Acquisition Streamlining Act of 1994 (the "FASA") § 1091, 10 U.S.C. 2306a(b) (2000). Indeed, in virtually any procurement, past performance is one of the most highly weighted evaluation factors because it is an "indicator of an offeror's ability to perform the contract successfully." *Id.* § 15.305(a)(2)(i). The Office of Federal Procurement Policy ("OFPP"), in its guide to agencies on collecting and using past performance information, encourages "agencies to make contractors' performance records an essential consideration in the award of all negotiated acquisitions."[4] In fact the OFPP recommends that the weight assigned to past performance be at least 25% of the total evaluation score to ensure that no other non-cost factor is assigned a greater significance. *Id.*

The importance of past performance as an evaluation factor is reflected in the evaluation factors in solicitations that PWC is currently pursuing. In a currently open solicitation for work in Iraq, for instance, past performance is the most important non-price factor, and the combined non-price factors are given "significantly" more weight than price. (*See* Excerpt froom Solicitation No. W91GXZ-07-R-0011 (hereinafter "Solicitation Excerpt"), submitted as Exhibit

---

[4]    Office of Federal Procurement Policy, *Best Practices for Collecting and Using Current and Past Performance Information*, (May 2000) *available at* http://www.whitehouse.gov/omb/procurement/contract_perf/best_practice_re_past_perf.html.

0; *see* also Switzer Decl., Ex. B, ¶ 18.)    Given the paramount importance of past performance and the level of PWC's competition, as a practical matter, without a favorable past performance review on its largest contracts, PWC has little hope if any of winning many of these contracts.

Because of the critical importance of past performance information in selecting contract awardees, the FAR contains a number of provisions designed to require agencies to provide past performance information and evaluations for use in award decisions.    The FAR makes it *mandatory* for agencies to "prepare an evaluation of contractor performance for each contract that exceeds the simplified acquisition threshold at the time the work under the contract is completed." See 48 C.F.R. § 42.1502(a).  In addition the FAR states that "interim evaluations should be prepared as specified by the agencies to provide current information for source selection purposes, for contracts with a period of performance, including options, exceeding one year." *Id.* Finally, the FAR states "[d]epartments and agencies *shall* share past performance information with other departments and agencies when requested to support future award decisions." *Id.* § 42.1503(c) (emphasis added).  Despite the clear requirements of the FAR, DSCP has refused to share past performance information and evaluations of PWC's performance under the PV contracts with other agencies.

In addition, the Department of Defense's own guide to collecting and using past performance information states "[a]nnual performance assessment reports, or report cards, may be written more frequently during contract performance but must be written after the end of the annual performance period.  Although not mandatory, interim reports written during contract performance are valuable in improving performance as well as providing contemporaneous documentation." Office of Under Secretary of Defense For Acquisition, *A Guide to Collection and Use of Past Performance Information*, Technology & Logistics (May 2003).  The FAR

reiterates this encouraged practice: "interim evaluations should be prepared as specified by the agencies to provide current information for source selection purposes, for contracts with a period of performance, including options, exceeding one year." 48 C.F.R. § 42.1502(a).

### E.    The Effect of a Missing or Neutral Past Performance Evaluation

By refusing to provide past performance information related to PWC to requesting procurement agencies, PWC will receive a "neutral" rating with respect to these contracts. (*See* Cooper Decl., Ex. H, ¶ 10.) Given the tremendous significance of past performance information in a procuring agency's award decision, DSCP's refusal to provide information about PWC's performance, on what constitutes PWC's largest and most important government contracts, has the practical effect of preventing PWC from being evaluated seriously and fairly in the highly competitive world of government contracting where favorable past performance reviews are common place. (*See id.*) Most of PWC's competitors, which also are often under investigation, will have received favorable past performance reviews from their largest customers, leaving PWC—sitting with an undeserved neutral rating—at a distinct disadvantage. (*See id.*)

Indeed, a neutral or missing evaluation has more draconian consequences for PWC than if DSCP had provided procurement agencies with negative past performance evaluations of PWC. First, if DSCP had submitted negative past performance evaluations, the FAR provides PWC some recourse, entitling PWC to certain due process protections. FAR 42.1503(b) gives a contractor 30 days after the completion of an agency evaluation to submit comments, rebuttal statements, or additional information. 48 C.F.R. § 42.1503(b). No such comparable right exists if a contractor is missing an evaluation. Thus, by refusing to submit an evaluation or past performance information, DSCP additionally deprives PWC of its right to contest the evaluation.

Second, a neutral evaluation is, in practice, more injurious than a negative evaluation. (Cooper Decl., Ex. H, ¶ 11.) While the problem with the contractor's performance is self-

12

explanatory in a negative evaluation, and can be rebutted by the contractor, a neutral evaluation leaves it to the agency requesting the evaluation to guess the performance problem of the contractor.  In other words, the result of a neutral evaluation is that the agency assumes the contractor performed poorly on the contract, regardless of the lack of evidence.  (*See id.*)

DSCP's refusal to provide past performance information and evaluations to source selection entities related to PWC has disrupted and will continue to disrupt and irreparably harm PWC's business.  This irreparable harm includes:

(i)     Constructive debarment of PWC from receiving government contracts;

(ii)    Long-term inability to competitively bid for procurement contracts and loss of good will, impairing PWC's ability to be awarded future contracts;

(iii)   A resulting decline in PWC's revenue and projected revenue;

(iv)    Substantial monetary damage, which would be impossible to calculate reliably;

(v)     Damage to PWC's company image and reputation.

(*See* Switzer Decl., Ex. B, ¶ 20.)

## III. ARGUMENT AND AUTHORITIES

### A.     DSCP's Refusal to Provide Past Performance Information and Evaluations Constitutes a Violation of the Federal Acquisition Regulation and the Administrative Procedure Act.

#### 1.     DSCP Refuses to Provide a Past Performance Evaluation for the Bridge Contract, Which DSCP Is Required to Provide Under the FAR.

In an e-mail dated February 28, 2007, DSCP informed PWC that it "will not participate in past performance surveys[5] for other agencies during the period of the  DOJ investigation."

---

[5]     While DSCP used the term "past performance surveys," to PWC's knowledge, DSCP has refused to provide (1) past performance information on any of the parties' contracts, and (2) a past performance evaluation of PV Bridge to requesting agencies.  The only past performance survey to which other agencies have access is a PV1 past performance evaluation.  This evaluation, or Contractor Performance Assessment Report (CPAR), can be retrieved by procurement agencies from an online CPAR database.  Such retrieval requires no action on the part of DSCP.  On the other hand, if procuring agencies contacted DSCP regarding PV1, whether directly or indirectly, and

(*See* Ford E-mail, Ex. I.)  Upon learning this, PWC sent Army Brigadier General Jesse R. Cross, the Commander of DSCP, a letter on March 5, 2007 requesting that DSCP's decision be reviewed and overturned.  (*See* E-mail from Toby Switzer dated 3/5/07 (hereinafter "Switzer E-mail"), submitted as Exhibit J.)  DSCP's refusal was confirmed by an e-mail dated March 6, 2007 from DSCP's Counsel, stating, "DSCP will not participate in past performance surveys for other agencies during the period of the Department of Justice investigation." (*See* Surrena E-Mail, Ex. A.)  DSCP has so refused <u>irrespective of the fact that it is fully aware that the allegations have no merit</u>, as is demonstrated by DSCP's communications with PWC regarding prompt payment rebates.  *See* Section II.A. herein, at 6.

DSCP's refusal violates a federal regulation.  Because of the vital importance of past performance information and evaluations in an agency's contract award decision, the FAR makes it mandatory for agencies to "prepare an evaluation of contractor performance for each contract that exceeds the simplified acquisition threshold at the time the work under the contract is completed." *See* 48 C.F.R. § 42.1502(a).  DSCP's refusal to provide the past performance evaluation of PWC on the PV Bridge contract, a contract which was completed in December 2005, is in direct violation of the FAR.

> ### 2. DSCP's Refusal to Provide Past Performance Evaluation for PV2, an Ongoing Contract, Is A *De Facto* Abuse of Its Discretion In Violation of the APA.

Not only did DSCP refuse to provide a past performance evaluation for PV Bridge, but it also refused to provide such an evaluation for PV2, an ongoing contract.  (*See* Surrena E-Mail, Ex. A).  While the FAR states that agencies *should* provide interim evaluations for ongoing

---

DSCP refused to share any information on PWC's performance under PV1, the benefit of a good past performance review under PV1 is clearly diminished.

contracts, *see* 48 C.F.R. 42.1502(a), a government agency's actions will not be upheld by the courts if such a decision not to issue such an evaluation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706; *see also Donnelly v. FAA*, 411 F.3d 267, 271-72 (D.C. Cir. 2005) (citing *Chritton v. NTSB*, 888 F.2d 854, 856 (D.C. Cir. 1989)). DSCP's sole justification for refusing to provide past performance information and evaluations is the Department of Justice's ongoing investigation of PWC.

Not only was DSCP's refusal arbitrary and capricious, but it was also a complete abdication of discretion: rather than consider *performance-related* reasons why it should or should not provide an interim evaluation of PV2—the only factors covered by the past performance review forms,[6] it mechanically based its refusal solely on the existence of a DOJ investigation, a fact that has nothing to do with PWC's laudable performance of PV2. Procurement officials must use judgment in making contract-related decisions; they cannot act as "automatons." *Schlesinger v. United States*, 390 F.2d 702, 708 (Ct. Cl. 1968). If the contracting officer was "improperly influenced by ... anyone else to terminate the contract for default rather than to exercise his own independent judgment in the light of the factors set out in the regulations, it would represent an abdication rather than an exercise of his discretion." *Fairfield Scientific Corp. v. United States*, 611 F.2d 854, 862 (Ct. Cl. 1979). Government agencies must make decisions on the merits of a contractor's performance. The procurement official must assess all of the relevant circumstances of the contract, and not blindly accept directions from others. *Schlesinger*, 390 F.2d at 707-08. Indeed, there is nothing in the FAR that permits DSCP to ignore its obligations to share past performance information because of the pendency of a government investigation.

---

[6]    *See generally* PV1 CPAR Evaluation, attached hereto as Exhibit K.

As discussed above, DSCP knows first-hand that the DOJ's allegations have no merit: DSCP confirmed in an e-mail that PWC was not required to pass on prompt payment rebates to DSCP. (*See* Dlugokecki E-mail, Ex. F, at 1). The question of whether or not such rebates should be passed along to DSCP is the *central focus of the DOJ's investigation*. Yet DSCP nevertheless relies on this baseless civil investigation as the justification for its refusal to provide a past performance evaluation for PV2. DSCP's decision to withhold such an evaluation demonstrates a complete abdication of discretion; DSCP ignored any reasonable duty it had to base such a decision on PWC's performance of PV2—which, as discussed above, was and is exemplary—and it deferred any obligation to evaluate PWC until an external factor, entirely out of the control of either party, is removed. Most galling is the fact that the investigation has just commenced, meaning that it could be years before it is concluded, meaning that PWC faces the likelihood that it will never receive another past performance review from its largest and most satisfied customer. Such a total abdication of discretion is a *de facto* abuse of discretion. DSCP's refusal to provide a past performance evaluation for PV2 violates the APA as the refusal is entirely arbitrary, capricious and a *de facto* abuse of DSCP's discretion.

### 3. DCSP's Refusal to Provide Past Performance Information With Respect to PVI, the Bridge, or PV2 Is a Violation of the FAR.

DSCP has refused to provide past performance information to other agencies while the investigation by the Department of Justice of PWC is ongoing. Under the FAR, however, "Departments and agencies *shall* share past performance information with other departments and agencies when requested to support future award decisions." 48 C.F.R. § 42.1503(c) (emphasis added).

Importantly, the drafters of the FAR used different language in this provision from the terminology employed in 48 C.F.R. § 42.1502(a). While agencies are required to provide

"evaluations" for completed contracts and should provide interim "evaluations" for ongoing contracts, *see id.*, agencies are <u>required</u> to share past performance "information" to requesting procurement agencies. *See id.* § 42.1503(c). Courts "must strive to interpret a statute to give meaning to every clause and word, and certainly not to treat an entire subsection as mere surplusage." *Donnelly*, 411 F.3d at 271 (citing *United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1198-99 (D.C. Cir. 2005)); *see also Unification Church v. I.N.S.*, 762 F.2d 1077, 1083-85 (D.C. Cir. 1985). Had the drafters intended for FAR section 42.1503(c) to refer to "evaluations," they would have so stated; rather, the drafters intentionally used a word with a broader meaning: "information." In order to give meaning to every word in the FAR, one must conclude that the drafters meant to <u>require</u> agencies to share past performance information, not merely evaluation forms. Any data or opinions related to a contractor's past performance on a procurement contract could reasonably be considered "information" but not a formal "evaluation." DSCP's refusal to provide *any* past performance information with respect to PV1, PV Bridge, or PV2 is, therefore, a violation of the FAR.

**B.**     <u>**PWC Has a Constitutionally Protected Property Right to Operate its Business That Cannot Be Taken Away from PWC Without Due Process**</u>

PWC has a constitutionally recognized property interest in being able to operate its business. This interest cannot be taken away from PWC without affording PWC due process prior to such deprivation so that PWC can have the opportunity to demonstrate the illegality of such a taking.

**1.**     **PWC Has a Property Right in Operating its Business.**

A business "is an established property right entitled to protection." *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 131 F.3d 353, 361 (3d Cir. 1997), *aff'd*, 527 U.S. 666 (1999). *See also Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir.

2006) ("due process protects an interest in the continued operation of an existing business");
*Thomas v. Independence Twp.*, 463 F.3d 285, 297 (3d Cir. 2006) (the plaintiffs adequately pled a claim for relief where the complaint alleged that the governmental defendants' campaign of defamation, harassment and intimidation "deprived plaintiffs of their liberty and property interests in their business without due process of law"); *San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697, 703-04 (5th Cir. 1991) (a business or business owner has "a property interest in the profits of [its] business and [its] liberty interest in operating [its] business do rise to the level of protectible interest."); *United States v. Tropiano*, 418 F.2d 1069, 1076 (2d Cir. 1969) ("[t]he right to pursue a lawful business . . . has long been recognized as a property right within the protection of the Fifth and Fourteenth Amendments"); *Small v. United States*, 333 F.2d 702, 704 (3d Cir. 1964) (the "right to pursue a lawful business or occupation is a right of property"). As a major government contractor which must rely upon new opportunities as older contracts expire to maintain and grow its business, PWC, like the parties in the cases referenced above, has a constitutionally protected property interest in pursuing its business interests.

### 2.    DSCP's Refusal to Share Past Performance Information Is a Constructive Debarment Which Deprives PWC of its Business, a Recognized Property Right.

As discussed above, a missing or a neutral evaluation will prevent PWC from competitively bidding on future government contracts. Thus, by refusing to provide past performance information or evaluations and rendering PWC noncompetitive in its industry, DSCP's actions constitute a constructive debarment of PWC. While no individual or corporation has a right to be awarded a specific government contract, this Court has found that a contractor who "has been dealing with the government on an ongoing basis may not be blacklisted from further contracting except for valid reasons and in conformity with procedural safeguards established by law." *Art-Metal USA, Inc. v. Solomon*, 473 F. Supp. 1, 4 (D.D.C. 1978). To find

a *de facto* or constructive debarment it is not necessary for the government to overtly tell the contractor that they will no longer award contracts to it; a court can also find a *de facto* debarment based upon the conduct of the agency. *See Leslie & Elliott Co. v. Garrett*, 732 F.Supp. 191, 195 (D.D.C. 1990). In *Leslie & Elliott Co.*, the court found that statements and actions made by representatives of the procuring agency, as well as the contractor's failure to be awarded the contract,[7] were sufficient to show *de facto* debarment. *Id.* at 197-98.

In this case, it is equally clear that DSCP's conduct has the effect of depriving PWC of the ability to fairly compete for government contracts, thus depriving PWC of an economic livelihood without proper notice or any opportunity for rebuttal. While DSCP has not specifically stated that it was barring PWC from future contracts, its actions in refusing to issue past performance information and evaluations on PWC's largest and most important contracts has the same practical effect as a debarment. Because of DSCP's decision, PWC is "dangling in suspension," unable to fairly compete for government contracts, with no recourse available to challenge the substance of the charges leveled against it, while its economic livelihood is destroyed. *See ATL, Inc. v. United States*, 3 Cl. Ct. 259, 268 (1983) ("we think an action that 'suspends' a contractor and contemplates that he may dangle in suspension for a period of one year or more, is such as to require the Government to insure fundamental fairness to the contractor whose economic life may depend on his ability to bid on government contracts"). In *ATL, Inc.*, the court found that fairness required that the bidder be given "specific notice as to at

---

[7]     It is not necessary, however, for a contractor to lose out on any awards to show a violation of its due process rights. The right being protected is not the right to the contracts being awarded, but rather the right "not to be debarred without due process from government contracting at all." *Art-Metal USA*, 473 F. Supp. at 5 n.10.

least some charges alleged against him, and be given, in the usual case, an opportunity to rebut those charges." *Id.*

The gravity of DSCP's actions is not justified by the existence of the Department of Justice's investigation. The DOJ, still in the nascent stages of its investigation, has adduced no evidence of fraud, corruption, or even contractual deficiencies on the part of PWC. The very accounting practice at issue here, PWC's retention of prompt payment discounts, was not only perfectly acceptable under the contract and relevant case law, but it was also known and approved by the contracting officer. (*See* Dlugokecki E-mail, Ex. F, at 1.) Despite the lack of any evidence supporting the investigation, and despite the lack of any opportunity to present evidence rebutting the baseless charges, PWC's ability to compete for future government contracts has been seriously and substantially harmed. As the court in *Art-Metal USA* creatively described it, "our system of laws does not operate on the principle of the Queen in Alice in Wonderland 'Sentence first verdict afterwards.' It requires the evidence to come first." 473 F. Supp. at 8 (footnote omitted).

### 3. Because PWC Has a Recognized Property Right, It Is Entitled to Pre-Deprivation Due Process.

The Fifth Amendment to the United States Constitution provides: "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. Amend. V. The general principles of due process require that notice and an opportunity to be heard precede a governmental action that denies a person of his property. *United States v. James Daniel Good Real Property*, 510 U.S. 43, 48 (1993). The purpose of due process "is not only to ensure abstract fair play to the individual. Its purpose . . . is to protect his use and possession of property from arbitrary encroachment–to minimize substantively unfair or mistaken deprivations of property." *Id.* at 53 (internal quotes and citation omitted).

While the government has the right to take actions that may result in the deprivation of a property interest, the government's right to act is not absolute. Once a party demonstrates the existence of a potential property right, that party is entitled to due process _prior_ to the government depriving the owner of its rights. Under _Mathews v. Eldridge_, 424 U.S. 319, 334 (1976), to determine the kind of process that is due, a court should consider the following factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

_Id_. at 335.

Due process of law requires that "before a contractor may be blacklisted (whether by debarment or suspension) he must be afforded specific procedural safeguards, including, _inter alia_, a notice of the charges against it, an opportunity to rebut those charges and, under most circumstances, a hearing." _Art-Metal USA_, 473 F. Supp. at 4. (citing _Gonzalez v. Freeman_, 334 F.2d 570, 578 (D.C. Cir. 1964)). Thus, for due process to be satisfied in a situation in which a government agency will exercise a taking of PWC's property, _i.e._, its business, there must be an expedited hearing prior to such an action.

Here, the affected private interest is PWC's entire business. DSCP's refusal to provide past performance information will likely cause the dramatic curtailing of PWC's government contract awards. PWC cannot continue to be a competitive offeror for government contract work when its primary government customer refuses to share past performance information with other agencies. DSCP's refusal would leave DSCP without the ability to operate its business. (Switzer Decl., Ex. B, ¶ 20.)

**C.    PWC Satisfies the Requirements for Preliminary Injunctive Relief To Be Granted.**

In considering PWC's request for a preliminary injunction, this Court must weigh four factors: (1) whether the plaintiff has a substantial likelihood of succeeding on the merits; (2) whether the plaintiff would suffer irreparable injury were an injunction not granted; (3) whether an injunction would substantially injure interested parties; and (4) whether the grant of an injunction would further the public interest. *Katz v. Georgetown Univ.*, 246 F.3d 726, 731 (D.C. Cir. 2003); *see also Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998). As set forth in this Motion, the Complaint, the Memorandum of Points and Authorities in Support of the Complaint, and the declarations of Mr. Toby Switzer and Pamela Cooper, Plaintiff meets all of the requirements for the issuance of a preliminary injunction. *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.").

First, PWC has a substantial likelihood of success on the merits of its Complaint. As discussed above, DSCP's refusal to provide past performance information violates the FAR. Further, as a government contractor, PWC has a constitutionally protected property interest in pursuing its business interests. The result of DSCP's refusal to provide past performance information to requesting procurement agencies would be a deprivation of DSCP's protected property without proper due process of law. Because DSCP's refusal would essentially effect a constructive debarment of PWC, and therefore a taking of PWC's property, mere notice of such a taking would be insufficient to meet the requirements of due process.

Second, PWC has and will continue to suffer imminent and irreparable harm without an injunction. PWC is currently in the process of bidding on numerous U.S. government contract

solicitations. (*See* Switzer Decl., Ex. B, ¶ 9.) PWC's bid on the first of these solicitations is due on March 18. (*Id.*) PWC's bids are due on the remaining solicitations in the next few weeks. (*Id.*) As soon as PWC's bids are submitted, officials at the procuring agencies will begin to evaluate the bidding companies by reviewing past performance information and other factors. Government contract solicitations make very clear the pre-eminent importance of past performance information in the selection process. (*See* Solicitation Excerpt, Ex. 0; *see also* Switzer Decl., Ex. B, ¶ 18.) In a currently open solicitation for work in Iraq, for instance, past performance is the most important non-price factor, and the combined non-price factors are given "significantly" more weight than price. (*Id.*) With no past performance evaluation on its largest contracts, PWC will be irreparably harmed in the bidding process, as it will not be considered a strong contender for these contracts relative to others which will have strong past performance evaluations. Within the next week, therefore, PWC will begin to be unjustifiably denied these business opportunities unless the Court requires DSCP to provide the past performance information and evaluations. The successful business that PWC employees have worked hard to build will be lost. By not providing past performance information and evaluations, DSCP is constructively debarring PWC.

For a government contractor, constructive debarment is tantamount to destruction of its business. *See Art-Metal USA*, 473 F. Supp. at 4 & n.4. Such business losses are not compensable with damages and are, therefore, considered irreparable harm. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz*, 298 F. Supp. 2d 27, 34 (D.D.C. 2002) (finding plaintiff made adequate showing of irreparable harm by establishing that, without preliminary injunctive relief, firm would lose its customers and future income flowing from those accounts); *Ahmed v. United States*, 47 F. Supp. 2d 389, 400-01 (W.D.N.Y. 1999) (finding irreparable injury

established by plaintiff's averments that fifty percent of its revenue involved the government program at issue and that disqualification from the program would "force the store out of business"); *Art-Metal*, 473 F. Supp at 4 n.4 (finding government contractor made showing of irreparable injury by showing it was barred from future government contracts).

Third, the injunction will not substantially harm DSCP or cause it undue inconvenience because this mandatory injunction will only require that which is required under the FAR: for DSCP to provide past performance information and evaluations to requesting procurement agencies in connection with their source selection activities.

Fourth, public policy supports the issuance of a mandatory injunction against DSCP, requiring it to provide past performance information to requesting procurement agencies. As discussed above, the FAR and the Office of Federal Procurement Policy have specifically addressed the importance of the use of past performance information and evaluations in the government contract award process. This is because it is in the government's interest to award procurement contracts to the most qualified government contractors. To issue the mandatory injunction that PWC seeks would only reiterate the already existing public policy supporting the use of past performance evaluations and information in the government contract award process.

Further, the DOJ's pending investigation into PWC's prompt payment policies has no bearing on the Court's decision to grant equitable relief in this case. The issue of DSCP's obligation to provide FAR-mandated past performance information and evaluations is wholly unrelated to the issues involved in the DOJ's investigation. *See, e.g., Robert Orr-SYS CO Food Servs. Co.*, ASBCA 50183, 97-1 BCA ¶ 28,903 (Mar. 26, 1997) (Board of Contract Appeals properly could decide underlying contract interpretation question which was independent of any potential Government claim and thus not "academic"). Moreover, the DOJ's investigation would

not be undermined if the DSCP issued a past performance survey, a routine evaluation used to assess a contractor's technical performance in meeting the requirements of a contract. Therefore, the certain damage to PWC's ability to bid on future government contracts far outweighs any speculative inconvenience to the DOJ's investigation. *See, e.g., TRW, Inc.*, ASBCA 51172 et al., 99-2 BCA ¶ 30407 (June 1, 1999) (Board determined that harm to the contractor from issuing a stay of its appeal outweighed the stay's potential effect on a pending court litigation, where the Government had failed to demonstrate any prejudice that would be caused if the appeal was allowed to continue). As such, the Government would not be not entitled to a stay of this Court's proceedings pending the results of an open-ended investigation.[8]

## IV. CONCLUSION

DSCP's continued refusal to provide procurement agencies with past performance information and evaluations of PWC under the parties' contracts has and will continue to cause irreparable harm to PWC. There are two grounds under which this Court can require DSCP to share such information with other procurement agencies: First, DSCP's refusal constitutes a violation of the FAR and the APA, and that refusal will cause irreparable harm to PWC; Second, DSCP's refusal constitutes a constructive debarment of PWC from government contracting, and PWC has a constitutionally protected property interest in its business. In order for due process to

---

[88]    Even if the Government's pending investigation were criminal, it would not qualify for a stay of a civil proceeding. *See Horn v. District of Columbia*, 210 F.R.D. 13, 15 (D.D.C. 2002). To justify a stay of a civil proceeding, or some portion thereof, during the pendency of a criminal investigation, a movant must: "(1) make a clear showing, by direct or indirect proof, that the issues in the civil action are related as well as substantially similar to the issues in the criminal investigation; (2) make a clear showing of hardship or inequality if required to go forward with the civil case while the criminal investigation is pending; and (3) must establish that the duration of the requested stay is not immoderate or unreasonable." *Id.* (citations omitted). Here a decision to require DSCP to issue past performance information and evaluations would be wholly unrelated to the issues arising out of the DOJ's investigation of PWC's prompt payment discount policies. Second, the Government would incur no hardship from allowing the Court to rule on the merit of DSCP's refusal to issue past performance information and evaluations. By contrast, DSCP's refusal is seriously jeopardizing PWC's ability to be awarded government contracts and, therefore, its economic livelihood. Lastly, the DOJ's investigation is in the beginning stages, with no clear end in sight, and any requested stay would be for a lengthy and indefinite period.

be satisfied, PWC is entitled to an expedited hearing so that it may contest DSCP's refusal to provide such past performance information and evaluations at the Court's earliest convenience.

For the foregoing reasons, PWC respectfully requests that the Court order a hearing on the matter and issue a mandatory injunction requiring DSCP to provide past performance information and evaluations to requesting procurement agencies.

DATED:  March 15, 2007

Respectfully submitted,

Michael R. Charness
D.C. Bar No. 289322
VINSON & ELKINS, L.L.P.
The Willard Office Building
1455 Pennsylvania Ave. Suite 600
Washington, D.C. 20004
Telephone:  (202) 639-6780
Facsimile:  (202) 639-6640

ATTORNEYS FOR PUBLIC WAREHOUSING
COMPANY K.S.C.

DC 658125v.1

# Exhibit A

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING

Public Warehousing Company K.S.C. v. Defense Supply Center Philadelphia,
the Defense Logistics Agency, and the Department of Defense

March 15, 2007

# REDACTED

-----Original Message-----
From: Surrena, Marlene (DSCP) [ mailto:Marlene.Surrena@dla.mil]
Sent: Tuesday, March 06, 2007 12:45 AM
To: Toby Switzer
Subject: FW: Request for Performance Survey

Mr. Switzer:

Your e-mail to BG Cross has been forwarded to me to respond on his
behalf.  Please be advised that DSCP Command supports the decision of
the Contracting Officer sent to you on February 28, 2007, that DSCP will
not participate in past performance surveys for other agencies during
the period of the Department of Justice investigation.

Sincerely,

Marlene Surrena
Counsel
Office of Counsel
Defense Supply Center Philadelphia
700 Robbins Avenue
Philadelphia, PA  19111
215-737-2632
215-737-8599 (FAX)
Marlene.Surrena@dla.mil

Please provide feedback on my service to you.  Click on this link.
http://ice.disa.mil/index.cfm?fa=card&service_provider_id=98204&site_id=
590&service_category_id=1

# Exhibit B

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING

Public Warehousing Company K.S.C. v. Defense Supply Center Philadelphia,
the Defense Logistics Agency, and the Department of Defense

March 15, 2007

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **PUBLIC WAREHOUSING COMPANY** | § | |
| **K.S.C.** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **DEFENSE SUPPLY CENTER** | § | |
| **PHILADELPHIA, THE DEFENSE** | § | |
| **LOGISTICS AGENCY, and THE** | § | |
| **DEPARTMENT OF DEFENSE** | § | |

---

## DECLARATION OF C.T. ("TOBY") SWITZER

---

I, Toby Switzer, declare as follows:

1.     I am Chief Executive Officer and President, International, for PWC Logistics Services K.S.C.(c) ("PWC Logistics Services"), which is a subsidiary of Public Warehousing Company K.S.C. ("PWC") headquartered in Sulaibiya, Kuwait.  I am authorized to execute this declaration on behalf of PWC.  I am submitting this Declaration in support of a Complaint for declaratory and injunctive relief filed by PWC in the United States District Court for the District of Columbia.  In addition, PWC has filed a Motion for Preliminary Injunction, a Memorandum of Points and Authorities in Support of the Motion (the "Memorandum"), and a Motion for Expedited Discovery.  I am fully familiar with the facts and circumstances underlying PWC's Complaint and the facts set forth in this Declaration, based on personal knowledge.

2.     I have served as the Chief Executive Officer of PWC Logistics Services since October 2006.  My primary duties include leading the company's Defense and Government business sector.  I am also a member of the Corporate Management Board, which is the internal group responsible for the company's overall performance and decision-making.  I also serve as the corporate sponsor for the company's IT strategy.  Prior to assuming my role as Chief

Executive Officer of PWC Logistics Services, I served in various senior executive roles for the parent company, PWC, including General Manager and Managing Director of the Subsistence Prime Vendor contract.

3.       Prior to joining PWC, I served for 20 years in the U.S. Navy, holding assignments in various shipboard and ashore locations including Italy and the U.S. Embassies in Kuwait and Portugal. My final active duty assignment was at the Naval Base in Pearl Harbor, Hawaii, where I served as the Navy Regional Chief Financial Officer and Chief Information Officer. I retired from the Navy in December 1998.

## PWC's Government Contracts

4.       PWC Logistics Services is the PWC subsidiary responsible for government contracting. PWC is currently engaged in negotiations with the Defense Supply Center Philadelphia ("DSCP") to novate several U.S. government contracts to PWC Logistics Services. However, this process has not yet concluded.

5.       PWC Logistics Services is almost entirely dependent on its U.S. Government contracts work. Government contracts represent the vast majority of the company's revenues and the vast majority of its anticipated future revenues. PWC and DSCP have entered into three "prime vendor" contracts pursuant to which PWC provides food to the dining facilities of the U.S. Armed Forces in the Middle East.

6.       In 2003, PWC and DSCP executed "PV1" (Contract No. SPO300-03-D-3061), which had a contract value of $1.4 billion. In 2005, the parties executed "PV Bridge" (Contract No. SPM300-05-D-3119) and "PV2" (Contract No. SPM300-05-D-3128). PWC has successfully completed both PV1 and PV Bridge. The PV Bridge contract was a very significant contract in itself. At $1.5 billion in contract value, it was larger than PV1 and expanded the company's work significantly.

7.      PV2 is PWC's largest contract.  It has a contract value of $14 billion, far larger than PV1 and PV Bridge combined.  This single contract accounts for over 90% of PWC's revenues from government contracts.

8.      PWC has performed all three of its prime vendor contracts in an exemplary manner.  In calendar year 2006, for example, PWC consistently achieved fill rates of over 99%.  (The "fill rate" is the ratio of cases accepted to cases ordered.)  PWC's rates exceeded those for vendors on domestic prime vendor contracts – that is, PWC was more successful in delivering food and related products to the U.S. Armed Forces in a war zone than other contractors were in delivering food to the military within the continental United States.  PWC also achieved record grades in two audits performed by the Department of Agriculture on DSCP's behalf.  PWC received a 97% item acceptability score in a food audit conducted in February 2006.  That score was the highest ever first-time score.  In a second audit conducted in February 2007, PWC received a perfect 100% item acceptability score.  That was the first 100% score ever received on any overseas food supply contract.  (*See* Food Audit Results, submitted as Exhibit L to Memorandum.)  In 2004 DLA awarded PWC the "New Contractor of the Year" award.  (*See* Awards, submitted as Exhibit M to Memorandum.)  In addition, DSCP has recognized PWC for outstanding customer service for three years in a row.  *Id.*  I have also received numerous letters of appreciation from DSCP as well as various end-users in the U.S. Armed Forces.  (*See* Letters of Appreciation, submitted as Exhibit N to Memorandum.)

9.      PWC is currently in the process of preparing to bid on approximately fifty additional government contracts.  Together, these contracts are worth about $2 billion in annual revenues.  PWC's proposal for the first of these contracts is due March 18.  Another proposal is due March 22.  The award for that contract will be made on April 1, as it is on a fast track.  Many other proposals are due over the next few weeks.

10.    PWC seeks to have DSCP provide past performance evaluations for PWC's work on the PV Bridge contract and the PV2 contract. These evaluations would be entered into the CPARs system and would be available for review by other government agencies. The existing CPARs past performance evaluations of PWC's work on PV1 are over two years old and are now considered "stale." No selection official would be comfortable relying on such dated evaluations. PWC also seeks to require DSCP to provide past performance information to other government agencies considering PWC's bids on future contracts. I will generally refer to these evaluations and the information provided to other agencies as "past performance reviews."

### The DOJ Investigation

11.    DSCP has refused to provide past performance reviews for PWC during an ongoing investigation by the U.S. Department of Justice ("DOJ"). Although the investigation is in its earliest stages, it appears that DOJ is focusing on two issues in particular.

12.    First, the DOJ is considering whether certain "prompt payment discounts" were improperly withheld from DSCP. In providing support to the U.S. Armed Forces, PWC contracts with third-party vendors. One aspect of negotiations with such suppliers is known as a "prompt payment discount." In fact, this practice is common within the food industry. A food supplier and its customer, such as PWC, will negotiate a discount if the customer pays the supplier's invoice earlier than contractually required. A prompt payment discount is completely unrelated to the prime vendor's contract with the government because the discount is not tied to the government's later procurement of those products. PWC negotiated prompt payment discount terms with many of its vendors and paid its vendors early in order to earn such discounts from time to time. PWC purchases products in bulk and has them shipped to its warehouse in Kuwait for storage until a government entity places an order for these products. PWC must pay its suppliers upon receipt and acceptance of the goods, but it cannot bill the government unless and until the government orders, receives and accepts the products in Iraq.

The lapse in time between when PWC orders the goods from its suppliers and when the government subsequently orders the products often amounts to several months. By paying its vendors early, PWC effectively increases its carrying costs and expenses – costs that it alone bears and cannot pass on to the government. Likewise, if PWC renders a payment late to its vendors, it cannot pass that cost along to DSCP as a part of the manufacturer's cost.

13.    PV1 and PV Bridge both incorporated by reference the PV1 Solicitation (Solicitation No. SPO300-02-R-4003). PV2 incorporates by reference the PV2 Solicitation (Solicitation No. SPM300-04-R-0323). Both of these Solicitations include a clause entitled "REBATES/DISCOUNTS," which requires PWC to return to DSCP any rebates or discounts directly attributable to sales resulting from orders exclusively submitted by DSCP or its customers. Because this clause relates only to discounts directly attributable to DSCP orders, it does not cover prompt payment discounts. As explained above, those are not directly attributable to DSCP orders. PWC therefore denies any wrongdoing with respect to prompt payment discounts. DSCP is not entitled to share in them, as DSCP itself has acknowledged.

14.    In fact, all three of PWC's prime vendor contracts have the same pricing structure. Under each of these contracts, PWC charges DSCP a "Unit Price" for each item the government purchases. The Unit Price is the "Delivered Price" plus the "Distribution Price." Our contracts and solicitations define the Delivered Price as the third-party supplier's actual invoice price to deliver the product to PWC. The Distribution Price is a fixed additional amount which reflects PWC's additional costs and profit. The prompt payment discounts, then, play no role in calculating the Unit Price that PWC charges DSCP.

15.    Second, the DOJ also seems to be focusing on PWC's relationship with The Sultan Center, a Kuwaiti company and third-party supplier which provides many local market items to PWC. Specifically, the DOJ seems to believe that The Sultan Center is an affiliate or subsidiary of PWC. PWC notified DSCP that The Sultan Center would be a preferred provider

on PV1 and PV2, but the companies are separate entities. The Sultan Center is neither a parent nor a subsidiary of PWC, as PWC has informed DSCP.

## The Importance of Past Performance Reviews

16.     As part of their evaluations of PWC's proposals, government source selection panels are required to consider and evaluate PWC's past performance. Past performance is an extremely significant and mandatory evaluation criterion, and it is very often the most important factor in the evaluation process because the government considers it a key indicator of a company's ability to perform successfully.

17.     The importance of past performance is made clear by the weight assigned to this factor in the solicitations that PWC is now pursuing. In a currently open solicitation for work in Iraq, for instance, past performance is the most important non-price factor, and the combined non-price factors are given "significantly" more weight than price. (*See* Solicitation No. W91GXZ-07-R-0011, submitted as Exhibit O to Memorandum.) Past performance is weighed so heavily in the evaluation process that it could easily be the determining factor in most of the solicitations PWC is currently pursuing.

18.     As a practical matter, without favorable past performance reviews on its largest contract, PWC has little chance of winning any of these contracts. That is, DSCP's refusal to provide past performance reviews on PWC's largest and most important government contracts has the practical effect of preventing PWC from being seriously and fairly considered for new government contracts. The government contracting business is very competitive, and it is most likely that our competitors will receive favorable past performance reviews from their largest customers. PWC's competitors will receive these favorable reviews even though statistics provided by government investigative agencies and public filings indicate that many of them are also under investigation. DSCP's action, therefore, unfairly robs the company of its primary and overwhelmingly most important customer, the U.S. Government.

19.     If DSCP is allowed to continue to refuse to provide past performance reviews of PWC to requesting procurement agencies until the investigation is completed, PWC will receive "neutral" ratings with respect to its contracts – contracts which it has, in fact, performed so successfully that it has received rave accolades from its government customers (as described above). In a system where positive performance reviews are the norm, a neutral (or missing) rating is perceived as a negative. In fact, in a practical sense, a missing review has more dire consequences for PWC than a negative one. If DSCP had submitted a negative past performance review, particularly a negative past performance evaluation on CPARs, then PWC would be entitled to certain due process protections. Thus, by refusing to provide reviews, DCSP additionally deprives PWC of its right to contest the evaluation.

### Imminent and Irreparable Injury

20.     DSCP's refusal to provide past performance reviews related to PWC to procurement agencies has disrupted and will continue to disrupt and irreparably harm PWC's business. This imminent and irreparable harm amounts to shutting PWC out of the government contracting industry. In the immediate short term, PWC will be unable to compete fairly for the five open solicitations. PWC will also suffer in the long term because it will be unable to competitively bid for government contracts. PWC will suffer an immeasurable loss of good will, and its ability to retain current business and develop future business will be impaired. As a result of DSCP's actions, PWC's revenue and projected revenue will drop precipitously. The financial damage to PWC will be impossible to calculate reliably. DSCP's refusal to provide past performance reviews will devastate PWC's government contracting business.

I declare, under penalty of perjury, that the foregoing is true and correct.  Executed on March 15, 2007.

Toby Switzer

DC 657934v.1

# Exhibit C

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING

Public Warehousing Company K.S.C. v. Defense Supply Center Philadelphia,
the Defense Logistics Agency, and the Department of Defense

March 15, 2007

# Confidentiality Statement

This proposal includes confidential data that shall not be disclosed outside the Government and shall not be duplicated, used, or disclosed, in whole or in part, for any purpose other than to evaluate this proposal.  If, however, a contract is awarded to this offeror as a result of or in connection with the submission of this data, the Government shall have the right to duplicate, use or disclose the data in this proposal, as necessary, to the facilities serviced under the contract.  This restriction does not limit the Government's right to use information contained in this proposal if it is obtained from another source without restriction.  The data subject to this restriction is contained in all pages of this Business Proposal.

BUSINESS PROPOSAL
**Volume II**

This proposal is hereby submitted by Public Warehousing Company of Kuwait ("PWC") to the Defense Supply Center Philadelphia for the Kuwait and Qatar Zone Military Facilities. Except as specifically set forth below, the attached Solicitation SPO300-02-R-4003 is hereby incorporated into this bid proposal and agreed-upon by PWC. If there is any conflict between the terms of this proposal and the terms of the attached Solicitation, we request that DSCP notify PWC of such objections prior to contract award. PWC has formed a subcontracting distribution team (hereafter referred to as the "PWC Group") utilizing Lankford-Sysco Food Services, Inc. ("Lankford-Sysco"), Pocomoke, Maryland, as PWC' principal subcontractor, are the lead members of what will be referred to in this proposal as the "PWC Group". It is PWC intent to purchase some of the high volume products directly and to CONUS based foodservice distributor such as our current supplier Lankford Sysco Food Services to supply the balance of products to our warehouse facility.

All terms used herein and not defined shall have the meanings ascribed to them in the Technical Proposal. This Business Proposal, as well as the Technical Proposal, will form a part of any resulting contract under this solicitation.

The following are responses to the noted sections of the Solicitation:

**Supplies/Services and Prices**

Government Furnished Material (GFM)

PWC will agree to receive, store, and deliver of DSCP procured products, including distribution of fresh fruits and vegetables to the Kuwait and Qatar facilities. We would request that those products be delivered between the hours of 9:00 A.M. to 5:00 P.M., Monday through Friday. Also, we requested the capability of refusing substandard or substandard shelf life product if we are there after required to issue credit on said substandard DSCP purchased product.

PWC concurs with the Contracting Officer's Representative office requirements for two people. This includes at a minimum, office space (approximately 100 square feet), two desks and chairs, electricity, as well as normal housekeeping services, temperature control, use of the rest rooms, and two parking spaces for each individual.

Customer Service Policy

The PWC Group interprets this section to mean that we will perform any resulting contract consistent with the high level of service provided to other large, multi-unit (prime vendor) type customers of the PWC Group. In addition, PWC agrees that all customer service representatives and drivers who come in contact with the Government customers will speak English.

Additional Customers

PWC will agree to add any mutually agreeable additional customers as requested by DSCP within the general proximity of the contracted distribution area. The transition period for implementation of additional customers will be approximately 45 days.

Juice/Drink Dispensers

PWC will agree to supply beverage machines (i.e., coffee, tea, hot chocolate or juice) and monthly service to any facility where we have installed beverage equipment and/or the facility is purchasing our products for use in their machines. The beverage equipment and maintenance will be provided at no additional charge to the Kuwait and Qatar facilities as long as the corresponding beverage is purchased from PWC. If requested, quality control inspections will be performed on each system.

Soda Dispensers

PWC believes it would be more cost efficient for the Kuwait and Qatar facilities to continue in their current soda fountain dispensing contracts, due to the cost advantages currently enjoyed by the military facilities and not available to commercial distributors. If requested and demanded, however, we will provide soda dispenser equipment and service to any Kuwait and Qatar facility that agrees to purchase its fountain products from us.

Warehouse and Distribution Sanitation Program

The PWC Group will use its best efforts to ensure that its sanitation program meets with the Code of Federal Regulations Title 21, part 110 and local laws. PWC will immediately notify DSCP's office of any critical sanitary deficiency and or recall notice and will include a report of our corrective action.

Food Establishments

The PWC Group will survey the suppliers to be utilized to determine their acceptability with respect to requirements such as debarment status, USDA inspection status and their inclusion in the sanitarily approved source list.

**Inspection and Acceptance**

Product Sanitarily Approved Source Requirements

The PWC Group will survey any additional suppliers to be utilized and determine their acceptability with respect to requirements such as debarment status, USDA inspection status and their inclusion in the Armed Forces list of sanitarily approved facilities.

Prime Vendor Systems Management Visits

The PWC Group would welcome Prime Vendor System Management visits, and would request an on-site visitation prior to final contract selection so that we might better demonstrate to the evaluation committee the facilities and systems we have to offer the Kuwait and Qatar facilities.

Strikes

PWC brings in the majority of our product through the Port of Kuwait and has never experienced a strike. Our vehicles are equipped with either phones or satellite devices so that we can track their movement and advise them of any problems. If a strike occurs on the highways necessitating us to utilize a more expensive transportation alternative (i.e., air, train or sea van transportation), we would ask for reimbursement of these expenses.

**Special Contract Requirements**

Commodity Shelf Life, Date of Pack, and Temperature Criteria Listing

PWC will provide a code book to the veterinarian's office information on designated products as to how to determine the manufacture product codes, use by date, or manufactured on date, etc. within thirty days of catalog completion land base dry goods. All perishable and semi-perishable product will have readable date of pack, date of expiration or best if used by date with the required case label with bar code.

Price Verification

The terms of these provisions of the Solicitation (as well as the provisions under 52.212-5(d) Comptroller General Examination of Records) are adopted in full; provided, however, that (i) any price verification or audit shall be limited to PWC and Lankford-Sysco and shall never include Sysco Corporation, and (ii) PWC and Lankford-Sysco shall be required to maintain documentation for an audit trail for no longer than 1 year from date of transaction. We would ask that the new FAR Clause requiring audit procedures to follow normal commercial business practice be implemented where legal.

Purchasing Procedures

For items ordered from the order guide, the Unit Prices will be frozen for a period of up to six (6) days from the date of order to the date of delivery. Any changes in the Unit Prices due to fluctuations in the Delivered Prices will be calculated on Thursday and effective the following Monday through Sunday week i.e. prices change every two weeks. PWC must be notified of the items to be placed on the order guide for them to be frozen for the bi- weekly period.

52.225-9P08 Preference for Certain Domestic Commodities (Nov 1996) DFARS

PWC will also provide due diligence in its efforts to only supply items that are grown and produced in the United States, other than the listed exclusions. These requirements will be eliminated if the laws requiring them change to a not required status.

## COST OR PRICE

*The offeror is required to submit the following information in writing as part of the Cost or Price:*

| | |
|---|---|
| *A.* | *Core Item Pricing* |
| *B.* | *Categories/Distribution Pricing* |
| *C.* | *Option Pricing* |
| *D.* | *Procurement Pricing Plan* |

*The requirements for each submission are outlined below.*

   *A.  Core Item Pricing - The Core Item List for each region is attached. See attachments 1-4 and submit the particular list related to the proposal. Each offeror must complete the appropriate core item list for each proposal submitted. For each core item, offerors shall submit the delivered price, distribution price and the total unit price as defined below:*

   *1. Pricing will be based on the following pricing formula:*

   *Delivered Price + Fixed Distribution Price = Unit Price*

*Definitions:*

*Delivered Price- The actual invoice price (in U.S. Currency) of the product paid to the manufacturer/supplier, for delivery of product to offeror's CONUS distribution point.*

*Distribution Price- The* *distribution price is defined as a firm fixed price, offered as a dollar amount, which represents all elements of the unit price, other than the delivered price. The distribution price typically consists of the Prime Vendor's projected general administrative expenses, overhead, profit, packaging costs, transportation cost from the Prime Vendor's OCONUS distribution facility(s) to the final delivery point or any other projected expenses associated with the distribution function. The distribution price is intended to reflect the difference between the delivered price and the total unit price to deliver the specified product to the ordering activity. The distribution price shall represent the amount to be added to the actual invoice price paid by the prime vendor to the manufacturer or supplier for each item. This distribution price shall remain fixed for the complete term of the contract year.*

*Unit Price-* *The unit price is defined as the total price (in U.S. currency) that is charged to DSCP per unit for a product delivered to the Government.*

*1. Although technically part of the distribution price, for the purposes of this solicitation, ocean transportation costs (the cost of shipping the product from contractor's CONUS facility(s) to the contractor's OCONUS facility(s), aka "Point to Point" delivery, will be deleted from the delivered price. Accordingly, for purposes of submitting offers under this solicitation, ocean transportation costs will be ignored. The Defense Transportation System will handle Point-to-Point delivery.*

*2. Distribution prices of the core items shall be based on the unit of issue specified on the core item list. Distribution prices on core items must have a direct correlation to distribution prices stated in the item category section.*

*3. An evaluation will be made against the list of core items. Estimated annual quantities for the items selected are indicated next to each item and are for information and evaluation purposes only. Unit prices as well as overall aggregate cost will be evaluated. The items and estimated quantities are only a representative sample of the total number of items that may be cataloged for each contract.*

*4. Offerors are to submit unit prices for each of the core items. This unit price must be in a format that shows the delivered price and he distribution price as separate entries, then totaled. For example, if the delivered price is $ 2.00 and the distribution price is $ .50, pricing should be formulated as follows:*

$$\$ 2.00 \ + \ \$ \ .50 \ = \ \$ 2.50$$

*Delivered Price, Distribution Price and Total Price Must be Shown Separately.*

*Do not deduct any NAPA allowances from the delivered price on your business proposal.*

*5. Price must not extend more than two (2) places to the right of the decimal point. Standard rounding methods should be observed. For example, a delivered price of $ 4.578 plus a distribution price of $ .232 should be rounded to $ 4.58 plus $ .23.*

*6. If an offeror carries a variety of brands for the same item, the price submitted should be for the lowest price, technically acceptable, item that meets the Government's requirements, except if a particular brand name is specified. In this case pricing must be specific to the brand.*

*7. Offered Delivered Prices Must Be Substantiated With A Copy Of The Supplier or Manufacturer's Invoice for the core items identified with an asterisk. The invoices should reflect the prices effectives within four (4) weeks prior to closing. IF AN INVOICE IS NOT AVAILABLE FOR THAT FOUR-WEEK PERIOD, SUBMIT A QUOTE WRITTEN DURING THAT PERIOD.*

Attached is the _____ item market basket reflecting delivered prices, distribution prices and unit prices for the items.

As required, PWC is submitting invoices or quotes as requested in conjunction with the submittal of delivered prices for all asterisked items on the schedule.  As a condition to submitting such invoices, we would ask DSCP to hold the invoices in confidence and not disclose the invoices to any third party.  The invoices may be viewed solely by government employees, and DSCP shall inform all such employees of this confidentiality obligation.  Furthermore, once the DSCP has completed its review of the invoices, we would ask that all invoices be returned to PWC.

Again, if copies need to be maintained by DSCP, we appreciate your using proper confidentiality procedures concerning our confidential documents.  To the extent that any such invoices were inadvertently not labeled "Proprietary," we ask that they be so labeled and be considered so labeled in any event.

Our personnel have reviewed the above and assigned distribution prices to all items listed.  Upon award of the contract, our personnel will work with the ordering facilities to determine the items they desire for their particular foodservice operation.  Should they desire an item not currently in stock, subject to our stocking requirements, we will expedite stocking the item(s). Due to the fact that Lankford-Sysco currently services the North Carolina and Mid Atlantic North Zone facilities, a great number of products used are currently in stock.

The qualities and product variations requested, however, have caused Lankford-Sysco to alter its stock status to meet the requests of its customers.  Therefore, we currently either stock and/or will stock 100% of the items listed in your Attachments, or requested by your personnel

Quoted versus In-Stock Product

PWC has denoted the products within the Top _____ core items, which were quoted versus stocked products. It is anticipated that due to the special product requirements of the Kuwait and Qatar facilities, and the quality requested versus the quality desired by Lankford-Sysco's North Carolina and Mid-Atlantic North DSCP facilities, a number of the products listed will not be in stock and will need to be quoted and/or sourced.

**B. Categories/Distribution Prices** – *The Government's Distribution Price Category List is as follows. Offerors shall use this list when submitting their Distribution Prices. Prices must be reflected per the unit of issue specified.*

| CATEGORY NUMBER | CATEGORY DESCRIPTION | DISTRIBUTION PRICE | PRICE PER |
|---|---|---|---|
| 1 | Beef (Pre-cut Steaks ((Raw) | | LB |
| 2 | Beef (Other) (Raw) | | LB |
| 3 | Pork or Lamb (Raw) | | LB |
| 4 | Poultry (Raw) | | LB |
| 5 | Seafood (Shellfish) (Raw) | | LB |
| 6 | Seafood (Canned) (Raw) | | CS |
| 7 | Seafood (Other than shellfish or canned) | | LB |
| 8 | Fruits/Vegetables (Frozen) | | CS |
| 9 | Fruits/Vegetables/Tomato Paste (Number 10 Size Can) | | CS |
| 10 | Fruit/Vegetables/Tomato Paste (Non-refrigerated – other than number 10 size cans) | | CS |
| 11 | Cereals | | CS |
| 12 | Pasta or Rice | | CS |
| 13 | Prepared Foods/Entrees/Precooked Foods-Frozen (Heat & Eat – No Other Preparation Required) | | CS |
| 14 | Snack Foods (to include Chips, Cookies, Granola Bars, Candy, Individual Pastries) | | CS |
| 15 | Soups, Bouillons, Gravy Bases or Gravy Mixes | | CS |
| 16 | Cheese | | LB |
| 17 | Dairy (Other than Cheese) | | CS |
| 18 | Bakery Products to include doughs (Chilled or Frozen) | | CS |
| 19 | Baking mixes, Baking Ingredients or Pie Fillings | | CS |
| 20 | Spices, Flavorings or Food Colorings | | CS |
| 21 | Sugar or Flour (Bulk Sizes) | | LB |
| 22 | Dressings, Sauces, Toppings, Syrups, Condiments, Jams or Jellies – Bulk Sizes | | CS |

| 23 | *Dressings, Sauces, Toppings, Syrups, Condiments, Jams or Jellies –Table top sizes or individual portion controlled sized items* | | *CS* |
|---|---|---|---|
| 24 | *Shortenings and Oils (i.e. cooking oil, salad oil, olive oil, etc.)* | | *CS* |
| 25 | *Coffee, Tea or Cocoa (Dry)* | | *CS* |
| 26 | *Beverages* | | *CS* |
| 27 | *Beverage Bases and Concentrates (liquid or dry) to include dispenser products* | | *CS* |
| 28 | *Other Refrigerated Food Products Not Covered Above* | | *CS* |
| 29 | *Other Non-Refrigerated Food Products Not Covered Above* | | *CS* |
| 30 | *Toiletries/Health and Comfort Items* | | *CS* |
| 31 | *Film* | | *CS* |
| 32 | *Other Non-Food Products (excluding Food Service Operational Supplies (FSOS)* | | *CS* |
| 33 | *FSOS (Chemicals or Cleaning Agents)* | | *CS* |
| 34 | *FSOS Other (Items Issued Individually)* | | *EA* |
| 35 | *FSOS Other (Items Issued by Case)* | | *CS* |
| 36 | *Government Furnished Materials (GFM) for Prime Vendor Distribution of FF & V and other Perishable Items (i.e. Fresh Bakery, Dairy and Other Items that are required to be cooled, chilled or frozen to maintain wholesomeness) Locally Purchased by DSCPE (Zones I and II) Only* | | *CS* |
| 37 | *Prime Vendor Cataloged Items which are Not In Stock (NIS) which DSCPE furnished to Prime Vendor as GFM Material for distribution* | | *CS* |
| 38 | *GFM – UGR – H&S Group Rations (Zone I only)* | | *EA* |
| 39 | *GFM – UGR-A Semiperishable Group Rations (number of cases per unit of issue = 2)(Zone I only)* | | *EA* |
| 40 | *GFM – UGR-A Breakfast Perishable Group Rations (Zone I only)* | | *EA* |
| 41 | *GFM – UGR-A Dinner Perishable Group Rations (Zone I only)* | | *EA* |
| 42 | *GFM – Individual Feeding Rations (Zone I only)* | | *EA* |
| 43 | *Prime Vendor FF&V (BPAIII Only)* | | *CS* |
| 44 | *Prime Vendor Dairy and other items that are* | | *CS* |

Use or disclosure of data contained on this page is subject to the confidentiality restriction

| | required to be cooled, chilled or frozen to maintain wholesomeness.(BPA – Zone III only) | | |
|---|---|---|---|
| 45 | *Prime Vendor Fresh Bakery (BPA – Zone III Only)* | | *CS* |

**C. Option Pricing** – *There are four (4) one-year options in this solicitation. Acceptance of these options is mandatory. The form below must be completed.*

*Offeror may choose to retain the same distribution fee as indicated for the base year distribution prices. In this case, annotate "non change" in each option year block below. If option pricing is not annotated below, the proposal will be evaluated as having "no change" to the distribution pricing for the four (4) option years.*

*Offerors who elect to increase or decrease their distribution prices for option years must submit the pricing in the form of a percentage rate of change over the prior year distribution prices. The offeror must limit any changes to their distribution prices by this percentage. The percent change per year will apply to all categories.*

*Also, please note that it is possible, and may be desirable, to offer a lower percentage for successive years, due to the experience factor gained in dealing with the region and business.*

**The distribution prices for the option years are calculated as a percentage increase or decrease from the previous year distribution price for each option year. Offerors shall indicate percent increase(s) over the previous year price for each option year. See below examples of a 2% increase and a 2% decrease:**

<u>*Percentage Increase Example:*</u>                       <u>*Percentage Decrease Example:*</u>
*Base Year Distribution Price = $ 10.00*                *Base Year Distribution Price = $ 10.00*
*Option year one:*          $ 10.00 x 2% = $ 10.20      *Option year one:*          $ 10.00 x –2%= $9.80
*Option year two:*          $ 10.00 x 2% = $ 10.40      *Option year two:*          $ 9.80 x –2% =$ 9.60
*Option year three:*        $ 10.00 x 2% = $ 10.61      *Option year three:*        $ 9.60 x –2% =$ 9.41
*Option year four:*         $ 10.00 x 2% = $ 10.82      *Option year four:*         $ 9.41 x –2% =$ 9.22

*OPTION YEAR ONE:*          _____ %
*OPTION YEAR TWO:*          _____%
*OPTION YEAR THREE:*        _____%
*OPTION YEAR FOUR:*         _____%

*BASE YEAR CORE ITEMS TOTAL DOLLAR VALUE:*      $ _____
*OPTION YEAR ONE TOTAL DOLLAR VALUE:*           $ _____
*OPTION YEAR TWO TOTAL DOLLAR VALUE:*           $ _____

Use or disclosure of data contained on this page is subject to the confidentiality restriction

| | |
|---|---|
| *OPTION YEAR THREE TOTAL DOLLAR VALUE:* | $ _____ |
| *OPTION YEAR FOUR TOTAL DOLLAR VALUE:* | $ _____ |
| *AGGREGATE TOTAL:* | $ _____ |

Public Warehousing Company intent *is to not escalate* the fees during the length of the contract.

**D. <u>Procurement/Pricing Plan</u>** *– The Procurement Pricing Plan consists of two parts: (1) Procurement Pricing Procedures and (2) Rebate Policy/Discounts/Allowances. The submission requirements for each part are outline below.*

**1.     <u>Procurement Pricing Procedures</u>**

     **a. *This is a procurement for commercial products and it is expected that your procurement pricing procedures be in accordance with established commercial practices. Therefore, the offeror shall <u>BRIEFLY</u> describe how distribution prices are formulated.***

     **b. *<u>BRIEFLY</u> describe what accounting practice you employ to account for inventory received at different prices to determine your catalog price.***

     **c. *<u>BRIEFLY</u> describe the purchasing methods utilized and how they take advantage of price discounts given for quantity purchases, sales, and other types of special arrangements made for preferred customers. Describe how market pricing commercial catalog pricing and competitive purchasing are utilized in your purchasing procedures. State whether volume price discounts offered are based on anticipated sales volume under this contract or the total sales volume for the company.***

**2. *<u>Rebate Policy / Discounts/Allowances</u>: The offeror shall <u>BRIEFLY</u> address how rebates, discounts and allowances as a result of manufacturer or broker's specials, <u>other than</u> the NAPA Program or Food Shows, are to be returned to the Government. Describe the process for tracking and reporting of rebates, discounts and allowances, method of return (i.e. lump-sum reimbursement, deviated pricing) and overall management of the program. The offeror will provide a description of those rebated and discounts meeting the requirements herein.***

PRICING

<u>Unit Price Formula</u>

All items purchased under the resultant contract shall consist of two separate price components: "Delivered Price" plus "Distribution Price" to equal "Unit Price." The Unit Price is the total price charged to DSCP per unit for a product delivered to the Government under the resultant contract.

Delivered Price

The Delivered Price is defined as the actual last invoice price of a product PWC pays a manufacturer, distributor or supplier for that product plus the freight transportation cost to move the product to PWC' various distribution facilities docks in Kuwait. Delivered Price is not reduced by cash discounts for prompt payment available to PWC or its supplier. PWC will use their last received cost as their delivered priced based on a LIFO system.

Last Invoice Price

Last Invoice Price is defined, for each product priced every two weeks under this contract, as the cost of the product as shown on the last invoice for such product issued to PWC by the product vendor, the Merchandising Services Department of SYSCO, or another SYSCO company prior to the date on which Lankford-Sysco establishes the Delivered Price.

Applicable Freight

"Applicable Freight", in those cases where the invoice cost to Lankford-Sysco is not a delivered cost, means that a reasonable freight charge for delivering products to Lankford-Sysco has been added. Applicable Freight charges may include (i) common or contract carrier charges by the product vendor or a third party, (ii) charges billed by Alfmark, SYSCO's freight management service, for third party carriage arranged by Alfmark (which charges may exceed the third party carrier's invoice for such carriage), or (iii) charges billed by Alfmark for shipments back hauled on trucks owned by Lankford-Sysco. Applicable Freight for any product will not exceed the rate charged by nationally recognized carriers operating in the same market for the same type of freight service for the same size of product. Applicable Freight may include transfer charges, calculated in accordance with any of the above, for the movement of product from any of SYSCO's forwarding warehouses to Lankford-Sysco. Finally, Applicable Freight may include assessorial charges such as lumping fees, pallet charges, cross-dock charges and other similar product handling charges necessary to ship and receive product to Lankford-Sysco.

Distribution Price

The Distribution Price shall be a fixed dollar amount for all items. The Distribution Price includes but is not limited to PWC' projected general and administrative overhead, packaging costs, transportation delivery costs from PWC' warehouse to the ordering Kuwait and Qatar facilities, and any other projected expenses associated with the PWC Group 's function, other than the Delivered Price or recovery of costs for merchandising services provided to vendors discussed below. The Distribution Price shall include PWC' anticipated distribution profit.

Calculation of the Unit Price in the Catalog

The Unit Price of each product requested will equal (i) the Delivered Price of such product plus (ii) the Distribution Price specified in the Business Proposal for the product, less (iii) promotional or non-profit or NAPA allowances reflected on invoices to PWC ("Off-Invoice Allowances"), which will be passed along as a temporary reduction in the Unit Price for the term of the promotion.

Example:     A product with a Delivered Price of $10.00 per case, a Distribution Price of $1.50, and an Off-Invoice, Non-Profit or NAPA Allowance of $0.50 per case will have a Unit Price calculated as follows:

| Product Price | | Distribution Price | | |
|---|---|---|---|---|
| $10.00 | + | $1.50 | = | $11.50 |
| | | less Off-Invoice or Non-Profit or | | |
| | | NAPA Allowance | | (0.50) |
| | | Unit Price | = | $11.00 |

PWC' Purchasing Policies

PWC guarantees that the Delivered Price definition for a product delivered to PWC is the same cost basis price that is used to determine the price for *all* PWC customers that have pricing based on a "delivered price" from the supplier other than the Government paid freight. PWC' computer systems are such that the "delivered price" for a product, on which the customer's price is based, remains constant for every customer, and this "delivered price" may not be changed from one customer to the next. This being the case, our "delivered price" must be competitive or our product prices will not be competitive.

PWC purchases competitively in order to be competitive in the marketplace. Lankford-SYSCO assists us in our purchasing and they do not bid products weekly, monthly or quarterly. PWC' wants a relationship with our suppliers over a long period of time to enhance the product consistency and availability our customers demand. Lankford-SYSCO' merchandisers (buyers) attempt to purchase in the lowest brackets available using our large volume purchases.

PWC' Effort to Obtain Lower Delivered Prices for DSCP

As the Kuwait and Qatar facilities begin to utilize common products, PWC, in coordination with the DSCP Contract Office Representative, will begin requesting manufacturers to provide specifically for the Kuwait and Qatar facilities specific rebates or special pricing for specific items (the "Direct Rebates") PWC' should be able to arrange favorable Direct Rebates for the Kuwait and Qatar facilities. Also the manufacturers should be interested in providing favorable Direct Rebates for DSCP since the Kuwait and Qatar facilities will be buying product in large volume as one consolidated force.

Bi-Weekly Fixed Pricing

The Unit Price for each product for a product listed in the Solicitation and listed in the printed order guides for the Kuwait and Qatar facilities will remain fixed for a period of six (6) days from the time of order. The STORES Unit Price for each product listed in the printed order guide will be transmitted by 832 transaction every other Thursday for the Kuwait and Qatar facilities (based upon PWC' last defined Delivered Cost plus Distribution Price) reflecting the Unit Prices in effect the following Monday through Sunday week i.e. 2 weeks.

During the period of this contract, the Unit Price for each product may increase or decrease in direct relationship to fluctuations in bona fide changes in the Delivered Price as depicted on the manufacturer's or supplier's invoice to PWC, plus ocean freight and such changes in the Unit Price shall be effective the following week and will be determined in accordance with the method of pricing described in the pricing formula set forth above. Adjustments in the Unit Price shall only reflect those changes in the Delivered Price that have taken effect during the previous two weeks and shall not reflect notices of future adjustments in the Delivered Price.

National Allowance Program

PWC will implement the NAPA program as outlined for the Kuwait and Qatar facilities.

Food Show Discounts

PWC can implement food show order discounts in either a rebate check format or an off-invoice format.

Rebates Directly to DSCP

In keeping with the standard commercial practice in the food service industry with respect to rebates and allowances, PWC will pass to the DSCP the following types of rebates and allowances:

> (a)    Off-Invoice Allowances - manufacturer promotions or allowances that are reflected on the invoices to PWC.

> (b)    Applicable Non-Profit Allowances - special allowances that are generally established by certain manufacturers specifically for non-profit concerns. The manufacturers of certain products for certain specific market areas usually offer these allowances.

(c)     Specific Manufacturer Pricing, Rebates or NAPA's - many manufacturers offer specific rebates or special pricing for specific items and customers. These deals are negotiated directly between the manufacturer and the customer. If the DSCP negotiates with a manufacturer a special price for a certain product, PWC will use the special price as the basis of the Unit Price charged to the DSCP. If the DSCP negotiates a specific rebate for certain products, the rebate is either paid directly to the DSCP by the manufacturer or the rebate will be passed through to the DSCP by PWC as a reduction in the Unit Price (and the applicable party, i.e., PWC will "bill back" the manufacturer). PWC agrees that all rebates, allowances and discounts outlined above will be passed through to the DSCP. With respect to the specific manufacturer rebates and pricing described in (c) above, PWC will be as aggressive as possible in assisting the DSCP in obtaining such rebates and discounts. Based on our combined purchasing strength and strong relationships with manufacturers, we believe that PWC can assist DSCP in obtaining favorable rebates and allowances from manufacturers.

PWC believes but cannot warrant that the DSCP customers will receive rebates and discounts equal to or better than our most favored commercial or other customers simply because PWC does not control the rebate deals as they are granted by the manufacturers. To reemphasize what we can do, however, PWC will be as aggressive in assisting the DSCP in negotiating these deals with the manufacturers as we are with our other largest customers.

<u>Processing Direct Rebates to DSCP</u>

The process of implementing Direct Rebates begins with an agreement between DSCP and the manufacturer, which lists the products to be discounted for DSCP and the length of time the discounts are authorized.

Once the list is agreed upon, the manufacturer usually sends each Kuwait and Qatar facility a list of the products, which have Direct Rebates.  A letter is also usually sent by the manufacturer introducing the product line to each Kuwait and Qatar facility with a copy sent to the DSCP Contract Administrator.

This process of implementing discounts takes approximately four weeks from the date the DSCP Contract Administrator receives an agreement from a manufacturer.

At the request of DSCP, the manufacturers can send the Direct Rebate checks directly to DSCP's designated official fund.  In this scenario, PWC will assist by tracking the purchases by the Kuwait and Qatar facilities of the affected items and provide a printout to the DSCP and the manufacturers.

Two Week Fixed Pricing

The Unit Price for each product in a product listed in the Solicitation and listed in the printed order guides for the Kuwait and Qatar facilities will remain fixed for a period of up to six (6) days from the time of order. The STORES Unit Price for each product listed in the printed order guide will be transmitted by 832 transaction set every other Thursday for the Kuwait and Qatar facilities (based upon the Delivered Cost plus Distribution Price) reflecting the Unit Prices effective the following Monday through Sunday week (i.e., two weeks). The Unit Price for all products ordered by the Kuwait and Qatar facilities and not listed in the printed order guides for the Kuwait and Qatar facilities will be calculated as set forth above; however, such Unit Prices may not be fixed for bi-monthly periods. During the period of this contract, the Unit Price for each product may increase or decrease every two weeks in direct relationship to fluctuations in bona fide changes in the Delivered Price as depicted on the last received invoice to PWC and such changes in the Unit Price shall be effective every two weeks and will be determined in accordance with the method of pricing described in the pricing formula set forth above. Adjustments in the Unit Price shall only reflect those changes in the Delivered Price that have taken effect during the previous two weeks and shall not reflect notices of future adjustments in the Delivered Price.

SYSCO Procurement

Overall, SYSCO will purchase for fiscal year 2001 approximately $19 billion dollars of products for the food service industry. This volume of purchasing establishes SYSCO as the largest purchaser of food service products in the United States. Due to the fact that SYSCO does purchase such a large volume of products from manufacturers and vendors, none of which represents the source of more than 5% of SYSCO's purchases, SYSCO has good purchasing relationships with a wide variety of manufacturers and vendors. SYSCO has thousands of suppliers worldwide. Generally, due to SYSCO's vast customer base, SYSCO is the most efficient point of distribution for a food service product vendor. Since suppliers usually price according to the quantity purchased, SYSCO companies often enjoy the lowest price bracket available for most food service products purchased.

The fact that SYSCO purchases in such large volume results in low product costs. SYSCO uses its leverage in purchasing by establishing, at the corporate level, purchasing programs at set prices with certain vendors so that Lankford-Sysco and the other SYSCO operating companies may purchase the products at low prices that are based on SYSCO's overall purchases from a particular vendor. The SYSCO operating companies may also purchase outside the SYSCO purchasing program to take advantage of low prices offered locally or regionally.

Additionally, SYSCO operates 14 forward warehouses across the United States that are used to consolidate product to reduce the cost of items to the SYSCO companies. Therefore, even if Lankford-Sysco may not buy a particular item by the truckload, it may be able to purchase the item through the forward warehouse for a price that reflects truckload purchasing.

SYSCO also monitors market conditions for products to attempt to forecast future prices and to coordinate purchases based on such forecasts. At the corporate level, SYSCO has a separate procurement department for each SYSCO category of food products. Each department will track market conditions for the products in their product category and will develop marketing reports or forecasts as to the availability of such products. These reports are shared with the SYSCO companies so that the SYSCO companies may take advantage of market conditions.

Merchandising Services

Lankford-Sysco and SYSCO perform value-added services for suppliers of SYSCO® brand and other products over and above procurement activities typically provided. These services include national marketing, freight management, consolidated warehousing, quality assurance and performance-based product marketing. Lankford-Sysco and SYSCO may recover the costs of providing these services and may also be compensated for these services and consider this compensation to be earned income. This compensation may also include profit. This cost recovery or earned income assumes many forms, including rebates from the manufacturers to SYSCO or Lankford-Sysco, SYSCO's internal attribution of a portion of its earned income to PWC, and intercompany mark-ups between SYSCO and Lankford-Sysco.

Such cost recovery or earned income does not reduce Delivered Price and is not passed through to our customers; however, it does not diminish Lankford-Sysco's commitment to provide PWC with competitive prices. Finally, while earned income is a method of cost recovery for services provided to suppliers, earned income cannot be tracked to specific services or specific products.

Lankford-Sysco represents that prices charged by the Merchandising Services Department of SYSCO to Lankford-Sysco for goods that are sold by Lankford-Sysco to the DSCP activities are the same as prices charged by the Merchandising Services Department of SYSCO for such goods that are sold to other customers of Lankford-Sysco.

Inventory Adjustment and Spoilage

In the event Lankford-Sysco receives non-conforming product from a supplier, any necessary inventory spoilage adjustments and credit procedures will not affect the prices charged to any of our customers, including PWC, as it is a cost of doing business. Merchandise returned to the manufacturer is billed back to the manufacturer and will not be passed on to the customers.

Pricing Comparisons

Lankford-Sysco guarantees that the Delivered Price for a product delivered to PWC is the same price that is passed through to *all* Lankford-Sysco's customers that have pricing based on a "delivered price" from the supplier. Lankford-Sysco's computer systems are such that the "delivered price" for a product, on which the customer's price is based, remains constant for every customer, and this "delivered price" may not be changed from one customer to the next.

This being the case, our "delivered price" must be competitive or our product prices will not be competitive.

Purchases From Other SYSCO Operating Companies

If Lankford-Sysco purchases products from another SYSCO operating Company, such products are priced in either of two ways, depending on whether Lankford-Sysco regularly purchases from the other SYSCO operating company. If Lankford-Sysco purchases a product from another SYSCO operating company and the other SYSCO operating company is not the normal supplier of that product, the Delivered Price will not exceed that normally charged by the normal supplier of the product. Alternately, if Lankford-Sysco regularly purchases a product from another SYSCO operating company, the Delivered Price will be based on the Last Invoice Price from the other SYSCO operating company; provided, however, the Delivered Price will be no higher than the price that would be charged by the product supplier to Lankford-Sysco for the particular product.

Agreement to Back Up Other Zone

The PWC Group agrees to serve as a back up to the other zones within the time frames required.

Competitive Purchasing

Lankford-Sysco's merchandisers have the ability through SYSCO's procurement database to determine the prices paid for an item by any SYSCO operating company. This information assists the merchandisers in negotiating a reasonable price for that particular item or group of items.

Lankford-Sysco 's Effort to Obtain Lower Delivered Prices for DSCP

As the Kuwait and Qatar facilities begin to utilize common products, PWC through Lankford-Sysco, in coordination with the DSCP Contract Office Representative, will begin requesting manufacturers to provide specifically for the Kuwait and Qatar facilities specific rebates or special pricing for specific items (the "Direct Rebates"). With the assistance of SYSCO and its combined purchasing strength, Lankford-Sysco should be able to assist in arranging favorable Direct Rebates for the Kuwait and Qatar facilities. Also the manufacturers should be interested in providing favorable Direct Rebates for DSCP since the Kuwait and Qatar facilities will be buying product in large volume as one consolidated force.

New Product Requests

      PWC will require that a customer desiring a particular product sign a request for that product depicting the expected average weekly demand. Should a product's reduced movement jeopardize the remaining product shelf life potential; PWC will notify DSCP and the requesting customers of the situation and will require that the product either be ordered by the requesting customer or some other military facility customer to extinguish our inventory as PWC should not be held responsible for expired product due to the failure of the requesting military facilities failure to use the product requested or to notify us of its change of desire. Local Kuwait and Qatar customers do not necessarily want military specific items.

# Exhibit D

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING

Public Warehousing Company K.S.C. v. Defense Supply Center Philadelphia,
the Defense Logistics Agency, and the Department of Defense

March 15, 2007

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | | 1. CONTRACT ID CODE | PAGE | OF | PAGES |
|---|---|---|---|---|---|
| | | | 1 | | 37 |

| 2. AMENDMENT/MODIFICATION NO. 0002 | 3. EFFECTIVE DATE 13 OCT 04 | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|

| 6. ISSUED BY | CODE | SP0300 | 7. ADMINISTERED BY (If other than Item 6) | CODE |
|---|---|---|---|---|

DEFENSE SUPPLY CENTER-PHILADELPHIA
DIRECTORATE OF SUBSISTENCE, BLDG. 6
700 ROBBINS AVENUE,
PHILADELPHIA, PA 19111-5092
POC: MARYANN DIMEO (215) 737-3726

SEE BLOCK 6

8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and ZIP Code)*

[X] 9A. AMENDMENT OF SOLICITATION NO.

SPM300-04-R-0323

9B. DATED *(SEE ITEM 11)*

3 SEPTEMBER 2004

10A. MODIFICATION OF CONTRACT/ORDER NO.

10B. DATED *(SEE ITEM 13)*

| CODE | FACILITY CODE |
|---|---|

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

[X] The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers    [X] is extended,    [ ] is not extended.

Offer must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning _____1_____ copies of the amendment (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. Accounting and Appropriation Data *(If required)*

**13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS,
IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| (X) | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES *(such as changes in paying office, appropriation data, etc.)* SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| | D. OTHER *(Specify type of modification and authority)* |

E. IMPORTANT:    Contractor [ ] is not,    [X] is required to sign this document and return _____1_____ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

A. The closing date for this solicitation has been extended to 16 November 2004, 3 pm local time.

B. See attached pages for additional information.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER *(Type or print)* | 16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)* MARYANN DIMEO |
|---|---|

| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA BY | 16C. DATE SIGNED |
|---|---|---|---|
| *(Signature of person authorized to sign)* | | *(Signature of Contracting Officer)* | |

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE

PerFORM (DLA)

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

This amendment contains two sections, Section I contains actual revisions (adds/changes/deletions) to the solicitation requirements. Section II provides answers to questions which were submitted in reference to the pre-proposal conference. The answers in Section II are provided for clarification purposes only and do not change the requirements in the solicitation.

## Section I

The solicitation is herein amended as follows:

Block 8 of the SF1449, page 1 of the solicitation, offer due date local time, is extended to 16 Nov 04. Please note this new closing date in any location which refers to the solicitation closing date.

Amendment 0001, page 33, item 68, the item description should read "UGRA- Heat and Serve supplied as GFM." The category should be "B," and accordingly, you only need to supply your distribution fee for this category.

The Note at the bottom of page 11 which begins "Due to security concerns," delete and substitute the following "Vendors are encouraged to submit alternate proposals which will effectively address the delivery requirements/timeframes within the solicitation. No specific location or number of platforms is mandated by the government in order to accomplish this."

Page 20, para. 3 to the definition of delivered price which begins "For OCONUS purchases," add the following: "Where OCONUS routes represent a recurring requirement, the DTS system will be used and transportation costs should therefore not be included in the delivered price. If however, the government determines that minimum source load requirements will not be met, DTS will not be utilized and the vendor will need to include transportation costs from their overseas point of origin as part of the delivered price. Clearly indicate on your paper submission of the market basket prices where you have included non-DTS transportation costs in your pricing. Vendors should substitute "Overseas Platform," for "CONUS Platform," in the Supply Pipeline chart on page 98 and indicate the country of origin, where an overseas point of origin will be used to support your platform.

Page 24, 19. <u>Estimated Value/Guaranteed Minimum / Maximum</u>: The estimated dollar value under this solicitation is changed from $6,223,254,775 to: $5,592,110,275. This reflects changes to the zone 3 estimates incorporated via Amendment 0001.

Page 37, Para. 3 Special PV Personnel, at end add the following: The above describes the present scenario under the convoy system. This is a fluid requirement, based on the requirements of the theatre. Currently, it is believed that no greater than 10 TO's per hub is more realistic. Offered distribution prices and breakout of itemized costs supplied should be based on this lower personnel scenario. Offerors are  also invited to submit alternate offers based on other methods of supporting the need to expedite the movement of assets through the convoy system, insuring the efficient forward movement of product to the hub-sites, and timely retrograde of trucks (out of Iraq within 7 days.) Alternate offers should be identified as such and priced separately.

Language in Amendment 1 referring to Page 38, B. ZONE 1 LAND BASED, para. 7 is changed to include the following:  "It should be noted that although the average/recommended delivery times to the hubs within the Iraq zone which have been provided to aid vendors in estimating their transportation costs within the convoy system are for deliveries originating from Kuwait, proposals may utilize other points of origin. Kuwait estimates have been provided simply because this is the area where the government has the most knowledge at this time."
a.) Changed to read "North of Anaconda – 10 days"

Page 38, B. ZONE 1 LAND BASED, add paragraphs 7, 8,9, and 10 as follow:

7. An itemized breakout of price is required for costs specific to the TO and Squad Leaders program, elevated insurance costs, vehicle recovery costs, and any other costs you've found necessary to include in your distribution fee which are unique to the expense of operating under these programs.

8. Private Security is not currently permitted within Iraq. However, should CENTCOM allow this in the future, the vendor would be given notice of the requirement and their proposal for private security would be negotiated and evaluated at that time.

9. Should the specific requirement no longer exist (i.e., should the government remove the requirement for TO's, should this system be replaced with private security, or should the zone no longer be considered a contingency zone) the contractor is required to immediately mitigate any costs allocable to the program and the government will adjust the distribution fees accordingly to reflect the absence of these costs.

10. Detailed cost information is to be submitted on Attachment 15 to the solicitation, included in Amendment 0002. All specific costs should be submitted as a per-unit of issue value in relation to the distribution fee, in $ value per pound or per case to address each unit of measure you utilize within your categories for zone 1 as detailed on page 106 paragraph 3., A. Distribution Prices. Accordingly, on page 119 ADDITIONAL SUBMISSION REQUIREMENTS, add "Attachment 15 to the solicitation, Submission of Itemized Costs Zone 1, required for all vendors offering on Zone 1." This attachment is included in Amendment 0002. Notwithstanding the requirement to submit this information for Zone 1, the evaluation for price purposes will continue to be based on aggregate costs, as stated on page 119.

Page 41, PRODUCT QUALITY: Add the following at the end: "If an offeror does not have a password for the CENTCOM directory of approved sources, they may submit an e-mail request to the contracting officer who will forward the request to the appropriate authorities."

Page 75 bottom, and bottom of page 99 through top of 100, delete all zone specific staging area minimum dimensions.

The clauses related to the fast pay provision as referenced on pages 33, 79, and 253-255 are hereby incorporated by reference into Attachment 6, FAR 52.213-1 and FAR Deviation 04-03.

Page 90, first paragraph as Amended in A0001, The following further explanation is added: "For all information under Factor I (whether sub-factor A or B) joint ventures should submit information as it pertains to each team member, identifying the role and experience of each team member. Joint ventures with a shared history should submit a separate chart as a joint entity to represent this shared history as well as an individual chart for each partner as a separate entity. First time joint ventures would not yet share a common history, but would submit each partner's individual history. In either scenario, each sheet should clearly indicate the team member and their intended role within the current proposal."

Page 100, Technical Factors, Factor 3 – Distribution Systems/Capability add the following additional Sub-Factor:
Factor 3 Distribution Systems/Capability
Sub-Factor D – Asset Control and Management

Although GPS (in some areas) cell phones, and 24x7 customer service among other means of providing asset visibility and assuring throughput of product to the customers are mandatory, indicate clearly any additional measures which you will take to assure the welfare of your staff, equipment, and inventory as well as to assure the safe and timely receipt of intact product by the customers. Provide any alternate, value added ideas which you may have in lieu of the TO/Squad Leaders Program. For Zone 1 offers, indicate any special measures you will take to insure efficient truck repairs and retrogrades and how you intend to insure efficient communications are maintained with the military. Any value added ideas which you add to your support concept may be viewed as enhancements to your proposal.

Napa items are identified as follows. These do not represent an endorsement by DSCP and their inclusion does not guarantee their inclusion on any catalogs which may result from this solicitation, however, they represent current customer preference and prices offered should reflect sourcing the exact items.

## Zone 1 – KUWAIT AND IRAQ

| | | |
|---|---|---|
| 890501E591217 | SAUSAGE, BREAKFAST | ROSE PACKING CO |
| 890501E592158 | BACON, PRECOOKED | DAILY FOODS |
| 890501E593897 | FRANKFURTERS, BEEF | HEBREW NATIONAL |
| 890501E594039 | BEEF, GROUND | ZARTIC FOODS |
| 890501E595537 | CHICKEN,  CUT UP | CONAGRA POULTRY |
| 890501E597758 | T-BONE STEAK | QUANTUM FOODS |
| 890501E600706 | CORNISH HEN | PERDUE |
| 890501E601030 | PORK CHOP, CENTER CUT | QUANTUM FOODS |
| 890501E602466 | CHICKEN WINGS | PERDUE |
| 890501E603680 | TURKEY BREAST | SARA LEE |
| 890501E604177 | CHICKEN BREAST FILLET | PERDUE |
| 890501E604311 | SHRIMP, RAW | OCEAN DIRECT |
| 891001E596929 | EGG PRODUCT | MICHAEL FOODS |
| 891501E593965 | FRENCH FRIES | LAMB-WESSON |
| 892001E093929 | CRACKERS | NABISCO/KRAFT |
| 892001E099276 | BISCUITS | PILLSBURY/GEN MILLS |
| 892001E591172 | WAFFLES | CHEF AMERICA |
| 892001E598920 | CEREAL, VARIETY | KELLOGGS |
| 892001E601248 | COOKIES, CHOC CHIP | OTIS SPUNKMEYER |
| 892501E098039 | SYRUP | SMUCKERS |
| 893001E098035 | JAM/JELLY ASST | SMUCKERS |
| 893501E094650 | SOUP | CAMPBELL |
| 894001E601622 | GRAVY MIX | CUSTOM FOOD PRODUCTS |
| 894001E601745 | PIZZA | SCHWAN'S/FRESCHETTA |
| 894501E096374 | SHORTENING, LIQ | CONAGRA |
| 895001E095681 | STEAK SAUCE | KRAFT/NABISCO |
| 895001E190115 | MUSTARD | FRENCH'S FOOD |
| 895001E591274 | SPICE, THYME | MCCORMACK |
| 895001E602197 | DRESSING, RANCH | UNILEVER BEST FOODS |
| 895501E598334 | COFFEE | KRAFT/MAXWELL HOUSE |

## ZONE 2 – UNITED ARAB EMIRATES AND OMAN

| | | |
|---|---|---|
| 8905-01-E60-0422 | BEEF LOIN | RASTELLI FINE FOODS |
| 8905-01-E60-0427 | TURKEY BREAST | RASTELLI FINE FOODS |
| 8920-01-E09-9228 | COOKIE DOUGH | GENERAL MILLS |
| 8920-01-E59-8920 | CERAL VARIETY | KELLOGGS |
| 8930-01-E09-8035 | JAM & JELLY ASST | SMUCKERS |
| 8950-01-E59-7349 | MAYONNAISE | UNILEVER – BEST FOODS |

## ZONE 3 – AFGHANISTAN

| | | |
|---|---|---|
| 8905-01-E59-0074 | HAM, BNLS | SMITHFIELD |
| 8905-01-E60-0418 | BEEF, ROAST | RASTELLI FINE FOODS |
| 8905-01-E60-0422 | BEEF LOIN | RASTELLI FINE FOODS |
| 8920-01-E59-8920 | CEREAL VARIETY | KELLOGGS |
| 8935-01-E59-4424 | SOUP, CRM OF BROC | UNILEVER – BEST FOODS |
| 8940-01-E59-4504 | BREAKFAST ENTRÉE | MICHAEL FOODS |
| 8940-01-e60-1727 | GRAVY MIX | CUSTOM FOOD PRODUCTS |
| 8950-01-E59-0352 | RELISH, SWEET | PORTION PAC INC. |

## ZONE 4 – BAHRAIN, QATAR, AND SAUDI ARABIA

| | | |
|---|---|---|
| 8905-01-E59-1217 | SAUSAGE, BRKFST | ROSE PACKING |
| 8905-01-E59-2158 | BACON, PRECKD | DAILY FOODS |
| 8905-01-E59-6320 | PORK LOIN | ZARTIC INC |
| 8905-01-E60-3342 | HAM, BNLS | JIMMY DEAN & BRYAN FOODS |
| 8910-01-E59-6557 | CREAM CHEESE | KRAFT FOODS |
| 8920-01-E09-4278 | CEREAL BAR | KELLOGGS |
| 8920-01-E09-6676 | COOKIE DOUGH | OTIS SPUNKMEYER |
| 8920-01-E59-4271 | COOKIE, NTR BTR | KRAFT FOODS |
| 8920-01-E59-8920 | CEREAL VARIETY | KELLOGGS |
| 8945-01-E60-2576 | SHORTENING | CONAGRA FOODS |
| 8950-01-E09-8437 | MAYONNAISE | KRAFT FOODS |
| 8950-01-E59-2920 | SPICE, GARLIC | TONES BROTHERS INC |
| 8955-01-E59-8334 | COFFEE | KRAFT FOODS |
| 8960-01-E09-9309 | ELECTROLYTIC BEV | PEPSICO FOODSERVICE & VENDING |
| 8960-01-E59-0165 | BEV BASE, 3 GAL | LYONS MAGNUS |

## ZONE 5 – DJIBOUTI

| | | |
|---|---|---|
| 8905-01-E09-5329 | CHICKEN WINGS | TYSON FOODS |
| 8920-01-E09-4461 | CEREAL BAR | KELLOGGS |
| 8920-01-E59-8920 | CEREAL VARIETY | KELLOGGS |
| 8930-01-E09-8035 | JAM & JELLY ASST | SMUCKERS |
| 8950-01-E59-2920 | SPICE, GARLIC | TONES BROTHERS INC |

ATTACHMENT – 15

Submission of Itemized Costs –Zone 1

Since you may use your own categories and special services may differ, please feel free to create your own version of this form. This attachment is just an example. Please title your version as  ATTACHMENT – 15, Submission of Itemized Costs –Zone 1, and identify all special (contingency unique) services which you have included in your Zone 1 distribution fee, and at what cost per unit of measure. You should also show a total for all "normal," distribution fee elements per applicable unit of measure. Please note that DSCP is not mandating high risk insurance. This was used as an example because it is one of several items which, if utilized, would need to be itemized.

| Category | Unit of Measure | Cost of Each Special Service Per Unit of Measure |
|---|---|---|
| Example – | | |
| Category – 1 | | Total of all "normal" dist. fee $ per LB |
| Beef (Pre-cut Steaks) | LB. | TO Program cost per LB  $ |
| (Raw) | | High Risk Insurance cost per LB $ |
| | | |
| Category  - 2 | | Total of all "normal" dist. fee $ per LB |
| Beef (Other) (Raw) | LB. | TO Program cost per LB  $ |
| | | High Risk Insurance cost per LB $ |

SECTION II


The charts presented at the pre-proposal conference are currently posted
to the subsistence website
http://www.dscp.dla.mil/subs/pv/mideast/mideast.htm

### Q&A Middle East SPV Pre Proposal Conference 10/1/04

**First we would like to thank you for your insightful questions regarding this solicitation. They are very much appreciated.**

**Please be advised that all of the below questions were received from potential offerors before, during and after the pre-proposal conference (both in writing and orally). They are being published in Amendment 0002 so that all offerors will be provided the same information with regards to this solicitation.**

1. Can offeror submit quotations from distributors and/or manufacturers?
   If so, what is your guideline for the quotation date? Based on the common sense, the date of quotation should be after the solicitation issue date. Please confirm this.

   **YES, the offeror can submit quotations from distributors and/or manufacturers. The quote must meet the delivered price criteria and should be based on the average delivered price (landed cost) during the full week (Monday through Friday) two weeks prior to the issue date of the solicitation. If no price is available for that particular week, the delivered price used shall be based on the last available price prior to the time specified above. If the price used is not based on pricing for the period two weeks before the issue date of the solicitation, your price should include the date of acquisition. (Page 104)**

2. Information provided at top of page 90 would seem to indicate you want us to use the form as provided in the RFP. Are we safe to assume we can use an electronic version with the same information requested but allowing the field for the response to expand as needed?

   **Yes, you may use the forms as provided on pages 92-94, or create your own template using the exact same block headings, and submit in paper version. For clarity, blocks may be expanded. Also, for supply pipeline, you may use the form on page 98, or duplicate the identical formal electronically.**

3. Pg 92, Past Experience – If we have multiple contracts with one organization, that equal large dollar figures; can we add additional blocks to show these contracts separate from our military contracts? Our joint-venture partners have there own vast experience. Can we complete separate past experience factors to prove an overall capacity?

   **No, additional blocks are not authorized. Past performance charts are required for each team member/joint venture partner in accordance with Subfactor B, Page 91. Please list only the five highest dollar value contracts for each team member (except in the case of government contracts, columns 4 and 5). In addition, see Amendment 0002.**

4. Zone 3: Estimated annual sales amount of $219 million for Zone 3 seems quite high. Is prime vendor responsible for transport of containers from Karachi, Pakistan? Are there any charges that US Government pledged to Pakistani Government when shipments are passing through Pakistan territory? Or, is it Pakistani Government when shipments are passing through Pakistan territory? Or

is it because of container detention charge? Can you give us what was just food cost?

**Amendment 1 has revised the estimate. PV is not responsible for transport from Port of Karachi if shipments are originating from CONUS and booked through the Defense Transportation System. For shipments originating outside of CONUS for which the Defense Transportation System is not used, then any transportation costs associated with delivering the product to the SPV OCONUS Distribution Point is part of the DELIVERED PRICE. See Amendment 0002 for definition of DELIVERED PRICE.**

5. What is the startup timeline for zones that have no current incumbent? (Zones 3 and 5)

**Today, all zones have incumbents as we are currently supporting these customers via other contractual means. See pages 13 and 14, Paragraph 5, Contract Implementation Effective Period.**

6. Can you give an example of the statement, "However, the Government reserves the right to phase in customer ordering points when it is in the best interest of the Government?"

**This statement is located on page 14 of the solicitation and refers to processes that may be required during implementation. Should a current PV not receive an award under this solicitation, DSCP reserves the right to "phase in" customers to the "new" PV in order to assist with the "ramp up" or start-up and "ramp down" inventory/supply pipeline of the "old" PV. This approach has been utilized on previous solicitations and has been successful. Additionally, as stated on this same page, the Government will avert significant and additional over-ocean transportation charges if the new PV considers procuring residual stock from the incumbent as an initial basis for creating his pipeline. In this case, the phased-in approach may not apply.**

7. Top core items list has specific listing for unit of issue for all items but no listing for a specific category. Please clarify clearly what is the understanding for unit of issue as compared to unit of measure. Furthermore, in the same top core list there
are items, which could fall under the same category but have different unit of issue.
    Please clarify.

**Unit of issue is how DSCP issues the particular product and how the customer orders it. PV unit of measure will differ on some items, as normally PVs issue by the case, or lb. It is possible that items could fall under the same category but have different units of issue because of the way it has been cataloged back at DSCP. For example, if you provide a distribution fee for a "category" such as canned vegetables by the "case", and our Unit of Issue is "can", on the market basket you would divide your case distribution fee by the number of cans in the case to come up with the distribution fee per can.**

8. Will the FFV, Bread, and Milk remain on the catalog or will it change to BPA?

   **Yes, these items will remain on the catalog and they may or may not require a BPA; reference DFARS 225.7002-2(F)(1). If the contingency designation is removed, the exception to the Berry Amendment will no longer apply and a BPA will be necessary for perishable items.**

9. There are no local approved sources in Afghanistan for FFV and other market ready items. The solicitation requires us to quote distribute prices for FFV and also some market ready items are included in the top core items for Afghanistan. In this case, do we include freight and packaging costs from approved source location to OCONUS Afghanistan in the delivered price?

   **YES, refer to definition of DELIVERED PRICE and Amendment 0002.**

10. Item 13 P 18. 'Airlifts'.
    a. Will reimbursable costs include all CONUS inland trucking charges and fees associated with freight forwarder?

       **No, the Government assumes this is part of the current delivered price.**

    b. If military air is utilized who and how will split invoices be generated and product tracking be coordinated?

       **We do not see a need for a split invoice and the Government will track.**

    c. Item 5 refers to 'deliver goods to customer within 48 hours via commercial air' Question: 48 hours from what? Order receipt? Order confirmation? Order ready to ship?

Item 5 states "MAKE ARRANGEMENTS to deliver goods to customer within 48 hours via commercial air." Theatre clearances may still be pending.

d. Please advise by zone what Government estimates have been included for commercial airlifts.

For all zones, the dollar estimate provided took into account commercial air costs. Historically, these costs have been extremely minor in relation to the Government estimate provided.

e. Reference is made to the provision of packaging, dry and wet ice etc. that should be included within the PV distribution fees. What would be the determination on cost responsibility if the PV was asked to support customers outside their contracted zone?

If the demand deems the SPV is not at fault in meeting requirements, then the U.S. Government reimburses the SPV for the cost of airlifting.
In a backup PV capacity, we will negotiate fees accordingly.

11. Are the multitude of costs incidental to the TO and Squad leader program to be figured into the distribution fees, or can the PV expect a separate fee (Zone 1)?

The costs should be included in the distribution fees, hence the separate market baskets for Zone 1 (see page 37). Please refer to all instructions in Amendment 0002 as to additional submission requirements.

12. General Questions – Will dedicated military convoys be authorized in hostile/war zones? If in hostile/war zones, and a total loss of goods was due to a hostile act, what provisions are in place to protect the contractor's delivery schedule and accountability?

Only Theatre Operations Groups authorize military convoys. At the present time, only Zone 1 applied. All risk is on the PV. See page 44, para. 8. RISK OF LOSS and clause 252.225-70XX pg. 281.

13. Will the government accept alternative proposals to provide transportation into Iraq outside the military convoy system with contractor provided security?

At this time, the Government is not accepting alternate proposals to provide transportation into Iraq outside the military convoy system with contractor provided security. Refer to Amendment 0002.

14. For areas, such as Zone 3 "Afghanistan", where there are ongoing combat operations and regular terrorist / criminal attacks, should an offeror be prepared to

include a fixed risk percentage of costs to cover potential loss of fixed facilities or transportation assets? If yes, what percentage should be used and will this be required of each offeror?

**Offerors should be prepared to bear all risks associated with operating in a combat zone. This will be a business decision on the part of each offeror. The government is not in a position to provide a percentage estimate.**

15. Would it be beneficial to have Distribution facilities in Turkey and Jordan to accommodate the outlined requirements in Zone 1? May the prime vendor adjust the percentages to maximize operating effectiveness and efficiency?

   **See Amendment 0002.**

16. Zone 5: How many Marines are there in Zone 5? How many top-offs during 2003 and half year of 2003 for Navy? Do you intend to have GOCO or we need to secure commercial warehouse?

   **DSCP is not at liberty to provide troop strengths in any AOR.**

   **Our Office does not know the number of past top-offs but the Navy has expressed interest in this region to perform future top-offs.**

   **There is no GOCO facility listed in the solicitation.**

17. Can the 10 case per month demand requirement be raised to 20 cases per month minimum?

   **No. As an example of why this is an important requirement for this region, there may be injured troops that require special needs type items, (I.e. purees, broths) in addition to our Forward Operating Bases whose populations would not support a 20 case minimum for stocking an item.**

18. What is the order receipt time for the T-AFS for zones 1,2,3,4,5? If 10 days, will the PV be given demand data in order to stock appropriately?

   **T-AFS applies Zones 1, 2, 4 and 5 (primarily zone 2). Market Basket does include estimates. At time of cataloging DSCP will provide detail as to latest demand trends. PV will also be given the opportunity to attend pre-deployment conferences.**

19. Do we have to buy NAPA products or can we buy according to specifications?

   **This requirement is customer driven. If the customer requests the NAPA item, the NAPA item must be provided. If this is in reference to your offered prices, if the item in the market basket is a NAPA item, you must**

offer on the specific NAPA item, and the price offered will be minus the
NAPA discount, unless the price you receive from the manufacturer is
more
advantageous to the government.  See page 28 (E) and Amendment 0002.

20.  In areas where there are no authorized service outlets/representatives for
branded
beverage and ice cream/yogurt dispensers (especially dangerous areas), how
will
offerors be expected to fulfill the requirement of providing service of these
dispensers?

The number of machines and dispensing heads required will be
determined
during  cataloging or the life of the contract and will be provided to the
customer's facility  to accommodate the specific needs of each order
activity.
All transportation and supplies required to repair and maintain the
contractor's equipment shall be the sole responsibility of the contractor.

21.  Assuming a hostile act has taken place, how do you deal with contractor's
delivery
schedule and accountability?

We may reprioritize current delivery orders in order to feed appropriately;
we normally score PV's in delivery and NIS but we will use common sense
in an emergency, unless the PV has done something out of line

22.  When does the title of product shift to the Government?

 When Prompt Payment Procedures Apply:  title passes to the Government
when products are inspected and accepted at final delivery point. When
Fast Payment Procedures Apply:  title passes to the Government upon
delivery to a post office or common carrier for shipment to the specific
destination or the point of first receipt by the Government if shipment is by
means other than postal service or common carrier.

23.  Convoy matrix keeps moving, sometimes leaving trucks/drivers behind.  If we
lose vehicles/drivers, how can we bear responsibility when we leave our hands in
the US military?

We have a relatively good historical background of what times were before
T/O's, and what they have been since implementation.  There has been
significant improvement.

24. Vehicles may be held 24/48 hours. What happens if they are held 5-10 days at DFACS? Do we get reimbursed per diem or should we factor this into distribution cost?

**It should be accounted for in the distribution fees. In addition there are several communication channels available now to minimize backups. It goes quickly to a relatively high General Officer level for resolution.**

25. DTS is not used for shipments originating from OCONUS. Will this always be the case?

**OCONUS to OCONUS DTS service is available. The USC contract provides for lift globally. For a non-recurring shipment SDDC would process a One-Time-Only (OTO) request through the carriers. For recurring requirements SDDC would ask the interested carriers to develop and enter rates into the booking system for those routes. These rates and routes would then be available to shippers identically to the CONUS origin routes. Also refer to Amendment 0002, definition of DELIVERED PRICE.**

26. It is fundamentally unusual to accept the cost of risk without being fully aware of the risks of tomorrow as conditions change. This may affect the share price of our company.

**Nothing in the FAR addresses the effect of risk on share price. We have a current contract in Iraq that is under these conditions and we have chosen to expand this requirement into all zones.**

27. P18 reference troop movement/risk of loss. Are there confidentiality issues/restrictions that the PV needs to be aware of?

**Nothing in the FAR. This will be up to the combatant commander on how you will operate.**

28. The Government states that they will recover vehicles to a point, but in the past this has not happened. If not recovered, do we have a claim option?

**No, you do not have a claim option; you are assuming all the risk. If outside the hub DFAC network, army will recover truck and bring it back to the hub DFAC.**

29. In regards to GPS, Is CAGO (Contractor Acquired Government Owned) an option?

**Best answer at this time, no.**

30. In regards to branded product, if not stated in the bid, will we be given a list?

**Please see Amendment 0002. We have incorporated brands into the Market Basket. If there is not specific brand stated, you are free to use a brand based on the specification.**

31. Is there a shelf life for chilled product?

    **Yes, there is a shelf life for all products (see p.42).**

32. For the NAPA items, the brand is not in the description but it is referred by the NSN/LSN. Do you want the brand item quoted?

    **If cited in market basket, use that brand. You must offer on the NAPA item, minus the government discount. See Amendment 0002.**

33. Is the "Contractor in the Battlefield" clause in conflict with Force Majeure?

    **The concept of "Force Majeure" addresses excusable delay or nonperformance due to Acts of God and not "Acts of War", therefore, it is not in conflict. See Contract Clause 52.212-4(f).**

34. Brands should be ID'd on the market basket.

    **See Amendment 0002.**

35. It's taken 26 days for some trucks to return from Iraq? We believe the convoy estimates are inaccurate.

    **The data is the government's best estimate at this time.**

36. Refers to Q19. Does NAPA apply to Market Ready?

    **No, NAPA does not apply to market ready items.**

37. Reference to convoys, is there a specific amount of insurance required?

    **We do not have specific requirements for insurance.**

38. We can not get insurance to cover us. You are expecting us to accept unlimited liability. Our own convoy protection has worked to date.

    **We have no control over this. This directive was passed down from DoD. If a vendor is giving his best efforts, we will be a little less harsh in evaluating contractor's performance. Awaiting Zimmerman**

39. Clarification on non-recovery trucks. If the U.S. destroys the vehicle with our product in it, this is not a hostile act. Where do you stand on that?

You can file a claim under the Foreign Claims Act "10 USC 2734". It has an exception for contracts, so DSCP is exempt. However, you can file a claim against the Army.

40. Can the DSCP COR (Contracting Officer Representative) specify insurance to carry?

**No.**

41. Does the Defense Based Act apply to the Middle East solicitation? In addition, Jordan should be added to list of qualifying countries under Balance of Payments Program Act.

**No, the Defense Based Act applies to public works contracts and this is a supply contract. Jordan is not listed as a qualifying country under the Balance of Payments Program. Please see DFARS site 225.872-1 for a list of qualifying countries.**

42. Under amendment 1 regarding Zone 3 (Afghanistan), the solicitation details that if an order can not be filled by the PV, DSCP may call on a European PV to satisfy the order. How often do you predict this will occur?

**This is would be only in an emergency situation and we do not foresee this situation happening often, as the European vendor would be the third or fourth option.**

43. Is there standard liability insurance that we will require on the product for transportation?

**The decision to insure or not to insure is entirely up to the offeror. Apply any associated cost for insurance to your distribution fee.**

44. P.71 states that the host nation of responsibility is to move cargo to FOB. What does this mean?

**The PV's responsibility will end at Bagram/Kandahar. The Army has a contract with the host nation and will provide vehicles to move supplies to FOB's.**

45. Does the PV bring FFV/GFM to the warehouse?

**The PV will bring product to the warehouse. The government will bring product to the warehouse as well.**

46. What is included in MWR orders?

**Historically, the office orders market ready items and FSO items. In**

addition, MWR is planning to set up American chain restaurants such as Chili's and we may be a potential supplier of these items.

47. P.112 references socio-economic factors.  How does DSCP define this factor?

**As stated on page 111, "socio-economic goals are rated on a comparative basis among offerors."  DLA does not establish sub-contracting goals.  As further explained on page 112, "When calculating socio-economic goals, the business size of the manufacturer is to be considered, not the business size of the broker/agent/distributor that may have supplied the product to the prime vendor."  Requirements for formal subcontracting plans approved by DCMA may differ from this.  We specify the criteria on which we evaluate the factor and this is also the expected format for the monthly reports.**

48. Are small disadvantaged distributors/holding groups included in the socio-economic factor?

**As stated on page 111, "socio-economic goals are rated on a comparative basis among offerors."  DLA does not establish sub-contracting goals.  As further explained on page 112, "When calculating socio-economic goals, the business size of the manufacturer is to be considered, not the business size of the broker/agent/distributor that may have supplied the product to the prime vendor."  Requirements for formal subcontracting plans approved by DCMA may differ from this.  We specify the criteria on which we evaluate the factor and this is also the expected format for the monthly reports.**

49. Is there a limit to when a customer can return product?

**Once the customer signs for the order the title is turned to them.  But at times it does depend on the zones and the circumstances and if the invoice is signed it will be considered a latent defect.  We do not foresee this to be a major problem however.**

50. Is Class 1 material the same as Class I product?

**Both mean Subsistence or food items.**

51. What is the cost of food shows and what is involved?

**Food shows are an effective channel for PV to market their manufacturers' products and for customers, manufacturers, and distributors to meet in order to introduce new products and provide discounts.  DSCP does not foresee food shows to be a common occurrence in the Middle East due to its contingency status.  If it were to happen, DSCP would only have a food show that is in a realistically safe/stable area.**

52. Does a PV make a claim if the PV does everything right and the customer is at fault (i.e. improper ordering)?

**Yes, but as the PV you will have a historical trend of orders and when orders seem extreme the PV should question such orders before satisfying, which is standard commercial practice.**

53. There are estimates for North and South of Anaconda (will be updated in Amend 2 from Scania). Can an estimate be provided for the area West of Anaconda?

**At this time there are no estimates available. Numbers provided are based on deliveries from Kuwait only.**

54. Is the PV responsible for RF tags?

**At this time, unless it is a ration item, if you are moving product from CONUS to a facility, there is no bar code requirement. If going from CONUS to the customer directly, you will have a bar code requirement. It is not the PV's responsibility to do the tagging; that duty is fulfilled by KBR/Army.**

55. Are facilities within Afghanistan and Iraq allowed?

**Afghanistan facilities would be allowed. We do not foresee facilities in Iraq; however, this does not preclude you from it. If you were to have a warehouse in Iraq, you would have to arrange where to pick up inventory as DTS P2P is not an option in Iraq.**

56. Zone 3 – For example, say a customer is added that is >6 days away (in NW Afghanistan)? Can we revise distribution fees?

**Significant changes to the original requirements may result in DSCP re-negotiating distribution fees.**

57. Pork products? What happens if truck gets into an accident?

**Our research has indicated that even if a trans-load was required due to an accident or vehicle breakdown, the original exemption letter provided by the Government/Customs Office designating the product as "diplomatic cargo" will suffice. Do not attempt to move any pork product via truck through Saudi Arabia.**

58. Should the PV show distribution fees as a back up for another zone?

**DSCP would negotiate such fees post award.**

59. Technical proposal Factor E details that there should be no reference to price but how does the PV submit that information without the price?

**We will make sure not to pass the pricing information on to the Technical panel.**

60. Camp Doha wasn't referenced on the Kuwait portion of the solicitation.

**Camp Doha is referenced on page 67 of solicitation.**

61. "What percentage 0f the 70 items in the market basket is included in the total required subsistence to Zone 3."

**The market basket items do not equate to a specific percentage of the total subsistence business for the zone. The market basket simply includes annual usage quantities for high usage items which represent the spectrum of projected distribution categories.**

62. Does a Service Disabled Veteran need to have an established business in CONUS to be qualified for this contract?

If a business is required, would a new establishment meet the obligation?

What does the DSCP/DLA consider a Joint-Venture contract in regards to SDVC?

What is the minimum criteria a SDV must meet to qualify in regards to a SDVC Joint-Venture Contract.

Since the Joint-Venture SDVC would be in Kuwait, How does this effect the contract in whole as far as taxes?

**A service-disabled veteran owned firm may joint venture with other SMALL BUSINESSES as long as when combined with all affiliates, the joint venture meets the small business size standard requirement. In addition, the joint venture must have a written agreement that specifically names the service disabled veteran owned firm as the managing venturer, and states that not less than 51% of the net profits will be distributed to the service disabled veteran owned firm. Also, SDVO non-manufacturers must comply with the requirements of the non-manufacturers rule. It must supply the end items of a small business manufacturer or processor in the U.S.**

**DSCP cannot provide any tax information.**

63. Pg. 10, #1, Zones – Can a proposal be issued for selected zones?  Or is it required to submit a proposal for all five zones?

**Yes proposals may be submitted for selected zones.**

64. Due the complexity of this procurement, will the Government consider granting an extension of the proposal due date?

**The Government will consider granting an extension if conditions warrant. See Amendment 0002**

65. How important are historical fill rates of the incumbent PV's in all five zones?

**Please refer to Past Performance history chart.**

66. What do you mean by technical in "technical and past performance when combined is: significantly more important than price?"

**Your Technical Factors as outlined on page 240.**

67. In the case of a menu driven inventory, will the PV be held to the small business/minority owned business goals that they have?  For example, if the items dictated to stock are not available from those types of sources?

**Yes, the PV goals will need to be set to reflect this situation (if applicable) and the proposed goals will need to be achieved.**

68. Does a potential offeror qualify for substantive Prime Vendor-type experience for
supplying prime vendor-type products to a theater of operations but not actually distributing in the theater of operations?  Will an offeror be credited with relevant support in supplying customers in dangerous conditions, if the offer or actually does not perform deliveries into the dangerous area?

**All risk associated with operating in a contingency area is on the PV and should be incorporated into the distribution fee.  See pages 48 - 57, paragraph 8. RISK OF LOSS, 9. and 10.   Additionally, pages 281 thru 288.**

69. Item 19, P 24.Are the maximum value expressed accurate?

**YES**

70. Maximum dollars are incorrect?  3 times is the number.

**Maximum dollars are correct as DSCP reserves the right to shift support to other PVs depending on the dynamic environment.**

71. For all 5 zones in the solicitation please advise the anticipated $ value of Class 1 items along with case volume estimates. This should be separate from other contingent values that may be contained within the stated 'estimated annual sales' for each zone.

**Case Volume Estimates will not be provided except for Operational Ration type items. The market basket is another source of information for estimating purposes, along with the estimated dollar value.**

72. Could you please explain the structure and factors for the estimated yearly $ amounts for all zones? Please elaborate. We are looking for the determination of the cost of product.

**No, we do not disclose our estimating processes.**

73. Zone 3: Is FFV/FSOS inclusive of $219 million or is $6 million separate from $219 million?

**INCLUSIVE Amended to $145M**

74. Can you give us a rough estimated sales amount of FSOS in Zone 3?

**FSOS items were not represented in the Market Basket and therefore an estimated sales amount will not be provided.**

75. Pg. 100, Resource Availability – Any required MHE in this tender would need to be known to properly disclose this availability. Is there any projected number of containers to be shipped? What is the projected number of shipments in a given zone? What percentage of these shipments would require air freight vs. land freight?

**Estimates for required MHE is the responsibility of the offeror. DSCP has provided good faith estimates of $value and quantities contained in the market basket of items.**

76. Annual dollar estimates-the solicitation states that the dollar amount includes airlift cost. Does these estimated dollar amounts include:   FF&V procurement and delivery? Bread procurement and delivery? Dairy procurement and delivery?
FSOS procurement and delivery? Water and soda procurement and delivery? Heath and care procurement and delivery? Ice procurement and delivery? Food preparation equipment procurement and delivery? Could the government breakdown the estimated dollar amounts into subcategories above?

**No.**

77. Item 5, Page 13 details mobilization periods for non-incumbent PV. Please advise those zones that you consider an incumbent contractor to be present.

**All Zones currently have an incumbent.**

78. When (estimate based on $ depletion) will current contract expire?  How will this adjust the timeline for PV incumbency changes on page 13?

**DSCP cannot project future dollar expenditures under the current contract or when the maximum dollar ceiling will be reached.  Regardless, it will have no affect on the timeline for PV incumbency changes.**

79. What happens to duty-free inventory at the end of a contract that a follow-on contractor will not purchase and the government does not want but is within acceptable shelf life?

**The Government has multiple options to assist with draw down of residual stocks and will discuss with current PV at the appropriate time.**

80. If an adequate refrigerated warehouse is not possible both near bordering nation or within Afghan, would you give us 2 months of time to refurbish an old existing warehouse at our cost?  If we have a warehouse in Kabul but need to upgrade to meet Vetcom standard, we need to refurbish in 30-45 days after award.  Provided that we give you blue prints and layout of the building plan, would you consider this as viable RFP?  We shall meet your deadline so that servicing food distribution will take place within time frame DSCP imposes.

**Implementation timeframes are clearly stated on pages 13 and 14.  You must be able to demonstrate the ability to meet these timeframes.**

81. What does the words "following items" in the above paragraph refer? Does it refer to the whole market basket items or specific certain items?

**Whole Market Basket**

82. What does the words "the average delivered price" in the above paragraph mean? For example, if we have three landed prices during the specific time frame, do we have to average those three prices and put the averaged price into the spreadsheet? And accordingly, do we have to attach those three invoices for that specific item?

**YES.  YES**

83. Page 106 of 356 (under Point 3) requires distribution pricing to be given in the same manner in which the offeror sells the product, i.e. LB or CS.  We may have items in the same category where products may be sold CS or LB, since this is decided by DSCP based on NSN.  Please clarify.

**As stated, distribution pricing for catgories is according to how the "offeror" sells the product and has no relationship to DSCP's unit of issue.**

84. Page 21 of 356 (under "Item Categories") states that distribution prices are to be offered for the listed 42 categories based on the unit of measure mentioned in the list. However, unit of measure has not been mentioned in the categories listed on this page.

   **Offerors are to provide their own unit of measure for these categories (with the exception of those listed) and provide their distribution fee for this category based on same.**

85. Pg 24, #20, Option: Notes – What is meant by: By annotating the offeror's yearly option percentage change?

   **Page 25. Should the offeror deem it necessary to change their distribution fees for any of the options years provided for under this solicitation, this change (by percentage) must be provided. Please note that acceptance of the options are mandatory.**

86. Page 105 of 356 states that the offeror can create 50 categories of their own. If offerors create their own categories and assign to the top core list, how can different categories from different offerors be compared for fair evaluation of business proposals?

   **All categories of items are covered in the market basket. This will have no impact on evaluations as prices are based on an aggregate calculation.**

87. The solicitation recommends 42 categories plus 8 mandatory categories. The solicitation also states that offerors may create their own categories. Is it a definite advantage to use the suggested 42 categories (meaning preferred by DSCP and technical evaluation panel)?

   **This is a business decision on the part of the offerors.**

88. If the offeror defines their own distribution categories, do they also assign their own unit of measure for each category?

   **Yes.**

89. If an RDD is within 6 days, and the actual DD turns out to be after six days due to reasons beyond the PV's control, will a new price (receipted price) be acknowledged by DSCP? IOW, will a new invoice be necessary to meet the end customer's new catalog he is seeing at the time of receipt? Or will the PV be expected to invoice at the old price while the Customer receipts at a new (updated) price?

**No, if the RDD is within 6 days, then the price will be at time of order, regardless of the circumstances.**

90. Pg. 72, #4, Fill rates – Minimum fill rate is 97%. If the Government reduces the quantity lower then the required rate, will there be any detrimental action to the contractor for failing to supply required fill rates? If in the case of a disease breakout such as "Hoof & Mouth", or similar problems that resort to sourcing to another regional or nation for supplies, what action will the USG hold on the contractor for failing to meet a required fill rate?

**The fill rates are calculated by the number of cases ordered divided by the number of cases filled. In no instance will the Government reduce the required 97% fill rate. DSCP takes into account all market conditions when reviewing/analyzing fill rates.**

91. Page 96 of 356 (last Para) states that "current catalogued items" is attached to the solicitation as an attachment. However, no such attachment is found in the solicitation.

**Attachment was made part of Amendment 0001.**

92. When offeror is going to use and buy from the broad line distributor such as US Foodservice or SYSCO, can the offeror use manufacturers' invoices issued to those distributors, US Foodservice or SYSCO, during the week of 15 Aug. 2004?

**Yes, however, refer to the definition of delivered price.**

93. The phone number listed for Unistel Continental Developmental Services, Inc. is no longer in service. Please provide correct contact information.

**The correct phone number for Jack Pipes at Unistel is 585-224-0960 X0960**

94. Do you intend to let PV to have BPA and we are able to source local/nearby nations' FFV? Bread and bakery?

**DSCP may or may not utilize a BPA depending upon the circumstances.**

95. You provided the weight in lbs for the FFV, could you provide the total weight for the A-rations in all zones?

**No, the market basket provides estimated quantities.**

96. Should we propose separate fees for tri-walls for airlifts since they are so expensive?

**No. Stated on page 19 of the solicitation.**

97. Please clarify the requirement for airlift approval from CENTCOM on page 18. Is this statement potentially only required for Zone 1 (Iraq)?

**No. For all zones airlift approval is required for lift direct to a military site and the airlift originates from the CENTCOM AOR. FF&V exclusive shipments are exempt from this process.**

98. Item 4, LMR items P 13. Are the estimated volumes net weight or gross weight inc. of packaging, tri-wall, wet ice etc.

**Product weight. I.E. the weight ordered is the weight of the item to be delivered.**

99. Are we reimbursed for the cost of the tri-wall containers, dry ice costs for airlifts?

**No. All costs associated with airlifts are the responsibility of the PV.**

100. Do we receive reimbursement only, or a separate fee in addition, due to interest costs for contracts with commercial air carriers, where we have to pay the carrier?

**The Prime Vendor will receive reimbursement only as stated on page 18 of the solicitation.**

101. The solicitation states that the successful awardee will be responsible for all the airlift cost incurred for dry ice and packing if the government requests the airlift at no fault of the contractor. Consequently, there is no line item for billing these variable cost back to the government in hopes of recovering the money. In addition, there is no logical way of predicting how many contingencies will require airlifts. How is the contractor supposed to estimate this cost or control this cost?

**If the demand deems the SPV is not at fault in meeting requirements, then the U.S. Government reimburses the SPV for the cost of airlifting.**

**The U.S. Government does not anticipate routine deliveries via airlift and therefore the respective special packaging.**

**Any costs needed to get perishable products safely to your overseas facility are billable as part of Delivered Price.**

102. Pg. 19, #13, Airlift – Is US personnel required with Security clearances for monitoring the tracking systems? For cost evaluations: Estimate number of Tri-walls for shipping with wet or dry ice required. Who will keep the contractor updated on "scheduled" changes in airlift transportation? Will all TDE (pallets, nets, and straps) be provided by the USAF, or contractor? What if an AMC flight cancelled after arrival in an APOE/D? Will contractor pay for all charges relating to this USG delay in shipment?

**At this time US personnel with security clearances are not required. The Government has provided estimates (in lbs) of required FF&V. In good faith, the Government does not estimate a significant number of deliveries requiring additional packaging such as tri-walls, with wet or dry ice. CENTCOM's Air Mobility Command along with DSCP Contracting Officer's Representative will assist in keeping the contractor updated on scheduled changes in airlift transportation. Government furnished equipment will not be provided unless special aircraft requiring same is utilized. The U.S. Government is not liable for product loss due to flight schedule changes.**

103. If the Government schedules an air shipment, and we show up for pick up, or delivery to the aircraft, and schedules change, who pays for the attempted delivery/pickup, truck cost, deteriorated shelf life, etc.?

   **Page 19 of the solicitation states the U.S. Government will not be liable.**

104. Page 19 of 356 states that cost of triwalls and ice for airlifts to be included in the distribution fees. Airlifts will be exception but not norm. If this is included in the distribution fee, this will unnecessarily hike up the distribution fee for all categories under normal transportation mode. Would it not be more advantageous for DSCP to treat this as an add-on at actuals in case of airlifts?

   **Impact will be minimal. Gov't provided FFV estimates. It is the SPV responsibility to find sources for these items and offer a price based on our lead-times requirements.**

105. How can drivers be limited on a paid per trip basis when they are under complete control of convoy commanders (Zone 1)?

   **All market research reveals that for incentive purposes and control of the delivery process, drivers should be paid on a per trip basis. In addition, theatre Operations Groups prefer this procedure.**

106. (Special Personnel) Squad leader (convoys) to the end customer? When follow the order is stated, is that meant literally? Again, is this cost separate, or part of distribution fees?

   **Yes, Squad leaders are required to accompany the convoy. The cost of this service will be part of the distribution fee.**

107. Are security requirements costs paid separately or part of the distribution costs?

   **Distribution fee.**

108. Which criteria will be used to compensate a vendor for a vehicle lost in battle?

**No compensation will be made, therefore, there is no criteria. See 8. RISK OF LOSS page 48 and clause 252.225-70XX pg. 281**

109. In a wartime environment, under which circumstances can we expect reimbursement for those costs due to loss of drivers and vehicles?

**Note, this question was re-worded.**

**All risk associated with operating in a contingency area is on the PV and should be incorporated into the distribution fee. See pages 48 - 57, paragraph 8. RISK OF LOSS, 9. and 10. Additionally, pages 281 thru 288, clause 22.225-70XX.**

110. Since Vendors don't control the convoys in Zone 1, and are under the direction of the military commander, how will PVs be compensated when trucks are gone for long periods of time.

**Note, this question was re-worded.**

**Amendment 1 covers expected timeframes. PVs will not be compensated separately if trucks are gone for a longer period of time.**

111. Is there a security restriction on using Iraqi drivers or helpers as far as transportation and deliveries?

**NO**

112. Contractor equipment traveling in US Military conveys-if the equipment is lost, damage or destroyed, what are the contractor's options for recovering his cost for lost equipment?

**See page 48, 8. RISK OF LOSS**

113. Do empty returning trucks stay in US Military conveys or after unloading return on their own without military escort?

**Military Escort is used.**

114. Can the future PV make requests for military escorts in all zones where applicable?

**No.**

115. Who pays for the GPS requirement from CONUS to the PV, and in turn from PV to the customers?

**There is no GPS requirement from CONUS to the PV.  Vendor is responsible for GPS requirement in Iraq Zone 1 See page 38.**

116. Will Zone 1 Transportation costs have to be included in the Distribution Fees?

   **Yes**

117. Will SDDC directly coordinate the movement of containers at OCONUS Turkey for Zone 1?

   **Yes via Point to Point shipments from CONUS supply points to the SPV place of performance in Turkey.**

118. Will the Distribution Fee be the same for Kuwait & Iraq?

   **There are two market baskets provided – this will be at the offeror's discretion.**

119. Would the government consider a warehouse in the future within Iraq after security stabilizes?

   **There is nothing in the current solicitation that prohibits you from offering from a platform in Iraq.  NOTE:  If an offer is made based on a platform in Iraq, DTS Point to Port distribution will be utilized and additional costs of draying the product from the port to the platform in Iraq will be borne by the contractor as part of delivered price.**

120. Pg. 11, #2, Zone 1 – How will the cost be adjusted for changes in delivery points? Modifying a distribution point in % from a location may have a cost not projected in the proposal, so how will the change be accounted for to the contractor?  IE: Estimated that Kuwait will have 65%, Jordan 23%, and Turkey 12%, so if Turkey was to change to 40% and that change is not accounted for in the means of storage facilities, transportation, etc.

   **See Amendment 0002.**

121. Are all deploying personnel required to possess the Geneva Convention ID card? P49

   **Yes.**

122. Zone 3: Can we (PV) use Kandahar and Bagram army warehouses as GOCO? If not now, how about early 2005?

   **There are no provisions in the solicitation for use of a GOCO in Kandahar and Bagram, nor are there any plans to do so in the future.**

123. Is US Army convoy to be provided from warehouse in Pakistan to bases in Afghanistan?  What about within Afghanistan if we have bases within Afghanistan territory?  (Example: Kabul to Herat: Do you provide US Army convoy on this route?  Or from Kabul to Kandahar?)

**No military convoy will be provided in Zone 3.**

124. Zone 3:  Page 71 of 356 reads "the host nation has the responsibility to move cargo to the Forward Operating Bases: We are not too clear if this will be part of prime vendors job or not.

**This is not a Prime Vendor responsibility.**

125. What is the current and projected BDFA for Afghanistan and Djibouti?

**REQUEST FOR THIS TYPE OF INFORMATION SHOULD BE SUBMITTED THROUGH THE FREEDOM OF INFORMATION ACT GUIDELINES.**

126. Is Zone 3 "Afghanistan" an area that will be using the US Army's 21 day CONOPS menu during the performance period of SPM300-04-R-0323?

**YES**

127. Does the government have an objection of a warehouse with Afghanistan for Zone 3?

**This is a business decision on the part of the offeror.**

128. Page 71 states that the Host Nation has responsibility for moving cargo to Forward Operating Bases (FOBs) in Zone 3.  What if the Host Nation is unable to perform this function and the Prime Vendor is requested to do so – will the distribution fee be renegotiated and will force protection support to FOBs be provided by the US Military?

**All changes to Statement of Work  requirements under any resultant contract will be negotiated with the PV.  DSCP does not foresee any PV delivering directly to the FOBs at this time for Zone 3.**

129. Since there is no fully operational prime vendor platform in Zone 3 "Afghanistan", what will be the implementation schedule be for Zone 3?

**The implementation schedule for Zone 3 is as stated in the solicitation, pages 13 and 14.**

130. What becomes of the products warehoused in CONUS, OCONUS, and in the pipeline, when a Ship, or other customer changes their requirement?

**Changes in requirements are a prime vendor risk, however, DSCP has been actively engaged in assisting PVs "ramp down" in these instances. DSCP has required an aged item report and will also assist in promoting these items to other customers.**

131. Which other classes of supply items might we be requested to distribute?

    **All Classes of supply. See page 13, No. 3.**

132. Item 31, P32 states that '...to the best of DSCP knowledge at this time importation of subsistence items and other supplies limited for US Forces shall be free of duties and taxes.' If this is not the case or should it change during the period of the contract would DSCP permit the PV to add any duty or tax to the cost of product through an 832-catalog update?

    **YES, provided the updates are approved by KO first.**

133. What is the suspense for allowing the customer to change an order?

    **Page 39 states for T-AFS; no later than 6 days prior to RDD.**

    **Amendment 1 states for land based customers, changes permitted up to 24 hours after order placement and for Navy End Use Ships, no later than 6 days prior to RDD.**

134. Will the overstock resulting from stocking for a non-existent T-AFS become the financial responsibility of DSCP?

    **No. However, DSCP will assist in marketing excess stock to other customers/PVs. The required "Aged Item" report will assist in this process.**

135. Pg 16, #9, Cargo Items – The bi-annual change to weight, packing, and cube according to the U.S. Navy is unknown currently. Therefore, how will the cost be estimated in the proposal for the contractor to accommodate these changes? Will the contract be modified to meet these requirement changes by the US Navy?

    **DSCP cannot foresee these changes impacting the distribution fee. There is no historical record of these changes requiring distribution fee adjustments.**

136. On page 107, it lists the qualified countries, for product purchases, does this mean that we are allowed to purchase any of our products from these places, i.e. Egyptian Chicken?

**Yes, be advised that subject to clause 252.225-7001 – Buy American Act and Balance of Payments Program and Provision 252.225-7000 same title, and as long as the product comes from an "approved source". Page 41, para. 4.**

137. Item E (2), P119 refers to' non qualified country', 'qualified country', 'domestic offers'. Please clarify further these definitions and how this impacts on Berry compliance.

**NOTE, U.S. Government's preference remains U.S. Domestic Sourced Product.**

138. Item 4, P 41 'Product Quality' Please advise how this relates to Berry compliance?

**Information is this paragraph does not relate to Berry compliance..**

139. Can we obtain CENTCOM listing for approved local vendors?

**Website to VETCOM's Directory of Sanitarily Approved Food Establishments is listed on page 41. In addition, please see Amendment 0002.**

140. What timeframe do you anticipate for approval of substitutions of items or brands?

**Automatic substitution lists may be developed at the time of cataloging.**

**Amendment 1 adds the timeframes. Within 6 days of RDD for all Navy Ships and within 24 hours for land Based Customers upon receiving notification from the SPV.**

141. What is the procedure for product inspection and acceptance on navy ships?

**They will be the same as for land based customers as listed on pages 63 through 67.**

142. Does a signed invoice mean that product has been inspected and accepted and that payment has to be made in full?

**Yes, unless otherwise annotated on the signed invoice (short shipped, damaged, mispick, etc.) However, latent defects could arise and adjustment must be made.**

143. Pages 64/65 – When will an item not be subject to rejection anymore? A day? Prior to the next delivery? week? A month? After delivery? Please give us an exact time frame.

**Timeframes for rejection of product varies and is not possible to determine based upon circumstances. If it is a latent defect, meaning that the defect was only found when the food preparer opened a box of canned tomatoes for use that night and he found one to be exploded, severely damaged, etc., this case could have been delivered a month previous to its use. If the damage is apparent, they would reject it that same day.**

144. Please clarify: In what instance may a customer "NOT" reject a product?

**The only instance wherein a customer may not reject a product would be due to customs considerations in transporting the product back to the country of origin. Should any discrepancy/disagreement arise between the customer and PV, DSCP has Contracting Officer Representative's located throughout the theatre to assist in any such situation.**

145. (Authorized returns) Point 'i': If the customer "says" that he inputted a quantity wrong and we are expected to accept a return of the product, is this at "OUR" cost?

**Yes. By the same token, there are instances whereby the PV ships more than what the customer has ordered (by error) and customer accepts the product.**

146. (Authorized returns) Point 'B': Who is responsible for "deeming" a "valid reason" for a return of a product?

**Contracting Officer, Contracting Officer's Representative, ACO's.**

147. (Short shipments/Shipping errors): Point "C": Will the PV be expected to take away all plastic wrapping from meat products, and or milk products away, acting as "Garbage men?" Is this sanitarily correct? Or is the PV expected to bring garbage truck to accommodate the customer? How will this material be containerized by the customer prior to removal? Does this include the contingency area (IZ)? Will the PV be expected to include this function in their distribution fees, or be reimbursed separately?

**DSCP cannot foresee this scenario applying to this solicitation.**

148. Can NAPA items be invoiced to the PV Net NAPA?

**Note, this question was re-worded.**

**If this is for NAPA item price in the market basket of items, then the price offered should be minus the NAPA discount, unless the price you receive from the manufacturer is more advantageous to the government. See page 28**

149.Item 24, 27. Please provide more clarity as to this requirement.

**Based on the volume of product a PV purchases from a manufacturer, the manufacturer will offer rebates and discounts to the PV. These rebates and discounts must be passed on to DSCP and their customers.**

150.Does juice and ice cream dispenser maintenance, and service personnel include Iraq?

**No**

151.Pg. 47, #6, Dispensers/Machines – What is the estimated number of machines per

Zone? What types of machines will be required per zone? Will there be any additional type of serving machines added not listed? Coffee, Cocoa, Candy Vending, Etc.? Is there a specific brand of machine required?

**Number/types of machines would be determined at time of cataloging.**

152.Pg. 45, Audit Samples – For evaluation & cost estimates; how many audits will be

required annually? How many items per audit annually?

**It is expected that an audit would be conducted once per contract year (or 18 months). The number of items audited may vary (estimated at 80 items), but they include categories such as meat, poultry, fish, canned vegetables, etc. PV is only responsible for the first $9,000.00 of**

**product samples.**

153.Pg. 57, #11, Catering – If this was to be implemented, what estimated quantity of site would be required? What approximate number of personnel would be fed per

meal? Who would supply the HACCP training?

**Should catering ever be required, DSCP will accomplish a statement of work and negotiate all aspects at a future date.**

154.The Government has requested a % discount on the distribution fees in the event

of surges and mobilizations. Will effective dates for surges and mobilizations be communicated formally?

**Yes. In addition, effective dates will be dependent upon when DSCP is formally notified.**

155. Page 103 of 356 (Subfactor B, Mobilization) states that mobilization could be up to 500% over normal demand. However, page 75 of 356 states mobilization as 50% over normal demand. Please clarify.

**This was a typographical error. Amendment 1 changed the 500% to 50%**

156. Pg 17, #12, DTS – How many estimated numbers of tracking systems are required? RF-Tags? GPS? Type of GPS system is required? Will a special computer system (SARRS) be required? Approx. number of MHE (container stackers) required for the special zones? Will any of this equipment be CAGO (contractor acquired, government owned)?

**See Attachment 1 for current requirements. Approximate number of MHE required is a business decision on the part of the offeror. Government has provided dollar estimates for each zone and estimated quantities are included in the market basket of items. There will not be any CAGO involved.**

0157. Zone 3: Does "point-to-point" mean DSCP is responsible for delivery of ocean containers from U.S. points to designated warehouse whether it is inside of Pakistan or Afghanistan?

**YES. This process is controlled by the Surface Deployment Distribution Command and charges are transparent to the PV.**

158. Pg. 33, #32, Title – What is meant by: A fifty (50%) percent reduced distribution fee shall be applied?

**While this solicitation is FOB Destination, there may be some instances where FOB Origin terms will apply. The Government will take title at either the PVs CONUS or OCONUS facility in lieu of end user. In this instance, you will decrease your distribution by half on this product as less administrative processes are required on the part of the PV.**

159. Page 70/71 – What conditions are necessary to have the approval of the COR or the customer to combine loads to different Dodaacs?

**The PV will combine loads only at the direction of the Contracting Officer or COR. There will be no requests made from the PV.**

160. Could the offeror obtained copies of the current national contracts with the appropriate NSN's?

**Amendment 0001 lists all the NSNs currently on the catalogs for these AORs.**

161. Item 22, P26. The solicitation states: 'Multiple catalogs may be required to support each zone' does that mean that one zone could have multiple catalogs?

**YES**

162. Item 31, P 32. Please provide a copy of the most recent SOFA.

**Status of Forces Agreements are not public information and therefore copies can not be provided.**

163. Pages 70 and 71 state that purchase orders for different DODAAC are not allowed to be delivered on the same truck without the permission of the contracting officer.  Does this also apply to different DODAACS located on the same installation (within the same force protection infrastructure)?

**NO**

164. Page 73 mentions the requirement of a customer service representative to provide a fax number.  In areas where there is no functioning fixed telephone system – is it acceptable to provide a mobile telephone number email address only?

**YES**

# Exhibit E

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING

Public Warehousing Company K.S.C. v. Defense Supply Center Philadelphia,
the Defense Logistics Agency, and the Department of Defense

March 15, 2007

**Confidentiality Statement**

This proposal includes confidential data that shall not be disclosed outside the Government and shall not be duplicated, used, or disclosed, in whole or in part, for any purpose other than to evaluate this proposal.  If, however, a contract is awarded to this offeror as a result of or in connection with the submission of this data, the Government shall have the right to duplicate, use or disclose the data in this proposal, as necessary, to the facilities serviced under the contract. This restriction does not limit the Government's right to use information contained in this proposal if it is obtained from another source without restriction.  The data subject to this restriction is contained in all pages of this Business Proposal.

## SUBMISSION REQUIREMENTS
### Price PROPOSAL – PARTII

This proposal is hereby submitted by Public Warehousing Company of Kuwait ("PWC") to the Defense Supply Center Philadelphia for the Kuwait, Iraq and Jordan (Zone 1) Military Facilities. Except as specifically set forth below, the attached Solicitation SPM300-04-R-0323 is hereby incorporated into this bid proposal and agreed-upon by PWC.  If there is any conflict between the terms of this proposal and the terms of the attached Solicitation, we request that DSCP notify PWC of such objections prior to contract award.  PWC has formed a subcontracting distribution team (hereafter referred to as the "PWC Group") utilizing Lankford-SYSCO Food Services, Inc. ("Lankford-SYSCO"), Pocomoke, Maryland, as PWC' principal CONUS subcontractor and Professional Contract Administrators, who will provide on-site contract administration assistance. Together the lead members will be referred to in this proposal as the "PWC Group". It is PWC's intent to purchase some of the higher volume products directly as well as to utilize a CONUS based foodservice distributor such as our current supplier Lankford SYSCO Food Services to supply the balance of products to our warehouse facility.

All terms used herein and not defined shall have the meanings ascribed to them in the Technical Proposal.  This Business Proposal, as well as the Technical Proposal, will form a part of any resulting contract under this solicitation.

The following are responses to the noted sections of the Solicitation:

Supplies/Services and Prices

Government Furnished Material (GFM)

PWC will agree to receive, store, and deliver DSCP procured products.  Although PWC Prime Vendor operates 24/7, we would request that those products be delivered to our facility between the hours of 9:00 A.M. to 5:00 P.M., Saturday through Thursday.  Also, we requested the capability of refusing substandard or shelf life challenged product if we are there after required to issue credit on said substandard DSCP purchased product.

PWC concurs with the Contracting Officer's Representative office requirements for two people. This includes at a minimum, office space (approximately 100 square feet each), two desks and chairs, electricity, as well as normal housekeeping services, temperature control, use of the rest rooms, and a parking spaces for each individual.

Customer Service Policy

The PWC Group will perform any resulting contract with the highest level of service. In addition, PWC agrees that all customer service representatives will speak English and drivers who come in contact with the Government customers will speak English or have the capability to call an English speaking translator.

Additional Customers

PWC will agree to add any mutually agreeable additional customers as requested by DSCP within the general proximity of the contracted distribution area. The transition period for implementation of additional customers will be approximately 45 days.

Juice/Drink Dispensers

PWC will agree to supply beverage machines (i.e., coffee, tea, hot chocolate or juice) and monthly service to any facility where we have installed beverage equipment and/or the facility is purchasing our products for use in their machines.

The beverage equipment and maintenance will be provided at no additional charge to the Kuwait facilities as long as the corresponding beverage is purchased from PWC. If requested, quality control inspections will be performed on each system.

Soda Dispensers

PWC believes it would be more cost efficient for the Kuwait facilities to continue in their current soda fountain dispensing contracts, due to the cost advantages currently enjoyed by the military facilities and not available to commercial distributors. If requested and demanded, however, we will provide soda dispenser equipment and service to any Kuwait and Jordan facility that agree to purchase its fountain products from us.

Warehouse and Distribution Sanitation Program

The PWC Group will use its best efforts to ensure that its sanitation program meets with the Code of Federal Regulations Title 21, part 110 and local laws. PWC will immediately notify DSCP's office of any critical sanitary deficiency and or recall notice and will include a report of our corrective action.

Food Establishments

The PWC Group will continue to survey the suppliers to be utilized to determine their acceptability with respect to requirements such as debarment status, USDA inspection status and their inclusion in the sanitarily approved source list.

**Inspection and Acceptance**

Product Sanitarily Approved Source Requirements

The PWC Group will survey any additional suppliers to be utilized and determine their acceptability with respect to requirements such as debarment status, USDA inspection status and their inclusion in the Armed Forces list of sanitarily approved facilities:

1. ***Directory of Sanitarily Approved Food Establishments for Armed Forces Procurement***
2. ***European Directory of Sanitary Approved Food Establishments for Armed Forces Procurement (USAREUR Circular 40-657)***
3. ***United States Department of Commerce (USDC) directory***
4. ***United States Department of Agriculture (USDA) directory***
5. ***CENTCOM Directory of Sanitary Approved Food Establishments for Armed Forces Procurement***
6. ***VETCOM Directory of Sanitary Approved Food Establishments for Appropriate Qualifying End Countries***

Prime Vendor Systems Management Visits

The PWC Group would welcome Prime Vendor System Management visits, and would request an on-site visitation prior to final contract selection so that we might better demonstrate to the evaluation committee the facilities and systems we have to offer the Kuwait, Iraq and Jordan facilities.

**Special Contract Requirements**

Price Verification

The terms of these provisions of the Solicitation (as well as the provisions under 52.212-5(d) Comptroller General Examination of Records) are adopted in full; provided, however, that (i) any price verification or audit shall be limited to PWC and Lankford-SYSCO and shall never include SYSCO Corporation, and (ii) PWC and Lankford-SYSCO shall be required to maintain documentation for an audit trail for no longer than 1 year from date of transaction. We would ask that the new FAR Clause requiring audit procedures to follow normal commercial business practice be implemented where legal.

Purchasing Procedures

For items ordered from the order guide, the Unit Prices will be frozen for a period of up to six (6) days from the date of order to the date of delivery. Any changes in the Unit Prices due to fluctuations in the Delivered Prices will be calculated on Wednesday 12:00 PM EST and effective the following Sunday through Saturday week i.e. prices change every two weeks.

52.225-9P08 Preference for Certain Domestic Commodities (Nov 1996) DFARS

PWC will also provide due diligence in its efforts to only supply items that are grown and produced in the United States, other than the listed exclusions. These requirements will be eliminated if the laws requiring them change to a not required status.

*PRODUCT LISTING*

*The offeror shall submit one (1) copy of its complete product listing for all food, beverage, and related non-food items as part of the Business Proposal.*

Refer to Attachment 4, Product Listing (Separate Cover)

*SCHEDULE OF ITEMS*

*A schedule of 50-90 Core Items for each zone is listed on Pages    through    , with quantity estimates. The quantities for these items represent current annual usage for the regions. Complete pricing data for those items is essential. However, it should be noted that most of the individual delivery points should be expected to develop a routine demand pattern for approximately six hundred or less of the items. In the post award phase, all available quantity estimates for all the items on the schedule will be provided to the awardee. Ability to source and supply all the items on the schedule will weigh in the evaluation of offers. All of the top items will be subject to extensive price analysis. The offeror must submit current supplier invoices for these items. Invoices should be supplied from the time period two weeks prior to the solicitation issue date (i.e. week of 15 Aug. 2004.)*

*Delivered prices for the following items should be based on the average delivered price ("landed cost") during the full week (Monday through Friday) two weeks prior to the issue date of this solicitation. If no price is available for that particular week, the delivered price used shall be based on the last available price prior to the time specified above. If the price used is not based on pricing for the period two weeks before the issue date of this solicitation, your price should include the date of acquisition.*

Attachment 1 is the market basket reflecting delivered prices, distribution prices and unit prices for the items.

As required, PWC is submitting invoices or quotes as requested in conjunction with the submittal of delivered prices for all items on the schedule.  As a condition to submitting such invoices, we would ask DSCP to hold the invoices in confidence and not disclose the invoices to any third party.  Solely government employees may view the invoices, and DSCP shall inform all such employees of this confidentiality obligation.  Furthermore, once the DSCP has completed its review of the invoices, we would ask that all invoices be returned to PWC.  Again, if copies need to be maintained by DSCP, we appreciate your using proper confidentiality procedures concerning our confidential documents.  To the extent that any such invoices were inadvertently not labeled "Proprietary," we ask that they be so labeled and be considered so labeled in any event.

Our personnel have reviewed the above and assigned distribution prices to all items listed.  Upon award of the contract, our personnel will work with the ordering facilities to determine any change in the items they desire for their particular foodservice operation.  Should they desire an item not currently in stock, subject to our stocking requirements, we will expedite stocking the item(s). PWC as the incumbent stocks the products that the facilities have requested of the type brand, specifications and quality desired. Lankford-Sysco currently services the North Carolina and Mid Atlantic North Zone facilities, therefore they also have a great number of products used by DSCP Prime Vendor facilities  currently in stock.

<u>Therefore, we currently either stock and/or will stock 100% of the items listed in your Attachments, or requested by your Zone 1 Facilities.</u>

## *ADDITIONAL SUBMISSION REQUIREMENTS*

*The offeror is required to submit the following additional information in writing as part of the Price Proposal:*

> *Product Listing*
> *Procurement Pricing Plan*
> *Schedule of Items*

## *A. DISTRIBUTION PRICES*

*1. Firms shall offer a distribution price for each category of items.  The distribution price must be offered as a dollar/cents amount.  Distribution prices offered as a percentage of the delivered price are not acceptable.  The distribution price shall represent the amount to be added to the actual invoice price paid by the prime vendor for each food and beverage product to the manufacturer or supplier.*

*2. Offerors are strongly urged to use the Government's Category List as outlined in paragraph D of the section entitled "Supplies/Services and Prices" when submitting their Distribution Prices.  However, offerors may submit their own food and beverage category listing on which distribution prices are based, subject to the restrictions as outlined in the above listed section.  As stated previously, there is a fifty [50] category limit.*

*3. For Distribution Price Category Listing, prices are to be offered in the same manner in which you sell the product. For example, if you sell a product by the case, then the distribution price will be by the case. Whereas, if you sell the product by the pound or by the each, the distribution price would be listed accordingly. The distribution prices must be stated in a dollar amount, with not more than two places to the right of the decimal point.*

*4. Distribution prices shall remain constant for the complete term of the contract.*

**a. *PRODUCT LISTING***

*The offeror shall submit one (1) copy of its complete product listing for all food, beverage, and related non-food items as part of the Price Proposal.*

Refer to Attachment 4, Separate Cover.

**b. *PROCUREMENT PRICING PLAN***

*The information requested below will not be rated, but will be used in conjunction with your business proposal to substantiate how pricing was developed.*

*1. The offeror should <u>BRIEFLY</u> describe how unit prices are formulated and discuss the variable that may affect the price. <u>BRIEFLY</u> include the methodology used to "cost" products for items acquired from any divisions, subsidiary, or affiliates. Explain how the price to your firm is converted to the delivered price (e.g. average monthly costs, LIFO or FIFO, last invoice methods, etc.).*

*2. <u>BRIEFLY</u> describe the purchasing methods utilized and how they take advantage of price discounts given for quantity purchases, sales and other types of special arrangements made for preferred customers. Describe how market pricing, commercial catalog pricing and competitive purchasing are utilized in your purchasing procedures. State whether qualities of volume price discounts offered are based on anticipated sales volume under this contract or the total sales volume for the company. Pricing of inventory adjustments, including breakage or spoilage shall be provided.*

PRICING

<u>Unit Price Formula</u>

All items purchased under the resultant contract shall consist of two separate price components: "Delivered Price" plus "Distribution Price" to equal "Unit Price." The Unit Price is the total price charged to DSCP per unit for a product delivered to the Government under the resultant contract.

<u>Delivered Price</u>

The Delivered Price is defined as the actual last invoice price of a product PWC pays a manufacturer, distributor or supplier for that product plus the freight transportation cost to move the product to PWC' various distribution facilities i.e. to our CONUS distributor based consolidator or other facility partner in order for SDDC to pick up and deliver to our OCONUS distribution facility docks. Delivered Price is not reduced by cash discounts for prompt payment available to PWC or its supplier. PWC will use their last received cost as their delivered priced based on a LIFO system.

**SPM300-04-R-0323 Public Warehousing Company Price Proposal   Zone 1**                    6
**Use or disclosure of data contained on this page is subject to the confidentiality restriction**

<u>Last Invoice Price</u>

Last Invoice Price is defined, for each product priced every two weeks under this contract, as the cost of the product as shown on the last invoice for such product issued to PWC by the product vendor, supplier, manufacturer, the Merchandising Services Department of SYSCO, or another SYSCO company prior to the date on which PWC establishes the Delivered Price.

"Applicable Freight" means a freight charge for delivering products to SYSCO. Applicable Freight charges may include: (i) common or contract carrier charges by the Product vendor or a third party: (ii) charges billed by Alfmark, Parent's freight management service, for third party carriage arranged by Alfmark; or (iii) charges billed by Alfmark for shipments back hauled on trucks owned or leased by the SYSCO Group.  Applicable Freight for any Product will not exceed the rate charged by nationally recognized carriers operating in the same market for the same type of freight service and for the same quantity of Product.

Merchandising services: The SYSCO Group, including BSCC, performs value-added services for suppliers of SYSCO brand and other Products over and above procurement activities typically provided.

These value-added services include regional and national marketing, freight management, consolidated warehousing, distribution, quality assurance and performance-based product marketing.  Members of the SYSCO Group may recover the costs of providing these services and may also be compensated for these services and consider this cost recovery and compensation to be earned income.  Receipt of such cost recovery or earned income does not reduce the Cost and does not diminish SYSCO's commitment to provide the competitive prices to its customers.

<u>Sell Price.</u>

<u>Calculation of Sell Price</u> – For Products subject to margin on sell pricing, the Sell Price will equal (i) the Cost of the Product divided by (ii)  the difference between 100% and the percentage margin on sell applicable to the product category of such Product as set forth in Schedule 2, less (iii) Supplier Allowances (as defined in Section 7.1.)

    For example, a case of Products with a Cost of $25.00 per case, a margin on sell of 10% and an applicable Supplier Allowance of $.50 per case will have a Sell Price calculated as follows:

| Calculate base price from margin | $\dfrac{\$25.00}{(100\%-10\%)}$ = | $\dfrac{\$25.00}{90\%}$ = | $27.78 |
|---|---|---|---|
| Less applicable allowance (per case) | | | (.50) |
| | Sell Price | | $27.28 |

Frequency of Sell Price Calculation- Sell Prices for all Products will remain in effect for the pricing period set forth in Schedule 2 for the applicable Product Category. Alternative pricing periods are further described below;

    (1)    Time of sale pricing-pricing in effect for current purchase only:

    (2)    Daily Pricing-pricing in effect for a 24 hour period:

    (3)    Weekly pricing-pricing in effect for seven consecutive days; and

(4)  Monthly pricing-pricing in effect for a calendar month  or a defined Customer accounting period.

Starting and ending dates of Supplier Agreements, as defined in Section7.1 hereof, may affect the effective dates of the above pricing periods.

SYSCO reserves the right, on prior notice to Customer, to adjust monthly or weekly pricing in the event of major changes in Cost of any Product defined as a change of more than 10% of then-current Cost.

Distribution Price

The Distribution Price shall be a fixed dollar amount for all items.  The Distribution Price includes but is not limited to PWC' projected general and administrative overhead, packaging costs, transportation delivery costs from PWC' warehouse to the ordering facilities, and any other projected expenses associated with the PWC Group 's function, other than the Delivered Price or recovery of costs for merchandising services provided to vendors discussed below.  The Distribution Price shall include PWC' anticipated distribution profit.

Calculation of the Unit Price in the Catalog

The Unit Price of each product requested will equal (i) the Delivered Price of such product plus (ii) the Distribution Price specified in the Business Proposal for the product, less (iii) promotional or non-profit or NAPA allowances reflected on invoices to PWC ("Off-Invoice Allowances"), which will be passed along as a temporary reduction in the Unit Price for the term of the promotion.

Example:    A product with a Delivered Price of $10.00 per case, a Distribution Price of $1.50, and an Off-Invoice, Non-Profit or NAPA Allowance of $0.50 per case will have a Unit Price calculated as follows:

| Product Price | | Distribution Price | | |
|---|---|---|---|---|
| $10.00 | + | $1.50 | = | $11.50 |
| | | less Off-Invoice or Non-Profit or | | |
| | | NAPA Allowance | | (0.50) |
| | | Unit Price | = | $11.00 |

PWC' Purchasing Policies

Lankford SYSCO, our CONUS based distributor guarantees that the Delivered Price definition for a product delivered to Lankford SYSCO is the same cost basis price that is used to determine the price for all Lankford SYSCO customers that have pricing based on a "delivered price" from the supplier other than the Government paid freight. Lankford SYSCO's computer systems are such that the "delivered price" for a product, on which the customer's price is based, remains constant for every customer, and this "delivered price" may not be changed from one customer to the next. This being the case, our "delivered price" must be competitive or Lankford SYSCO product prices will not be competitive.

PWC purchases competitively in order to be competitive in the marketplace. Lankford-SYSCO assists us in our purchasing and like ourselves they do not bid products weekly, monthly or quarterly. PWC' wants a relationship with our many suppliers over a long period of time to enhance the product consistency and availability our customers demand. Both PWC buyers and Lankford-SYSCO' merchandisers (buyers) attempt to purchase in the lowest brackets available using our combined large volume purchases.

Bi-Weekly Fixed Pricing

The Unit Price for each product for a product listed in the Solicitation and listed in the printed order guides for Zone 1 facilities will remain fixed for a period of six (6) days from the time of order.

The STORES Unit Price for each product listed in the printed order guide will be transmitted by 832 transaction every other Wednesday by 12:00PM EST for the Kuwait, Turkey, Iraq and Jordan facilities (based upon PWC' last defined Delivered Cost plus Distribution Price) reflecting the Unit Prices in effect the following Sunday through Saturday week i.e. 2 weeks.

During the period of this contract, the Unit Price for each product may increase or decrease in direct relationship to fluctuations in bona fide changes in the Delivered Price as depicted on the manufacturer's or supplier's invoice to PWC, plus any freight to our CONUS based distribution point or for OCONUS purchases to our OCONUS distribution facility. Freight and such changes in the Unit Price shall be effective the following week and will be determined in accordance with the method of pricing described in the pricing formula set forth above. Adjustments in the Unit Price shall only reflect those changes in the Delivered Price that have taken effect during the previous two weeks and shall not reflect notices of future adjustments in the Delivered Price.

National Allowance Program

PWC will implement the NAPA program as outlined for the Kuwait, Turkey, Iraq and Jordan facilities.

Food Show Discounts

PWC can implement food show order discounts in either a rebate check format or an off-invoice format.

Rebates Directly to DSCP

In keeping with the standard commercial practice in the food service industry with respect to rebates and allowances, PWC will pass to the DSCP the following types of rebates and allowances:

       (a)    Off-Invoice Allowances - manufacturer promotions or allowances that are reflected on the invoices to PWC.

       (b)    Applicable Non-Profit Allowances - special allowances that are generally established by certain manufacturers specifically for non-profit concerns. The manufacturers of certain products for certain specific market areas usually offer these allowances.

       (c)    Specific Manufacturer Pricing, Rebates or NAPA's - many manufacturers offer specific rebates or special pricing for specific items and customers. These deals are negotiated directly between the manufacturer and the customer.  If the DSCP negotiates with a manufacturer a special price for a certain product, PWC will use the special price as the basis of the Unit Price charged to the DSCP.

If the DSCP negotiates a specific <u>rebate</u> for certain products, the rebate is either paid directly to the DSCP by the manufacturer or the rebate will be passed through to the DSCP by PWC as a reduction in the Unit Price (and the applicable party, i.e., PWC will "bill back" the manufacturer). PWC agrees that all rebates, allowances and discounts outlined above will be passed through to the DSCP. With respect to the specific manufacturer rebates and pricing described in (c) above, PWC will be as aggressive as possible in assisting the DSCP in obtaining such rebates and discounts. Based on our combined purchasing strength and strong relationships with manufacturers, we believe that PWC can assist DSCP in obtaining favorable rebates and allowances from manufacturers.

To reemphasize what we can do, however, PWC will be as aggressive in assisting the DSCP in negotiating these deals with the manufacturers as we are with our other largest customers.

<u>Processing Direct Rebates to DSCP</u>

The process of implementing Direct Rebates begins with an agreement between DSCP and the manufacturer, which lists the products to be discounted for DSCP and the length of time the discounts are authorized.

Once the list is agreed upon, the manufacturer usually sends each Zone 1 facilities a list of the products, which have Direct Rebates. A letter is also usually sent by the manufacturer introducing the product line to each facility with a copy sent to the DSCP Contract Administrator.

This process of implementing discounts takes approximately four weeks from the date the DSCP Contract Administrator receives an agreement from a manufacturer.

At the request of DSCP, the manufacturers can send the Direct Rebate checks directly to DSCP's designated official fund. In this scenario, PWC will assist by tracking the purchases by the Zone 1 facilities of the affected items and provide a printout to the DSCP and the manufacturers.

<u>Two Week Fixed Pricing</u>

The Unit Price for each product in a product listed in the Solicitation and listed in the printed order guides for the Zone 1 facilities will remain fixed for a period of up to six (6) days from the time of order. The STORES Unit Price for each product listed in the printed order guide will be transmitted by 832 transaction set every other Wednesday 12:00 PM ESTfor the Zone 1 facilities (based upon the Delivered Cost plus Distribution Price) reflecting the Unit Prices effective the following Sunday through Saturday week (i.e., two weeks).

During the period of this contract, the Unit Price for each product may increase or decrease every two weeks in direct relationship to fluctuations in bona fide changes in the Delivered Price as depicted on the last received invoice to PWC and such changes in the Unit Price shall be effective every two weeks and will be determined in accordance with the method of pricing described in the pricing formula set forth above. Adjustments in the Unit Price shall only reflect those changes in the Delivered Price that have taken effect during the previous two weeks and shall not reflect notices of future adjustments in the Delivered Price.

<u>SYSCO Procurement</u>

Lankford-Sysco and SYSCO perform value-added services for suppliers of SYSCO® brand and other products over and above procurement activities typically provided. These services include national marketing, freight management, consolidated warehousing, quality assurance and performance-based product marketing. Lankford-Sysco and SYSCO may recover the costs of providing these services and may also be compensated for these services and consider this compensation to be earned income.

This compensation may also include profit. This cost recovery or earned income assumes many forms, including rebates from the manufacturers to SYSCO or Lankford-Sysco, SYSCO's internal attribution of a portion of its earned income to PWC, and intercompany mark-ups between SYSCO and Lankford-Sysco.

Such cost recovery or earned income does not reduce Delivered Price and is not passed through to our customers; however, it does not diminish Lankford-Sysco's commitment to provide PWC with competitive prices. Finally, while earned income is a method of cost recovery for services provided to suppliers, earned income cannot be tracked to specific services or specific products.

Lankford-Sysco represents that prices charged by the Merchandising Services Department of SYSCO to Lankford-Sysco for goods that are sold by Lankford-Sysco to the DSCP activities are the same as prices charged by the Merchandising Services Department of SYSCO for such goods that are sold to other customers of Lankford-Sysco.

Inventory Adjustment and Spoilage

In the event Lankford-Sysco receives non-conforming product from a supplier, any necessary inventory spoilage adjustments and credit procedures will not affect the prices charged to any of our customers, including PWC, as it is a cost of doing business. Merchandise returned to the manufacturer is billed back to the manufacturer and will not be passed on to the customers.

Pricing Comparisons

Lankford-Sysco guarantees that the Delivered Price for a product delivered to PWC is the same price that is passed through to *all* Lankford-Sysco's customers that have pricing based on a "delivered price" from the supplier.

Lankford-Sysco's computer systems are such that the "delivered price" for a product, on which the customer's price is based, remains constant for every customer, and this "delivered price" may not be changed from one customer to the next. This being the case, our "delivered price" must be competitive or our product prices will not be competitive.

Purchases From Other SYSCO Operating Companies

If Lankford-Sysco purchases products from another SYSCO operating Company, such products are priced in either of two ways, depending on whether Lankford-Sysco regularly purchases from the other SYSCO operating company. If Lankford-Sysco purchases a product from another SYSCO operating company and the other SYSCO operating company is not the normal supplier of that product, the Delivered Price will not exceed that normally charged by the normal supplier of the product. Alternately, if Lankford-Sysco regularly purchases a product from another SYSCO operating company, the Delivered Price will be based on the Last Invoice Price from the other SYSCO operating company; provided, however, the Delivered Price will be no higher than the price that would be charged by the product supplier to Lankford-Sysco for the particular product.

Agreement to Back Up Other Zone

The PWC Group agrees to serve as a back up to the other zones within the time frames required at a negotiated fee structure.

Competitive Purchasing

Lankford-Sysco's merchandisers have the ability through SYSCO's procurement database to determine the prices paid for an item by any SYSCO operating company. This information assists the merchandisers in negotiating a reasonable price for that particular item or group of items.

Lankford-Sysco 's Effort to Obtain Lower Delivered Prices for DSCP

As the Zone 1 facilities begin to utilize common products, PWC as well as Lankford-Sysco, in coordination with the DSCP Contract Office Representative, will begin requesting manufacturers to provide specifically for the Zone 1 facilities specific NAPA rebates or special pricing for specific items (the "Direct Rebates").  With the assistance of SYSCO and its combined purchasing strength, Lankford-Sysco should be able to assist in arranging favorable Direct Rebates for the facilities.

New Product Requests

PWC will require that a customer desiring a particular product sign a request for that product depicting the expected average weekly demand. Should a product's reduced movement jeopardize the remaining product shelf life potential; PWC will notify DSCP and the requesting customers of the situation and will require that the product either be ordered by the requesting customer or some other military facility customer to extinguish our inventory as PWC should not be held responsible for expired product due to the failure of the requesting military facilities failure to use the product requested or to notify us of its change of desire.

### c.  PRIME VENDOR (MARKET BASKET) SCHEDULE OF ITEMS

*1.  Delivered prices for the following items should be based on the last delivered price ("landed cost") during the full week (Monday through Friday) two weeks prior to the issue date of this solicitation.  If no price is available for that particular week, the delivered cost used shall be based on the last available price prior to the time specified above.  If the price used is not based on pricing for the period two weeks before the issue date of this solicitation, your price should include the date of acquisition.*

*THE PRIME VENDOR SCHEDULE OF ITEMS FOR THE 7 Middle East Zones ARE ATTACHED as Section 11 of the solicitation ON Pages - to .  YOUR MOST CURRENT SUPPLIER INVOICE FOR THESE ITEMS MUST BE SUBMITTED WITH YOUR OFFER.*

*PLEASE FURNISH PRICES PER POUND FOR ITEMS THAT SPECIFY WEIGHT RANGES.*

*Submission Requirement: The vendor must properly annotate clause 252.225-7001, Buy American Act and Balance of Payments found in the Clause Section of this solicitation in order to identify each item within the market basket as either domestic, qualifying country, or non-qualifying country product.   Qualifying counties are listed in DFARS 225.872-1. At time of solicitation issuance, the qualifying countries are: Australia; Belgium; Canada; Denmark; Egypt; Federal Republic of Germany; France; Greece; Israel; Luxembourg; Netherlands; Norway; Portugal; Spain; Switzerland; Turkey; Italy; United Kingdom of Great Britain and Northern Ireland.*

*NOTE:  OFFEROR MUST INCLUDE A BOTTOM LINE DOLLAR FIGURE FOR THE BASE YEAR AND EACH OPTION YEAR.*

*FOR Zone 1*

*TOTAL DOLLAR VALUE FOR THE BASE YEAR:$_____*

*TOTAL DOLLAR VALUE FOR THE FIRST OPTION PERIOD:$_____*

*TOTAL DOLLAR VALUE FOR THE 2ND OPTION PERIOD: $_____*

*TOTAL DOLLAR VALUE FOR THE 3RD OPTION PERIOD:$_____*

*ESTIMATED GRAND TOTAL BASE YEAR + ALL 3 OPTIONS:$_____*

*F.    OPTION PRICING*

*FAILURE TO INDICATE ACCEPTANCE OF THE OPTION BY ANNOTATING THE OFFEROR'S YEARLY OPTION PERCENTAGE CHANGE MAY BE DEEMED AS NON-ACCEPTANCE OF THE OPTION AND MAY RESULT IN REJECTION OF THE OFFEROR'S ENTIRE PROPOSAL.*

*NOTE: An offeror may choose to maintain the same distribution fees for multiple option years, or, throughout the life of the contract, but, would need to so annotate within this section.*

*Offerors are required to stipulate their distribution price rate of change for all items for each of the available four option years, in the event the option periods are invoked.*

*OPTION YEAR ONE:        _____*

*OPTION YEAR TWO:        _____*

*OPTION YEAR THREE:      _____*

*G.  PLACE OF PERFORMANCE ____*

*(a)  The offeror must stipulate information pertinent to the place of performance. Failure to furnish this information with the offer may result in rejection of the offer.*

*(b)  No change in the places(s) of performance shall be permitted between the opening/closing date of the offer and the award except where time permits and then only upon receipt of the Contracting Officer's written approval.*

*(c)  Any change in the place(s) of performance cited in this offer and in any resulting contract is prohibited unless it is specifically approved in advance by the Contracting Officer.*

*(d)  The offeror in the performance of any contract resulting from this solicitation, ( x ) intends, (  ) does not  intend (check applicable block) to use one or more plants or facilities located at a different address from the address of the offeror as indicated in this proposal or quotation.*

*(e)  If the offeror checks "intends" in paragraph (a) above, it shall insert in the spaces provided below the required information:*

_Zone 1  See Attachment 5_

**_Place of Performance_**
**_(Street, Address, City,_**
**_County, State, Zip Code)_**

**_Name and Address of Owner_**
**_and Operator of the Plant or_**
**_Facility if other than Offeror or Quoter_**

_____   _____

_____   _____

_____   _____

_____   _____

# Exhibit F

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING

Public Warehousing Company K.S.C. v. Defense Supply Center Philadelphia,
the Defense Logistics Agency, and the Department of Defense

March 15, 2007

## Mongeon, Dan

| | |
|---|---|
| **From:** | Toby Switzer [TSwitzer@agilitylogistics.com] |
| **Sent:** | Friday, January 05, 2007 9:00 AM |
| **To:** | Mongeon, Dan; Allen, George |
| **Subject:** | FW: Discounts for Early Payment Inquiry |

FYI

---

**From:** Toby Switzer
**Sent:** Friday, January 05, 2007 4:44 PM
**To:** Sam McCahon; Bader El Jeaan; Tarek Sultan
**Cc:** Essa Al-Saleh; Stephen Lubrano; bcomerpca@earthlink.net
**Subject:** FW: Discounts for Early Payment Inquiry

FYI. Pretty clear guidance. Toby

**C.T. (Toby) Switzer**
CEO and President International
*Agility – Defense & Government Services*
*The new name for PWC Logistics Services*

 

Sulaibiya, Kuwait
tswitzer@agilitylogistics.com
www.agilitylogistics.com
Office: +965-498-1900
US number that reaches my office: 1-617-933-9610
Mobile: +965-983-5801
Fax: +965-467-8953

---

**From:** Dlugokecki, Timothy (DSCP) [mailto:Timothy.Dlugokecki@dla.mil]
**Sent:** Thursday, October 26, 2006 6:21 PM
**To:** Toby Switzer; Stephen Lubrano; Steven Nelson; Basheer Abdul Mansoor
**Cc:** Gordon; Gary Shifton; Linda Ford; Ginny Barnwell; Karla Thompkins
**Subject:** RE: Discounts for Early Payment Inquiry

Toby,
I would like to rescind this request.

I was informed the following:

Discounts or rebates received by the prime vendor from its suppliers as a result of a prompt or early payment made by the prime vendors to such suppliers are not required to be passed to DSCP or its customers.

Thanks,

Tim

**From:** Toby Switzer [mailto:ty.switzer@pwclogistics.com]
**Sent:** Thursday, October 26, 2006 7:13 AM
**To:** Dlugokecki, Timothy (DSCP); Stephen Lubrano; Steven Nelson; Basheer Abdul Mansoor
**Cc:** Ferguson, Gordon (DSCP); Shifton, Gary (DSCP); Ford, Linda (DSCP); Dlugokecki, Theresa A; Barnwell, Ginny (DSCP)
**Subject:** RE: Discounts for Early Payment Inquiry

Tim...I just got back this AM from a long business trip. We are reviewing your request and will respond ASAP. In the interim, could you please let us know the reason behind this request at this time?

Thanks, Toby

C.T. (Toby) Switzer
CEO and President International
PWC Logistics - Defense and Government Services
Office: +965-498-1900
Mobile: +965-983-5801
PWC Logistics www.pwclogistics.com
**Global Supply Chain Excellence**

**From:** Dlugokecki, Timothy (DSCP) [mailto:Timothy.Dlugokecki@dla.mil]
**Sent:** Tuesday, October 24, 2006 9:38 PM
**To:** Toby Switzer; Stephen Lubrano; Steven Nelson; Basheer Abdul Mansoor
**Cc:** Gordon; Gary; Linda Ford; Dlugokecki, Theresa A; Ginny Barnwell
**Subject:** Discounts for Early Payment Inquiry

Toby and all,

How does PWC track the discounts that PWC receives and its subcontractors receive when paying early per payment terms to their suppliers.

For example, if a supplier offers 5% discount for paying within 14 days (a 5% /14, net 30 agreement), how does PWC track this?

Appreciate your assistance.

Thanks,
Tim

***********************************NOTICE*****************************************
This transmittal and/or attachments have been issued by Public Warehousing Company K.S.C.
The information contained here within may be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you have received this transmittal and/or attachments in error, please notify us immediately by reply or by telephone (Tel. +965-809-222) and immediately delete this message and all its attachments.

# Exhibit G

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING

Public Warehousing Company K.S.C. v. Defense Supply Center Philadelphia,
the Defense Logistics Agency, and the Department of Defense

March 15, 2007



*Agility*

A New Logistics Leader

18 January 2007

TO WHOM IT MAY CONCERN

The Sultan Center Food Products Company K.S.C. ("The Sultan Center") is neither a parent nor a subsidiary of The Public Warehousing Company K.S.C.

Yours faithfully

**Elaine Richardson FCIS**
**Group Company Secretary**
**The Public Warehousing Company K.S.C.**

P.O. Box 25418, Safat 13115 Kuwait
Tel. +965 809 222, Fax +965 467 9617
The Public Warehousing Company K.S.C.

ص.ب 25418 الصفاة 13115 الكويت
هاتف 222 809 +965 . فاكس 9617 467 +965
www.agilitylogistics.com    شركة المخازن العمومية ش.م.ك.ق.

**PWC LOGISTICS**

# Exhibit H

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING

Public Warehousing Company K.S.C. v. Defense Supply Center Philadelphia,
the Defense Logistics Agency, and the Department of Defense

March 15, 2007

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PUBLIC WAREHOUSING COMPANY K.S.C. | § § § | |
| vs. | § § | CIVIL ACTION NO. _____ |
| DEFENSE SUPPLY CENTER PHILADELPHIA, THE DEFENSE LOGISTICS AGENCY, and THE DEPARTMENT OF DEFENSE | § § § § § | |

## DECLARATION OF PAMELA S. COOPER

I, Pamela S. Cooper, declare as follows:

1.    I am the Corporate Director for Supplier Diversity for Agility Defense & Government Services Inc., a U.S. subsidiary of Public Warehousing Company K.S.C. ("PWC"), a Kuwaiti company. I work out of our corporate offices in Alexandria, Virginia and reside in Columbus, Ohio. I am authorized to execute this declaration on behalf of PWC. I am submitting this Declaration in support of the Complaint for declaratory and injunctive relief filed by PWC in the United States District Court for the District of Columbia. In addition, PWC has filed a Motion for Preliminary Injunction, a Memorandum of Points and Authorities in Support of the Motion (the "Memorandum"), and a Motion for Expedited Discovery.

2.    Through over thirty-five years of work for the U.S. Government, and an additional four years of work for government contractors, I have become highly knowledgeable about the contracting process and the weight given to past performance reviews. To highlight some of my most relevant credentials, I earned the DAWIA Level III certification, the highest level certification under the Defense Acquisition Workforce Improvement Act ("DAWIA"). A

DAWIA Level III certified Government Contracting Officer has the highest level of combined academic and professional experience in government procurement. I am also a charter member of the prestigious Defense Acquisition Corps, an additional professional designation for members of the senior contracting corps. For over a decade, I held an unlimited Contracting Officer's warrant which gave me authority to approve contracts for any dollar value.

3.     I joined Agility Defense & Government Services as a consultant on June 12, 2006, and became the company's Corporate Director for Supplier Diversity on November 1, 2006 (at that time, the company was known as "PWC Logistics Services Inc."). My primary duties include serving as the head of all small business programs for Agility Defense & Government Services, managing relationships with qualified socioeconomic companies, and helping determine the partners for upcoming Department of Defense ("DoD") business opportunities. I am further responsible for ensuring the quality of the product provided by those potential partners as well as ensuring that due diligence, which includes appraisal of past performance, is conducted on all potential partners.

4.     From April 2004 until April 2006, I served as SAIC's Supplier Relationship Manager for the Air Force Industrial Prime Vendor Program. In this capacity, I was responsible for ensuring that the performance of the vendor base would pass the future scrutiny of the DoD in both current Program Management Reviews and in future source selection decisions. I was responsible for ensuring the capabilities of the contractor base and, in numerous instances, I ensured that subcontracts were not awarded to contractors without proof of acceptable past performance.

5.     I served in the U.S. Government from December 1966 until I retired in September 2002. In my last position at Defense Supply Center Columbus ("DSCC"), I was the Deputy

2

Director of the Maritime Weapons Group and the Senior Contracting Officer within the organization. In that capacity, I was responsible for negotiating, approving and executing awards for up to $1.2 billion with large maritime-related original equipment manufacturers and distributors. In order to ensure that the Navy's future needs were fulfilled, I was responsible for performing due diligence to ensure the capabilities required of the contractor had been proven in previous contracting efforts. A contractor's capability, proven through past performance, was our key concern on critical Navy programs like the Navy Nuclear Program and the Aircraft Launch and Recovery Equipment Program. In addition, I was a Contracting Officer for twenty-seven years. For ten of those years, I was responsible for the entire Pre-Award Survey Process at DSCC, working with both in-house Industrial Specialists and Defense Contract Management Command. The past performance decisions rendered by my staff of over one hundred Industrial and Contract Specialists impacted award decisions across the entire spectrum of over seven hundred contracting officials at DSCC. My staff and I served on Source Selection Evaluation Boards for major source selections at DSCC. As part of this process, we evaluated contractors' technical capabilities and past performance. A brief summary of my U.S. Government experience is attached.

### Past Performance Reviews

6.        As part of their evaluations of prospective contractors' proposals for government contracts, government source selection committees are required to consider and evaluate bidders' past performance. Past performance is a significant, and often the most significant, factor in the evaluation process because the government considers it a key indicator of a company's future ability to perform successfully. In my experience, source selection officials and contracting officers always relied heavily on past performance appraisals.

3

7.    Reviews of a contractor's past performance are available to source selection committees in basically two forms. First, an agency that has contracted with a company is required to submit a past performance evaluation of any completed contract. Agencies are also strongly encouraged to submit these evaluations periodically for large or lengthy contracts. In my experience, unless we had a particular problem with a contractor, we would routinely issue past performance reviews for multi-year open contracts as part of the exercise of options. I have never heard of an agency refusing to give a past performance review because of a pending investigation that was completely unrelated to the technical performance of the contractor.

8.    Past performance evaluations, which are reports that focus solely on the factual technical quality of contractors' work, are entered on official forms and loaded into a government database known as "CPARs." In addition, the contracting agency is required to share past performance information with any other government agency that requests such information.

9.    As a practical matter, without favorable past performance reviews, a contractor has very little chance of winning future contracts. An agency's refusal to provide past performance reviews, particularly on a company's largest or most important government contract, has the practical effect of preventing the company from being evaluated seriously and fairly for new government contracts. That is certainly how I reacted when I was the source selection official evaluating multiple proposals from equally competent contractors.

10.    If an agency does not provide past performance reviews on a contractor to requesting procurement agencies, the contractor will receive "neutral" ratings with respect to its contracts. In a system where positive performance reviews are the norm, a neutral (or missing) rating was perceived by me and others on a source selection committee as a negative compared

4

to the excellent reviews received about that contractor's competitors. Most of the contractor's competitors will have received favorable past performance reviews from their largest customers, leaving the contractor without reviews at a distinct disadvantage – and leaving significant questions about the true capabilities of the contractor in the minds of selecting officials. Certainly, given the close competition on these procurements, the existence of a neutral rating from a contractor's largest customer would lead me to deny an award to that company, especially in view of my ability to choose another competent contractor which had excellent past performance reviews.

11.    Finally, if an agency that had done business with a contractor refused to provide past performance reviews, I would have considered that refusal to be equivalent to an extremely negative review. In other words, an agency's refusal to provide past performance reviews is seen as far more negative than an agency's mere failure to provide reviews. As a source selection official, I would have considered such a refusal tantamount to a warning not to contract with the company. I absolutely would not have awarded a contract to a company whose agency customer refused to provide past performance reviews.


I declare, under penalty of perjury, that the foregoing is true and correct. Executed on March 15, 2007.

Pamela S. Cooper

**ATTACHMENT 1**



Defense Logistics Agency | Defense Logistics Agency History

Storyboard   Organization History   Agency Directors   Hall of Fame   History Links



## Mrs. Pamela Cooper

Mrs. Pamela S. Cooper is nominated for induction into the DLA Hall of Fame for her exceptional leadership, dedicated service, and numerous contributions in support of the missions of the Defense Logistics Agency. Mrs. Cooper served as a role model and inspiration to everyone. Through her tenacity, perseverance, and continued self improvement, she demonstrated that hard work and focused effort are rewarded. Her thirty-five years of loyal service to this great Nation has immeasurably contributed to the readiness posture of the Armed Forces and its ultimate defense of this Nation. Mrs. Cooper embarked on her career as a GS-l temporary and climbed to a management position as a GM-l5. Mrs. Cooper remains an inspiration and her legacy lives on in Strategic Supplier Relationships and hundreds of Associates that ~she mentored who carry on the DSCC Way.

In her last position at DSCC, Mrs. Cooper served as the Deputy Director of the Maritime Weapons Group. As the Defense Logistics Agency's (DLA) Maritime lead center, Mrs. Cooper had oversight management of the Maritime Weapon Systems Group for Surface and Subsurface combatant weapons systems consisting of over 350 weapons systems, and 297,000 National Stock Numbers (NSNs) with an annual demand value in excess of $l68M. During her appointment, the Maritime Directorate excelled to unprecedented levels of achievement. Included in her many accomplishments are: improving support to the warfighter, positive strides in business efficiencies, streamlining acquisition procedures, spearheading the transition to DLA's Business Systems Modernization (BSM), and forging strong bonds with DLA's Navy customers. These accomplishments were possible through her extensive knowledge of the full spectrum of DSCC's business functions and her unwavering support, constant focus, and dedication to customer satisfaction.

The DSCC Way encompasses the principles of customer satisfaction, accountability, speed, quality, innovation, and teamwork performed in an atmosphere of mutual trust and respect. Evidence of Mrs. Cooper's understanding and application of these tenets was easily observed in the remarkable success Maritime enjoyed in achieving business goals. Stocked backorders were reduced by 54.1% and the overage portion of those backorders reduced by an amazing 60.5%. Lowering administrative lead-time for manual awards is a difficult task; however, using acquisition skills she affected a 36-day decrease in Maritime. The Level A weapons systems assigned to her teams consistently achieved their assigned availability goals. The Level B and C systems also showed consistent improvement. These phenomenal results were achieved as a direct result of Mrs. Cooper's keen foresight, understanding of contracting processes, direct involvement with her customers, and implementation of the DSCC Way. She always kept in mind that her people were the source of her power.

Mrs. Cooper constantly strived to improve the delivery of agency products and services. To meet the requirement of fulfilling 33,800 requisitions monthly, Mrs. Cooper implemented innovative approaches to improve the delivery of products. As the Supply Chain Manager for Maritime Supplier Operations, she promoted a significant shift to commercial practices. Taking the lead in the Maritime Directorate, she increased the percentage of actions classified as commercial practices from 11.6% to 58%. Key to this effort was the increase of automated procurements from an average of 322 to 1,667 per month, an 80.7% increase! Another innovative approach she promoted was to increase shipments directly from the vendor to the customer using purely automated electronic ordering procedures, Direct Vendor Delivery (DVD) actions. Championing this movement, Mrs. Cooper was the galvanizing force that resulted in the award of 2 DVD contracts. These contracts were awarded in record time, resulting in a high performing contractor who is experiencing substantial demand growth while meeting the customer's readiness needs. Mrs. Cooper's relentless pursuit to improve service to the warfighter has been a hallmark of the Maritime approach to meeting requirements.

Among the numerous examples of Mrs. Cooper's innovative acquisition solutions was support to the very low-density systems associated with the SEAWOLF class submarine. To meet the customer's needs, a number of creative acquisition solutions were employed, one of which was a partnership with NAVICP and Electric Boat (EB), the manufacturer. She had the foresight to capitalize on the large number of parts available from the manufacturer's stock, allowing immediate access to critical parts with long lead times. To date, over $2M of these parts have been ordered and delivered to the customer.

Mrs. Cooper also proved herself a diplomat in customer relations. While working closely with various Navy activities, she carefully guided her teams and DSCC during the difficult task of Logistic Reassignment of Aircraft Launch and Recovery Equipment (ALRE). This effort culminated with Mrs. Cooper representing DLA during the negotiations for a Memorandum of Understanding (MOU) between DLA, Naval Inventory Control Point (NAVICP),

Naval Air Systems Command and Naval Air Warfare Center, Lakehurst. This MOU, the initiation of Maritime Customer Conferences, and recurring meetings with the Commander, NAVICP were instrumental in forging strong bonds and an atmosphere of trust and mutual confidence within the ALRE community.

Mrs. Cooper displayed a rare combination of business savvy, unflagging energy, and

personal concern for the success and well being of all that work with or for her. Mrs. Cooper was always cognizant of the need to monitor Maritime's progress and was extremely adept at providing leadership that brings positive results. Even more importantly, she was very skillful at managing her people, thus building a team of logistics professionals who worked well together and understood the meaning of customer service. Mrs. Cooper was the driving force behind the concept of developing team metrics and then tying those metrics to annual performance awards. The Maritime model of performance awards was adopted across DSCC.

Mrs. Cooper was also adept at working complex and challenging issues and getting results. She was selected by DSCC's senior leadership to spearhead DSCC's transformation into DLA's Business Systems Modernization (BSM) program. She also played an integral part in developing the BSM business processes from procurement, order fulfillment, planning, and finance. Her comprehensive knowledge of all facets of DSCC business processes was critical in the technological replacement of the aged legacy systems and the transformation into ESM.

Mrs. Pamela S. Cooper is truly a DLA pioneer. She spearheaded new frontiers for women's roles and responsibilities within DSCC and remains an inspiration for future generations of upwardly mobile women. In addition, Mrs. Cooper's astute business acumen had significant positive mission impact spanning three decades. Her legacy will continue to impact the center for years to come. Mrs. Pamela S. Cooper's dedication, selfless devotion to duty, and impact the customer readiness makes her an outstanding candidate for induction to the DLA Hall of Fame.

**Return to Nomination Page**
**Privacy/Security**   **Contact webmaster**

# Exhibit I

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING

Public Warehousing Company K.S.C. v. Defense Supply Center Philadelphia,
the Defense Logistics Agency, and the Department of Defense

March 15, 2007

REDACTED

---

**From:** Ford, Linda (DSCP) [mailto:Linda.Ford@dla.mil]
**Sent:** Wednesday, February 28, 2007 10:06 PM
**To:** Toby Switzer; Steven Nelson; Stephen Lubrano
**Cc:** Gary Shifton; Timothy Dlugokecki; McDuffy, Aditya (DSCP); Gordon
**Subject:** FW: GSA Schedule Application Past Performance Questionnaire

Toby,

Please be advised that DSCP will not participate in past performance surveys for other agencies during the period of the DOJ investigation. Regret any inconvenience this may cause.

Linda


Linda L. Ford
Contracting Officer
DSCP-FTAE
Middle East Region - Prime Vendor
Commercial: (215) 737-7804 / DSN 444-7804
Fax: (215) 737-2161 / DSN 444-2161

# Exhibit J

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING

Public Warehousing Company K.S.C. v. Defense Supply Center Philadelphia,
the Defense Logistics Agency, and the Department of Defense

March 15, 2007

REDACTED

-----Original Message-----
From: Toby Switzer <TSwitzer@agilitylogistics.com>
To: Cross, Jesse R BG (DSCP)
CC: Bellis, Brad CAPT (DSCP); Shifton, Gary (DSCP); Ford, Linda (DSCP);
Ferguson, Gordon (DSCP); Dlugokecki, Timothy (DSCP); Stephen Lubrano
<SLubrano@agilitylogistics.com>; Steven Nelson
<SNelson@agilitylogistics.com>; THoffman
<THoffman@agilitylogistics.com>; Sam McCahon
<SMcCahon@agilitylogistics.com>; McDuffy, Aditya (DSCP); Basheer Abdul
Mansoor <bmansoor@agilitylogistics.com>
Sent: Mon Mar 05 11:24:29 2007
Subject: Request for Performance Survey

Sir,

I am sorry to be writing to you under less than favorable circumstances
but we unfortunately have an issue with an action that DSCP has taken
that can seriously affect our Company's future as a US Government
contractor. Even though I hope we are recognized as one of your top
performers as a Subsistence Prime Vendor, and have performed as such for
almost 4 years in one of the largest and in one of the most challenging
and dangerous environments, I have been advised that DSCP will not issue
a past performance survey for us to other government contracting
officials that request one in conjunction with proposals that we have
submitted.

Obviously, for a Contracting Officer to refuse to provide such report,
especially given the size and scope of our
contracts with DSCP past and present, will send a negative signal even
if it is given without prejudice. All of the great accomplishments we've
made in support of our nation's warriors through the hard work our Team
has done to be a top contractor for DSCP will be for naught and will be
damaging as past performance does mean so much in US Government
contracting. The signal being given by this could jeopardize our ability
to be fairly considered for what we have done.

Knowing that there is an investigation ongoing, nothing has been proved,
nor do we believe anything will, as we have prided ourselves in the
honorable way we have performed. Yet we are being heavily penalized
because there is an investigation. Unfortunately in today's environment,
it is not uncommon for there to be an investigation for a major
contractor in Iraq.  However even with that said, we know of no
restrictions under FAR that would prevent giving facts for a survey of
our past performance record. Hopefully we have earned DSCP's support for
providing one based upon the facts of our performance.

Accordingly, I have attached a formal letter to you respectfully
requesting that this decision be reviewed and overturned or, if need be,
that this request be forwarded to the appropriate officials with your

recommended in order to see that it can be done. The original will be sent to you by courier as well.

I thank you for your support and attention to this matter.

Very respectfully,

Toby

C.T. (Toby) Switzer

CEO and President International

Agility - Defense & Government Services

The new name for PWC Logistics Services


Sulaibiya, Kuwait

tswitzer@agilitylogistics.com

< mailto:jsmith@agilitylogistics.com> www.agilitylogistics.com
< http://www.agilitylogistics.com>

Office: +965-498-1900

US number that reaches my office: 1-617-933-9610

Mobile: +965-983-5801

Fax:  +965-467-8953

# Exhibit K

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING

Public Warehousing Company K.S.C. v. Defense Supply Center Philadelphia,
the Defense Logistics Agency, and the Department of Defense

March 15, 2007

FOR OFFICIAL USE ONLY / SOURCE SELECTION INFORMATION - SEE PAR 2.101 and 3.104

| INCOMPLETE - RATED | CONTRACTOR PERFORMANCE ASSESSMENT REPORT (CPAR) | SERVICES INFORMATION TECHNOLOGY OPERATIONS SUPPORT |
|---|---|---|

**1. NAME/ADDRESS OF CONTRACTOR (Division)**
PUBLIC WAREHOUSING COMPANY (PWC)

SUAIBIYA BESIDE LAND CUSTOMS
SAFAT,
KWT

| 2. | | INITIAL | | INTERMEDIATE | X | FINAL REPORT | | OUT OF CYCLE | | ADDENDUM |
|---|---|---|---|---|---|---|---|---|---|---|

**3. PERIOD OF PERFORMANCE BEING ASSESSED**
07/15/2004 - 02/14/2005

| CAGE CODE SG137 | DUNS + 4 NUMBER 644337248 | **4a. CONTRACT NUMBER** SP030004D3061 | **4b. DOD BUSINESS SECTOR & SUB-SECTOR** TROOP SUPPORT |
|---|---|---|---|

| FSC OR SERVICE CODE 8940 | NAICS 424490 | **5. CONTRACTING OFFICE (Organization and Code)** HFOM |
|---|---|---|

**6. LOCATION OF CONTRACT PERFORMANCE (If not in item 1)**
Customers located in Kuwait, Iraq and Qatar.
Contractor warehouses are located in Kuwait and Qatar.

| **7a. CONTRACTING OFFICER** LINDA FORD | **7b. PHONE NUMBER** (215) 737-7804 |
|---|---|

| 8a. CONTRACT AWARD DATE 05/28/2003 | 8b. CONTRACT EFFECTIVE DATE 07/01/2003 | 9. CONTRACT COMPLETION DATE 02/14/2005 |
|---|---|---|

10. N/A

| 11. AWARDED VALUE $111,959,520 | 12. CURRENT CONTRACT DOLLAR VALUE $873,284,256 |
|---|---|

| 13. | X | COMPETITIVE | | NON-COMPETITIVE |
|---|---|---|---|---|

**14. CONTRACT TYPE**

| X | FFP | | FPI | | FPR | | CPFF | | CPIF | | CPAF | | OTHER | MIXED: IDTC-IQC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**15. KEY SUBCONTRACTORS AND DESCRIPTION OF EFFORT PERFORMED**
0UUM9 Lankford-SYSCO Food Service, Pocomoke, MD
CONUS supplier providing full range of prime vendor food products.
  Rastelli's Fine Foods, Deptford, NJ
CONUS Small Business providing primarily meat items, but acts as broker/distributor for full range of prime vendor food products.

(continued...)

**16. PROGRAM TITLE AND PHASE OF ACQUISITION (If applicable)**
Prime Vendor Program Contractor providing full line food support to US Troops located in Kuwait, Iraq and Qatar.  The competitively awarded base year and four one-year options contract reached the dollar threshold ceiling for base period and first option in less than a year, each period had a dollar threshold of $291,094,752.  Base period began July 2003 and the dollar ceiling was reached in March 2004.  First year option was invoked in

(continued...)

**17. CONTRACT EFFORT DESCRIPTION (Highlight key components, technologies and requirements; key milestone events and major modifications to contract during this period.)**
After award OIF was incorporated into the requirements of this contract.  An active military mission introduced into this contract a delivery area fraught with unanticipated contract complications and an unstable customer base.  PWC has demonstrated a clear committment to providing the best possible support to US Troops;  has exhibited a high level of cooperation with all involved; and continued with internal growth and development.

During this contract period, two specific programs were initiated as a result of the

(continued...)

| 18. EVALUATE THE FOLLOWING AREAS | PAST RATING | CURRENT RATING | | | | | |
|---|---|---|---|---|---|---|---|
| | | Unsatisfactory | Marginal | Satisfactory | Very Good | Exceptional | N/A |
| a. QUALITY OF PRODUCT OR SERVICE | Very Good+ | | | | X | | |
| b. SCHEDULE | Very Good | | | | X | | |
| c. COST CONTROL | NA | | | | | | X |
| d. BUSINESS RELATIONS | Exceptional+ | | | | | X | |
| e. MANAGEMENT OF KEY PERSONNEL * | NA | | | | X | | |
| f. OTHER AREAS | | | | | | | X |
| (1) | | | | | | | X |
| (2) | | | | | | | X |
| (3) | | | | | | | X |
| (4) | | | | | | | X |
| (5) | | | | | | | X |
| (6) | | | | | | | X |
| (7) | | | | | | | X |

DD Form 2846, September 2002
* Not applicable to Operations Support

FOR OFFICIAL USE ONLY (When Filled In)

FOR OFFICIAL USE ONLY / SOURCE SELECTION INFORMATION - SEE FAR 2.101 and 3.104

| 19. N/A | | | |
|---|---|---|---|
| | | | |
| | | | |

**20. ASSESSING OFFICIAL** (i.e. PROGRAM MANAGER OR EQUIVALENT INDIVIDUAL RESPONSIBLE FOR PROGRAM, PROJECT, OR TASK/JOB ORDER EXECUTION) NARRATIVE (See PARA. 1.3)

QUALITY OF PRODUCT OR SERVICE: PWC provides both prime vendor items and fresh fruit and vegetables.

Based on 1132s and communication with DSCP Europe, there appears to be few complaints regarding prime vendor type items.  There have been order/product rejection due to temperature malfunctions on delivery vehicles, and expired shelf life.  Such instances are infrequent - less than monthly.  PWC delivers up to a million cases a week.

Based on 1132s and communication with DSCP Europe, there are on-going problems with fresh fruits and vegetables.  PWC replaces rejected items and is seeking an effective

(continued..)

| 21. NAME AND TITLE OF ASSESSING OFFICIAL (See PARA. 1.3) | ORGANIZATION AND CODE | PHONE NUMBER |
|---|---|---|
| GARY SHIFTON<br>SECTION CHIEF, PV EUROPE & MID EAST | DSCP-FTABM | |
| EMAIL ADDRESS | | FAX NUMBER |
| SIGNATURE | | DATE 07/18/2005 |

**22. CONTRACTOR COMMENTS** (Contractor's Option)

| 23. NAME AND TITLE OF CONTRACTOR REPRESENTATIVE | PHONE NUMBER |
|---|---|
| EMAIL ADDRESS | FAX NUMBER |
| SIGNATURE | DATE |

**24. REVIEW BY REVIEWING OFFICIAL** (Comments Optional)

| 25. NAME AND TITLE OF REVIEWING OFFICIAL | ORGANIZATION AND CODE | PHONE NUMBER |
|---|---|---|
| EMAIL ADDRESS | | FAX NUMBER |
| SIGNATURE | | DATE |

DD Form 2846, September 2002                                                    FOR OFFICIAL USE ONLY (When Filled In)

FOR OFFICIAL USE ONLY / SOURCE SELECTION INFORMATION - SEE FAR 2.101 and 3.104

15. KEY SUBCONTRACTORS (...continued)
1T651 Richmond Wholesale, Richmond, CA
CONUS supplier.  Distributor/wholesaler providing full range of prime vendor food products.

16. PROGRAM TITLE (...continued)
March 2004 and the dollar ceiling was reached in July 2004.  Options 2, 3 & 4 were invoked concurrently July 2004 with a total cumulative ceiling of $873,284,256.

17. CONTRACT EFFORT (...continued)
combined efforts of US Military Representatives in theater, DSCP and PWC.  These two programs are the Transportation Officers and Squad Leaders Programs.

The implementation of the Transportation and Squad Leader Programs was the result of an evergrowing problem of the loss of PWC vehicles.  While there were a few reasons for loss of vehicles, a major issue was that PWC vehicles were being held for extended periods of time as additional storage by US Troops in the field of operation.  US Government agencies and PWC worked diligently to develop strategies to return PWCs assets, to provide for on-the-road vehicle and driver safety, and to maintain better oversight of PWC delivery vehicles.  Anticipated positive results have been realized, in that PWC vehicles are being returned to PWC; vehicles can be checked at established PWC stations en route as drivers are provided the opportunity to eat and rest; and PWC is actively tracking all vehicles.  Additonal benefits of these programs are alleviation of war environment related difficulties between delivery personnel and US Troops, and increased efficient and effective customer ordering - reducing customer need for extra storage space.

Each of the identified programs were incorporated into the contract via  modification and did provide financial compensation to PWC for the addtional requirements.

Additonal efforts by PWC to stimulate the development of a more positive business relationship with customers include the development and distribution of a PWC bi-weekly newsletter.  The PWC newsletter provides US Troops with relevant changes at PWC and limited information on customers, as well as addresses current system challenges (PWC and/or customer systems), current menus, short shelf life items and available substitutions.

PWCs average monthly fill rates are 96.2 to 98.8% without substitutuion, and 96.6 to 99.6% with substitution; average monthly number of cases shipped ranges from 3.8 million to 8.4 million.

Average daily expenditures range from $2.9 to $6.8.

PWC actively pursues small business support and is currently providing 18 to 20% of product from US small business manufacturers.  PWC also participates in the Indian Incentive Program.

PWC continues to have some issues pertaining to data collection and verification, but has made significant improvements during this contract period and continues to make progress.

20. ASSESSING OFFICIAL NARRATIVE (...continued)
resolution to this problem.  PWC deliveries over a million pounds of produce a week.

Based on information received, acceptance vs. rejection demonstrates that product delivered is usually very good.

SCHEDULE: PWC has consistently met scheduled deliveries.

BUSINESS RELATIONS: PWC has expanded its supplier base, incorporating diversity of product requested by customers.

(continued...)

FOR OFFICIAL USE ONLY (When Filled In)

FOR OFFICIAL USE ONLY / SOURCE SELECTION INFORMATION - SEE FAR 2.101 and 3.104

20. ASSESSING OFFICIAL NARRATIVE (...continued)

In an effort to ensure continued product quality, PWC monitors and evaluates suppliers on their ability to provide maximum shelf life on all products.

PWC continues to demonstrate commitment to customers by maintaining close communications with US Military Representatives in theater and DSCP, both Europe and Philadelphia.

PWC has maintained an "open mind" to alternatives and new ideas to improve service while at the same time initiating their own plans to improve overall performance.

MANAGEMENT OF KEY PERSONNEL: PWC has greatly expanded its list of personnel, employing various searches and recruiting methods.  As a result of careful selection combined with on-going corporate evaluation, PWC has a refined staff of individuals fully capable of responding to the ever changing needs of US Troops involved in OIF.

ADDITIONAL/OTHER: Overall evaluation of PWC's performance as a prime vendor providing support to US Military in  Kuwait, Qatar and Iraq is Very Good to Exceptional.

For the duration of the contract the firm has demonstrated high commitment to customer service by being responsive to customer needs, providing quality products through on-time deliveries.

PWC accepted the challenge of providing support in a war zone and willingly worked to create a high level of open communications with appropriate US Government personnel.  PWC provided assistance in identifying problem areas and actively participating in problem resolution.

Based on the high level of customer satisfaction and PWCs demonstrated level of cooperation and responsiveness to customer needs, contractor performance is rated Very Good to Exceptional.

    RECOMMENDATION: Given what I know today about the contractor's ability to execute what they promised in their proposal, I definitely would award to them today given that I had a choice.

# Exhibit L

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING

Public Warehousing Company K.S.C. v. Defense Supply Center Philadelphia,
the Defense Logistics Agency, and the Department of Defense

March 15, 2007



**DEFENSE LOGISTICS AGENCY**
DEFENSE SUPPLY CENTER PHILADELPHIA
700 ROBBINS AVENUE
PHILADELPHIA, PENNSYLVANIA 19111-5092

IN REPLY
REFER TO

DSCP- FTABM (Linda Ford /215-737-7804)

The Public Warehousing Company K.S.C. (PWC)                          5 May 2005
ATTN: Mr. Toby Switzer
Beside Land Customs Clearing Area
P.O. Box 25418
Sulaibiya
Safat
13115 Kuwait

SUBJECT: PWC Summary Audit Results and Request for Corrective Actions
     References:
          A. Contract SPM300-05-D-3128
          B. Food audit dated 15-16 February 2006 in Safat Kuwait

Dear Toby,

Thank you for the time and effort you and your staff put into hosting our National Meat, Seafood,
Poultry, and Fruits and Vegetables Audit. I would like to specifically acknowledge your
supportive and hospitable staff.

As previously discussed, the result of your food audit was excellent. PWC received an overall
item acceptability rate of 97%. This rating is well above the DSCP control limit of 85%
acceptability. The following are the ratings per category:

|            |                    |
| ---------- | ------------------ |
| Meats      | 100% acceptability |
| Poultry    | 85% acceptability  |
| Seafood    | 100% acceptability |
| Fruits/    | 100% acceptability |
| Vegetables |                    |

A total of 58 items were evaluated during the audit. Two (2) of the audited items received a
BLUE rating indicating STOP – do not supply items from the inspected lots to DoD customers.
Five (5) of the audited items received a YELLOW rating indicating item needs work to be fully
acceptable.

For your convenience, the following is a summation of the results as it pertains to the evaluation
criteria utilized:

1

RED [STOP issue to DOD customers immediately], are issues that materially affect or is likely to affect the serviceability or continued storage of an item for future use. Some examples are products that exhibit: off condition, decomposition, freezer burn, dehydration or otherwise render an item not suitable for consumption or continued storage.

BLUE [STOP- Supply to other programs or use Undesirable], are deviations from contract or stock number requirements that materially affect, or are likely to materially affect the serviceability, condition, or continued storage of an item for further use. Product is not desirable for DOD customer food service application. Some examples are: Domestic Source Violations, Regulatory Violations, Approved Source Violations, Wrong Item, Grade Failures or Mismatch, Expiration Date or Shelf Life, Major Workmanship or Fabrication Violations, Gross Weight Violations, Major Portion Control Violations, Labeling, Packaging Packing Violations.

YELLOW [Needs work to be fully acceptable], these minor departures from requirements have some impact on the usability of the item for the food service requirements however, can be tolerated by the services for short period of time not more than 30 days. Some examples are: cataloging, minor-workmanship, weight, and packaging, marking or labeling issues that would not necessitate a regulatory market suspension

GREEN [Acceptable],no departures from the contract or the item description stock number requirements.

In addition to the data contained in the formal audit report that has been mailed to your office, the specific items or areas of concern were identified as follows:

1. *8905-01-E60-5930 - Turkey Breast Cutlet – Rating: Blue – Workmanship: Portion weights were inconsistent. Portion weight should be 5 oz.*
2. *8905-01-E09-2184- Turkey Breast, BNLS, Sliced – Rating: Blue – Wrong Item: Specs required deli- style turkey breast; however, a luncheon style turkey was provided.*
3. *8905-01-E60-5049 – Beef Sirloin Tip – Rating: Yellow – Packaging: No tape on bottom of box.*
4. *8905-01-E59-2158 – Bacon, Preckd, Slcd – Rating: Yellow – Workmanship: Char marks need to be removed from bacon strips.*
5. *8905-01-E60-7815 – pork Riblets, Bnls, Fzn – Rating: Yellow – Cataloging: item improperly identified. Local Stock number must match product*
6. *8905-01-E60-4317 – Fish, Crab Legs, Alaskan King – Rating: Yellow – Cataloging: NAPA number is incorrect*
7. *8915-00-129-0825 – Veg, Broccoli, Fzn – Rating: Yellow – Weight: 2 of 3 net weights were low.*

Upon receipt of the formal audit report, please review all the details and the results for all items and provide the written details of the corrective action taken to this office by May 26,2006. Please don't hesitate to contact me if you have any questions. Thank you for your cooperation.

Sincerely,

Linda L. Ford
Contracting Officer

# Exhibit M

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING

Public Warehousing Company K.S.C. v. Defense Supply Center Philadelphia,
the Defense Logistics Agency, and the Department of Defense

March 15, 2007



THE

DEFENSE LOGISTICS AGENCY

NEW CONTRACTOR OF THE YEAR AWARD

PRESENTED TO

PUBLIC WAREHOUSING COMPANY KSC
Safat, Kuwait

       

TF 2-2 IN   TF 1-63 AR   TF 2-63 AR   TF 1-6 FA   TF 82 EN   201 LTF   HHC, 3BCT   F TRP, 4CAV

# CERTIFICATE OF RECOGNITION

## IS PRESENTED TO THE

# Public Warehouse Company



*For providing outstanding support to the 3rd Brigade Combat Team during Operation Iraqi Freedom II. Your dedication to providing quality food and service to our soldiers has helped fuel their efforts in bringing freedom to the people of Iraq. Your efforts have provided an increased quality of life for all serving in Iraq. Your dedication to soldiers on the battlefield upholds the finest traditions of military service and reflects distinct credit upon PWC, the 3rd Brigade Combat Team, and the United States Army.*



*Given this 29th Day of January 2005*

JOHN D. FOURHMAN
CSM, USA
**Command Sergeant Major**

DANA J.H. PITTARD
COL, AR
Commanding

# Exhibit N

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING

Public Warehousing Company K.S.C. v. Defense Supply Center Philadelphia,
the Defense Logistics Agency, and the Department of Defense

March 15, 2007



**DEFENSE LOGISTICS AGENCY**
DEFENSE SUPPLY CENTER PHILADELPHIA
700 ROBBINS AVENUE
PHILADELPHIA, PENNSYLVANIA 19111-5092

IN REPLY
REFER TO

DSCP-FTAB (Linda Ford/215-737-7804)         18 November 2005

Ms. Elaine Bland
Public Warehousing Corp.
P. O. Box 25418, Safat
13115 Kuwait

SUBJECT:  Letter of Appreciation

Dear Ms. Bland:

   I would like to take this opportunity to recognize your outstanding personal efforts in support of DSCP, the warfighter and the U. S. war on terror.  Team Qatar faced many challenges and obstacles during the initial stages of implementation.  Your outstanding leadership and professionalism allowed Team Qatar to successfully overcome these difficulties, and provide DSCP customers with exceptional support.  You truly possessed the PWC "can do" attitude and we could always rely on you to "make it happen".

   Some of the more significant accomplishments you and your team were able to achieve are as follows:

- Over 2.1 million Prime Vendor product cases shipped
- Over 9.5 million pounds of Local Market Ready product shipped
- Value of total product shipped to date is $91M
- 100% Customer Satisfaction based on Customer Feedback Reports
- Out of 2,704 deliveries, only six were late (4 hours or less)

   Again, congratulations on a job well done.  On behalf of DSCP and the entire military services serving around the world, we thank you.

                    Sincerely,

                    JAMES D. HAVERSTICK
                    Deputy Director
                    Supplier Operations



**DIRECTOR**
**DEFENSE LOGISTICS AGENCY**
**8725 JOHN J. KINGMAN ROAD, SUITE 2533**
**FORT BELVOIR, VA 22060-6221**

February 10, 2005

Mr. C. T. Switzer
General Manager – Prime Vendor
PWC Logistics
PO Box 25418 Safat
13115 Kuwait

Dear Mr. Switzer:

It was indeed a pleasure to see you again. Thank you for your hospitality and for taking the time to brief me on the impressive performance and capabilities of PWC Logistics. The support that you provide to our troops is critical to our continued success in theatre. I look forward to our future collaboration as we identify opportunities to improve the support for our warfighter.

Again, thank you for your warm hospitality and support.

Sincerely,

KEITH W. LIPPERT
Vice Admiral, SC, USN










# Third United States Army
## Coalition Forces Land Component Command
### In Support of Operation Iraqi Freedom

# CERTIFICATE OF APPRECIATION

FOR

## TOBY SWITZER

For outstanding performance supporting Operation Iraqi Freedom Thanksgiving Meal. Your support of the Subsistence Prime Vendor Program has resulted in a greatly enhanced quality of life for soldiers, sailors, airmen and marines serving in the CFLCC Area of Operations. Your participation in the food service team truly embodies the "One Team, One Fight" concept for military operations, contractors and industry working together to achieve outstanding results. The quality of the Theater Good Service Program is a tribute to the military, Department of Army and Department of Defense civilians and contractors.

Presented this 25th day of November 2004

R. STEVEN WHITCOMB
LIEUTENANT GENERAL, US ARMY
Commanding General






# Certificate of Appreciation

## Mr. Toby Switzer

### PV GENERAL MANAGER



Persistence, perseverance, resilient - this was your battle cry in support of Operation ENDURING FREEDOM/Operation IRAQI FREEDOM. You rallied and reassembled with an indomitable, unbreakable spirit and the absolute refusal to ever compromise or quit regardless of the challenges you encountered in meeting the warfighters needs. Your hard work demonstrates one that is rooted in relationships—a company that can be counted on for support in the worst of times as well as in the best. We have seen barriers dissolve as our spirits blended in a common goal and a spirit that taught us we can meet any challenge, no matter the odds. You have sent a strong message of confidence, commitment and loyalty to our men and women of the armed services and having these principles helped them not only to survive, but prevail during trying times.





# Association of the United States Army Kuwait Chapter

# CERTIFICATE OF APPRECIATION

Mr. Toby Switzer

*Managing Director PWC Logistics*

On behalf of AUSA, I wish to extend my sincere thanks and appreciation for your support of the September 11th (9-11) Memorial Walk 2006. Your donation of food allowed over 230 people to pay their respects to the victims of 9-11 and then enjoy a great meal. Your generosity, coupled with the dedication and professionalism of your staff, were instrumental in the success of the 9-11 Memorial Walk. These actions reflect great credit upon you and are in keeping with the highest standards we have come to expect in the military.

## GIVEN UNDER MY HAND THIS 20th OF SEPTEMBER 2006

Samuel S. Thompson III
Brigadier General, USA. (Ret) President, Kuwait Chapter



# Exhibit O

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING

Public Warehousing Company K.S.C. v. Defense Supply Center Philadelphia,
the Defense Logistics Agency, and the Department of Defense

March 15, 2007

| SOLICITATION, OFFER AND AWARD | This Contract is a Rated Order Under DPAS (15 CFR 700) | Rating | Page | of pages |
|---|---|---|---|---|

| 2. Contract No. | 3. Solicitation No. W91GXZ-07-R-0011 | 4. Solicitation Type ☐ Sealed Bid (IFB) ☒ Negotiated (RFP) | 5. Date Issued 01 MAR 2007 | 6. Requisition/Purchase No. |
|---|---|---|---|---|

| 7. Issued By | Code | 8. Address Offer To (if other than item 7) | Code |
|---|---|---|---|
| Joint Contracting Command - Iraq/Afghanistan Facilities and Transportation Sector International Zone, Baghdad Iraq, APO AE 09348 | | See Section L-9 of the solicitation | |

NOTE: In sealed bid solicitations "offer" and "offeror" mean "bid" and "bidder".

## SOLICITATION

9. All offers are for furnishing the supplies or services in the Schedule will be received at the place specified in section L-9, until **1700hrs, BAGHDAD TIME** 01 APR 2007.

CAUTION — LATE Submissions, Modifications, and Withdrawals: See Section L, Provision No. 52.215-1. All offers are subject to all terms and conditions contained in this solicitation.

| 10. For Information Contact: | A. Name Liz Anton, Contract Specialist | B. E-Mail Liz.Anton@pco-iraq.net |
|---|---|---|

| (x) | Sec | Description | Page(s) | (x) | Sec | Description | Page(s) |
|---|---|---|---|---|---|---|---|
| | | **Part I — The Schedule** | | | | **Part II — Contract Clauses** | |
| X | A | Solicitation/Contract Form | | X | I | Contract Clauses | 27-37 |
| X | B | Supplies or Services and Prices/Costs | 1 | | | **Part III — List of Documents, Exhibits and Other Attachments** | |
| X | C | Description/Specs./Work Statement | 2-13 | X | J | List of Attachments | 38 |
| X | D | Packaging and Marking | 14 | | | **Part IV — Representations and Instructions** | |
| X | E | Inspection and Acceptance | 15 | | | | |
| X | F | Deliveries or Performance | 16 | X | K | Representations, Certifications and Other Statements of Offerors | 39-42 |
| X | G | Contract Administration Data | 17 | | | | |
| X | H | Special Contract Requirements | 18-19 | X | L | Instr., Conds., and Notices to Offerors | 43-51 |
| | | | 20-26 | X | M | Evaluation Factors for Award | 52-54 |

## OFFER (Must be fully completed by offeror)

NOTE: Item 12 does not apply if the solicitation includes the provisions at 52.214-16, Minimum Bid Acceptance Period.

12. In compliance with the above, the undersigned agrees, if this offer is accepted within _____ calendar days (60 calendar days unless a different period is inserted by the offeror) from the date for receipt of offers specified above, to furnish any or all items upon which prices are offered at the price set opposite each item, delivered at the designated point(s), within the time specified in the schedule.

| 13. Discount for Prompt Payment | 10 Calendar Days % | 20 Calendar Days % | 30 Calendar Days % | Calendar Days % |
|---|---|---|---|---|

| 14. Acknowledgment of Amendments The offeror acknowledges receipt of amendments to the SOLICITATION for offerors and related documents numbered and dated. | Amendment No. | Date | Amendment No. | Date |
|---|---|---|---|---|

| 15A. Name and Address of Offeror | Code | | Facility | 16. Name and Title of Person Authorized to Sign Offer (Type or print) |
|---|---|---|---|---|
| 15B. Telephone No. (Include area code) | 15C. Check if Remittance Address is different from above. Enter such address in Schedule. | | 17. Signature | 18. Offer Date |

## AWARD (To be completed by Government)

| 19. Accepted as to Items Numbered | 20. Amount | 21. Accounting and Appropriation |
|---|---|---|

| 22. Authority for Using Other Than Full and Open Competition ☐ 10 U.S.C. 2304 (c)(   ) ☐ 41 U.S.C. 253 (c)(   ) | 23. Submit Invoices to Address Shown in (4 copies unless otherwise specified) | Item |
|---|---|---|

| 24. Administered By (If other than item 7) | Code | 25. Payment Will be Made By | Code |
|---|---|---|---|
| | | USACE FINANCE CENTER ATTN: CEFC-FP-ACCOUNTS PAYABLE DIVISION MILLINGTON, TN 38054-5005 CEFC-p0invoices@fc02.usace.army.mil | |

| 26. Name of Contracting Officer (Type or print) DEREK W. KARIS | 27. United States of America (Signature of Contracting Officer) | 28. Award Date |
|---|---|---|

IMPORTANT — Award will be made on this form, or on Standard Form 26, or by other authorized official written notice.

NSN 7540-01-152-8064
PREVIOUS EDITION NOT USABLE

33-134

STANDARD FORM 33 (Rev. 4-85)
Prescribed by GSA • FAR (48 CFR) 52.214 (c)

**Section M - Evaluation Factors for Award**

CLAUSES INCORPORATED BY REFERENCE

| 52.217-5 | Evaluation Of Options | JUL 1990 |
|----------|-----------------------|----------|

### M-1 AWARD BASED ON BEST VALUE TO THE GOVERNMENT

The Government will award a contract resulting from this solicitation to the responsible offeror whose offer conforming to the solicitation will be most advantageous to the Government, price and other factors considered. All non-price factors, when combined, are significantly more important than price. With regards to non-price factors, Past Performance is more important than Socioeconomic and Technical; Socioeconomic and Technical are equal in value. Offerors shall submit proposals in four volumes that address past performance, socio-economic contributions, technical approach and cost, respectively.

Proposals will be assessed for how well the Offeror's proposal meets the solicitation requirements and the risks associated with the Offeror's approach. Determining how well the Offeror's proposal meets the solicitation requirements will be accomplished in two steps. First, a determination will be made if the Offeror's proposal meets the solicitation requirements. Next, the proposals will be evaluated on their unique strengths, weaknesses, significant weaknesses, and deficiencies of each offer. In addition, the Government will examine the impact of each strength, weakness, significant weakness, and deficiencies and assess the relative value to the Government.

In order to make a sound selection decision, the Government needs to understand the ways in which a given proposal is considered technically strong, as well as the ways in which it is weak or deficient. Hence, a catalog of the strengths, weaknesses, significant weaknesses, and deficiencies (in terms of the evaluation factors) facilitates the process of determining which proposal presents the best overall value to the Government.

(1) Past Performance. The past performance assessment will assess the confidence in the offeror's ability (which includes, if applicable, the extent of its critical subcontractors' or teaming partners' involvement) to successfully accomplish the proposed effort based on the offeror's demonstrated present and past work record. The Government will evaluate the offeror's demonstrated record of contract compliance in supplying products and services that meet users' needs including cost and schedule. The currency and relevancy level of the information, the source of the information, context of the data and general trends in the contractor's performance will be considered. The Government will perform an independent determination of relevancy of the data provided or obtained. A determination of risk that the offeror can successfully accomplish the proposed effort based on the provided or obtained past performance data will also be made. The Government is not bound by the offeror's opinion of relevancy. In the past performance evaluation, the following relevancy levels apply:

The following relevancy criteria apply:

- VERY RELEVANT: Present/Past Performance programs involved the magnitude of effort and complexities which are essentially what the solicitation requires

- RELEVANT: Present/Past Performance programs involved the magnitude of effort and complexities including most of what the solicitation requires

- SEMI-RELEVANT: Present/Past Performance programs involved the magnitude of effort and

complexities including some of what the solicitation requires

- NOT RELEVANT: Did not involve any significant aspects of what the solicitation requires

A higher degree of relevancy will carry a higher weight when determining an offeror's past performance rating.

To evaluate past performance, the offeror must complete and submit past performance questionnaire, Attachment J5, for like services within the last five (5) years. The Government reserves the right to contact any of the references listed, any references of other known efforts performed by the contractor, as well as any existing past performance information from Government databases.

Past performance will be evaluated using the following adjectival ratings:

- EXCEPTIONAL: Exceptional in all significant respects. Past performance data was very favorable overall. There is very low risk that the offeror will fail to meet the requirements of the proposed effort..  VERY LOW RISK

- GOOD:  High quality in most respects; good probability of success; generally exceeds minimum requirements; improvement possible or could be further detailed: Past performance data included some favorable elements and some unfavorable elements. There is moderate risk that the offeror will fail to meet the requirements of the proposed effort.  LOW RISK

- SATISFACTORY:  Adequate overall performance, but some areas less than thorough in analysis or detail; fair probability of success; meets minimum requirements, improvement possible in some major areas. There is moderate risk that the offeror will fail to meet the requirements of the proposed effort.  MODERATE RISK

- UNSATISFACTORY:  Inadequate performance fails to meet minimum requirements. Past performance data was unfavorable overall.  There is high risk that the offeror will fail to meet the requirements of the proposed effort.   HIGH RISK

- NEUTRAL:  Unknown confidence that the offeror will perform successfully. Firms lacking relevant performance history or for whom no information is available will not be evaluated favorably or unfavorably on this factor.   They shall receive a neutral rating. No risk determination can be made based upon the past performance data provided/obtained. Per FAR Part 15.305 (a) (2) (iv), in the case of an offeror without a record of relevant past performance or for whom information on past performance is not available; the offeror will not be evaluated favorably or unfavorably on past performance.  NO RISK ESTABLISHED

**Socio-Economic Contributions.** Offerors will be evaluated on contribution of Iraqi labor, number and positions of Iraqi workers, and involvement of Iraqi women.  Socioeconomic contribution will be evaluated in aggregate, using the rating methodology described below.

The Government shall evaluate the Socioeconomic factor using four adjective rating definitions.  The following four rating definitions apply:

- EXCEPTIONAL: Exceptional in all significant respects; maximizes contribution of Iraqi labor; maximizes employment of Iraqi women.

- GOOD: High quality in most respects; generally favors the contribution of Iraqi labor and includes employment of Iraqi women; improvement possible or could be further detailed.

- SATISFACTORY: Adequate overall; does not stress use of Iraqi labor, though some is included; minimal mention of Iraqi women; improvement possible in some major areas.

- UNSATISFACTORY: Inadequate presentation; fails to mention whether Iraqi labor of any type will be used.

(2) **Technical Approach.** The Government shall evaluate the Technical factor using four adjective rating definitions in order to assign an overall adjective rating definition to the Technical factor. The following four rating definitions apply:

- EXCEPTIONAL: Exceptional in all significant respects; offers significant advantages in key areas; excellent probability of success.

- GOOD: High quality in most respects; good probability of success; generally exceeds minimum requirements; improvement possible or could be further detailed.

- SATISFACTORY: Adequate overall presentation, but some areas less than thorough in analysis or detail; fair probability of success; meets minimum requirements, improvement possible in some major areas.

- UNSATISFACTORY: Inadequate presentation; fails to meet minimum requirements.

Additionally, a summary of strengths, weaknesses and deficiencies will be prepared for each evaluated offer.

(4) **Cost.** Cost/Price proposals will be evaluated for completeness, reasonableness and realism.

- Completeness: To be complete, the offeror must provide all the data that is necessary to support the proposal. The Government will evaluate the extent to which the cost proposal complies with the content and format requirements set forth in this solicitation and exhibits traceability of estimates.

- Reasonableness: The offeror's proposed costs will be evaluated to determine any unreasonably high or low estimated costs in relation to the offeror's technical proposal.

- Realism: Cost proposals will be evaluated to determine if the prices are realistic for the work to be performed, reflect a clear understanding of the requirements, and are consistent with the unique methods of performance and materials described in the offeror's proposal. If an Offeror's cost is evaluated as unrealistically low or high compared to the anticipated cost of performance and/or the offeror fails to recognize and/or mitigate management, technical, schedule, and price risks, the Government will reflect the inherent findings, risks, and associated cost impacts in the Cost Realism Analysis as well as in the appropriate Factor within the Technical proposal. A proposal in which costs proposed are unrealistically low for the effort proposed may cause that proposal to no longer be considered for award.

The Government will evaluate cost proposals to determine whether the offered cost reflects a sufficient understanding of the contract requirements and the risk inherent in the offeror's approach. Proposals found to have an unrealistic cost may be deemed to be unacceptable and may not receive further consideration.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **PUBLIC WAREHOUSING COMPANY K.S.C.,** | § | |
| | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **DEFENSE SUPPLY CENTER** | § | |
| **PHILADELPHIA, THE DEFENSE** | § | |
| **LOGISTICS AGENCY, and THE** | § | |
| **DEPARTMENT OF DEFENSE.** | § | |

---

## ORDER FOR PRELIMINARY INJUNCTION

---

Under the authority of the Federal Rule of Civil Procedure 65, it is hereby ORDERED that, pending the resolution of the merits of this action, Defense Supply Center Philadelphia, the Defense Logistics Agency, and the U.S. Department of Defense, and those acting under their direction or in concert with them, are instructed to provide requesting procurement agencies with past performance information and evaluations related to Plaintiff.


_____
UNITED STATES DISTRICT JUDGE