## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PUBLIC WAREHOUSING COMPANY
K.S.C.,

      Plaintiff,

        v.

DEFENSE SUPPLY CENTER
PHILADELPHIA, <u>et al.</u>,

      Defendants.

Civil Action No.  07-0502 (JDB)

### <u>MEMORANDUM OPINION</u>

Plaintiff Public Warehousing K.S.C., through its subsidiary PWC Logistics Services

(collectively, "PWC") is a United States government contractor providing food products to the

U.S. military in the Middle East pursuant to contracts with the Defense Supply Center

Philadelphia ("DSCP").  Plaintiff brings this action against DSCP, the Defense Logistics Agency,

and the Department of Defense seeking relief from (1) DSCP's alleged refusal to provide other

government procurement agencies with past performance evaluations and information on the

DSCP contracts and (2) DSCP's inclusion of allegedly improper information in one recent

evaluation.  Plaintiff contends that DSCP's actions violate the Federal Acquisition Regulations,

48 C.F.R. §§ 42.1502-.1503, and are arbitrary and capricious in violation of the Administrative

Procedure Act, 5 U.S.C. § 706.  Plaintiff further contends that DSCP's actions result in

constructive debarment of PWC from the government contracting industry in violation of its right

to due process.

Plaintiff seeks a preliminary and permanent injunction against DSCP    Defendants have

moved to dismiss for lack of subject matter jurisdiction or, in the alternative, for failure to state a

claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6).[1]  The

parties have agreed to consolidate plaintiff's motion for preliminary injunction with plaintiff's

request for a permanent injunction and final resolution of this action pursuant to Fed. R. Civ. P.

65(a)(2), and hence a consolidated hearing on the motions was held on April 26, 2007.  For the

reasons explained below, the Court will grant defendants' motion to dismiss for lack of subject

matter jurisdiction, and will deny plaintiff's motion for a preliminary or permanent injunction.

## BACKGROUND

Plaintiff and DSCP have entered into three Subsistence Prime Vendor contracts covering

the provision of food products and related services to U.S. military dining facilities in the Middle

East.  Decl. of Toby Switzer ¶¶ 5-7 (Pl.'s Mem., Ex. B) ("Switzer Decl.").  These contracts are

referred to as PV1 (Contract No. SPO300-03-D-3061), PV Bridge (Contract No. SPM300-05-D-

3119), and PV2 (Contract No. SPM300-05-D-3128).  Id.  The first contract, PV1, had an

estimated value of $1.4 billion, and expired on February 15, 2005.  Id. ¶ 6; Contractor

Performance Assessment Report for PV1 (Pl.'s Mem., Ex. K).  The second contract, PV Bridge --

in essence, a "bridge" contract for the continuation of services until the finalization of the next

contract -- had an estimated value of $1.5 billion, and expired on December 4, 2005.  Switzer

Decl. ¶ 2; Contractor Performance Assessment Report for PV Bridge (Defs.' Suppl. Mem., Ex.

2).  The third contract, PV2, has an estimated value of $14 billion -- approximately 90 percent of

plaintiff's overall revenues from government contracts.  Switzer Decl. ¶ 7.  Plaintiff is currently

providing services pursuant to PV2, which is scheduled to expire in June 2007.  Id.; see also Tr.

---

[1] For ease of reference, the Court will refer to plaintiff's memorandum in support of its
motion for preliminary injunction as "Pl.'s Mem." and defendant's memorandum in support of its
motion to dismiss as "Def.'s Mem."

of Mot. Hr'g at 11 (Apr. 26, 2007) ("Hr'g Tr."). DSCP has notified plaintiff, however, that DSCP

intends to exercise its option to renew the contract for a period of one year. See Mem. from

Dlugokecki to Switzer dated Mar. 22, 2007 (Defs.' Notice of Filing, Ex. 1) ("Notice of Intent

Mem.").[2]

The Federal Acquisition Regulations on "Contractor Performance Information" are set

forth at 48 C.F.R. subpart 42.15. Section 42.1502(a) provides that agencies "shall" prepare an

evaluation of contractor performance at the time the work under the contract is completed. Id.

§ 42.1502(a). It further recommends that "interim" evaluations "should" be prepared where the

contract exceeds one year, in order to provide current information for source selection purposes.

Id. In addition to interim and final evaluations, "past performance information" may be

developed in the form of interviews or comment documents to assist in other contracting

decisions. Id. § 42.1503(c). By regulation, agencies "shall" share past performance information

with other agencies to support future award decisions. Id. Past performance information is

weighed as an "indicator of an offeror's ability to perform the contract successfully," 48 C.F.R.

§ 15.305(a)(2)(i), and is thus "a significant, and often the most significant, factor in the

evaluation process." See Decl. of Pamela Cooper ¶ 6 (Pl.'s Mem., Ex. H).

PWC has received very positive feedback from DSCP until quite recently. The final

DSCP performance evaluation on the PV1 contract assigned PWC an overall rating of "very

good to exceptional," and commented that, if given a choice, DSCP "definitely would award to

[PWC] today" given its demonstrated ability to execute the promises made in its proposal.

---

[2] DSCP estimated that the written contract modification formally renewing the option
would be issued within eight to ten weeks of its written notice -- roughly late May to early June
of this year. See Notice of Intent Mem. at 1

CPAR for PV Bridge at 5 (Pl.'s Mem., Ex. K).  The Defense Logistics Agency awarded PWC the "new contractor of the year" award in 2004, and DSCP has recognized plaintiff for outstanding customer service three years in a row.  Switzer Decl. ¶ 8.  DSCP also sent PWC a letter of appreciation for its "significant accomplishments" in the performance of the PV Bridge contract (see Letter from Haverstick to Bland dated Nov. 18, 2005) (Pl.'s Mem., Ex. N), and PWC anticipated receiving a positive performance evaluation for its successful completion of that contract, too.  However, the issuance of that evaluation was delayed until after this litigation commenced, and fell short of PWC's expectations.  See infra at 6.

Indeed, the relationship between DSCP and PWC reached a turning point in or around January 2007 when the Department of Justice ("DOJ") initiated an investigation into PWC's activities.  Around that time, DOJ and the U.S. Attorney's Office in Atlanta, Georgia began investigating whether certain "prompt payment" discounts that PWC received from its suppliers had been improperly withheld from DSCP and whether PWC has an affiliation with one of its suppliers, The Sultan Center, that might suggest improper pricing.  Switzer Decl. ¶ 12; see also Am. Compl. ¶¶ 11-12.  PWC denies that it has engaged in any wrongdoing, and has proffered a detailed explanation to DSCP and the Court in its defense.[3]  See Switzer Decl. ¶¶ 12-15; Pl.'s

---

[3] Plaintiff contends that the contracts authorized PWC not to pass on "prompt payment" discounts to DSCP.  Plaintiff explains that its proposals for PV1 and PV2 each included the following statement:  "Delivered Price is not reduced by cash discounts for prompt payment available to PWC or its supplier."  See Pl.'s Mem. at 7 (quoting Ex. C at 12 and Ex. D at 6).  Plaintiff also quotes a DSCP email to PWC confirming this understanding.  Id. at 8 & Ex. F (email from PV2 contracting officer Timothy Dlugokecki rescinding his request for explanation of prompt payment discounts, and further stating: "I was informed the following: 'Discounts or rebates received by the prime vendor from its supplier as a result of prompt or early payment made by the prime vendors to such suppliers are not required to be passed to DSCP or its customers.'").  Plaintiff also has informed DOJ in writing that The Sultan Center is neither a parent nor a subsidiary of PWC.  Pl. Mem., Ex. G.

Mem. at 7-8.

In the meantime, DSCP has continued to receive requests for past performance information from other federal agencies who are considering PWC's bids for proposed federal contracts.  See Pl.'s Opp. to Defs.' Mot. to Dismiss, Ex. A ("Pl.'s Opp.").  On February 28, 2007, however, Linda Ford, the DSCP contracting officer, advised PWC that "DSCP will not participate in past performance surveys for other agencies during the period of the DOJ investigation." Email from Ford to Switzer dated Feb. 28, 2007 (Pl.'s Mem., Ex. I).  DSCP reiterated this refusal to provide past performance surveys through its Office of Counsel on March 6, 2007.  See Email from Surrena to Switzer dated Mar. 6, 2007 (Pl.'s Mem., Ex. A). DSCP also will not provide the final performance evaluation for PV1 to requesting agencies, although it remains available in the  Contractor Performance Assessment Reporting System database ("CPARS") for those agencies that initiate a search for it.  See Switzer Decl. ¶¶ 11, 19; see also Pl.'s Mem. at 13 n.5 (further explaining that other agencies may rely on DCPS rather than CPARS to provide evaluations).  In the absence of past performance evaluations and information, PWC will receive "neutral" ratings on its bids for future government contracts.  See Cooper Decl. ¶ 10; 48 C.F.R. § 15.305(a)(2)(iv).  Plaintiff has presented credible evidence indicating that the net result of this informational void is that it "has very little chance of winning future contracts."  Cooper Decl. ¶ 9.

On March 15, 2007, plaintiff filed this action seeking relief from DSCP's refusals to provide past performance evaluations and information.  In Count One, plaintiff contends that DSCP has violated 48 C.F.R. §§ 42.1502(a) and 42.1503(c) by its refusal to provide plaintiff a past performance evaluation for the PV Bridge contract and its refusal to provide past performance information to requesting procurement agencies as to any of the PV contracts.

Compl. ¶¶ 28-30, 32-34.  Plaintiff further contends that DSCP has acted arbitrarily and capriciously in refusing to provide interim evaluations pursuant to § 42.1502(a) for the PV2 contract.  Id. ¶ 31.  In Count Two, plaintiff contends that DSCP's refusal to provide contracting officers with past performance evaluations and information constitutes a constructive debarment of PWC from the government contracting industry, thus resulting in the deprivation of property without due process of law.  Id. ¶¶ 35-36.

After defendants filed a motion to dismiss, DSCP completed and provided the performance evaluation of PV Bridge.  Contractor Performance Assessment Report for PV Bridge (Defs.' Suppl. Mem., Ex. 2).   Defendants anticipated that the evaluation would render moot some or all of plaintiff's claims.  The evaluation, however, contains a reference to the DOJ investigation that plaintiff regards as inappropriate, speculative, and damaging, and it does not affect DSCP's refusal to provide past performance evaluations and information in response to requesting procurement agencies.  Plaintiff thus filed an amended complaint that reiterates the factual allegations and counts in its original complaint, and supplements those allegations to challenge disclosure of the allegedly damaging information in the new PV Bridge evaluation. See Pl.'s Mot. for Leave to Amend Compl. at 3; Am. Compl. ¶¶ 16-18, 20-22, 38, 41 & Request for Relief.  Hence, plaintiff's claims are not now significantly different from the original complaint except insofar as plaintiff alleges that the reference to the DOJ investigation in the PV Bridge evaluation is improper because it does not constitute objective, performance-related information. See Am. Compl. ¶¶ 38, 41.

Plaintiff has advised the Court that it is in the process of exhausting its administrative remedies with respect to the PV Bridge evaluation -- that is, preparing a written response as it is entitled to do under 48 C.F.R. § 42.1503(b) and, if necessary, seeking relief from a supervisory

contracting officer under that regulation.[4]  Hr'g Tr. at 8-9.  In plaintiff's view, however, its need

for expedited relief remains unchanged.  Plaintiff has submitted several bids in response to

federal solicitations since it was first advised of the DOJ investigation and anticipates submitting

about 50 bids in the foreseeable future, worth about $2 billion in annual revenues.  See Switzer

Decl. ¶ 9.  DSCP remains firm in its position that, during the period of the DOJ investigation, it

will not provide past performance evaluations or information in response to requesting agencies

or in response to PWC's request on behalf of such agencies.  Consistent with the parties'

supplemental briefs and arguments at the motions hearing, the Court will treat plaintiff's motion

for preliminary and permanent injunction, and defendants' motion to dismiss, as applying to the

amended complaint.

## STANDARD OF REVIEW

I.      **Rule 12(b)**

"[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over

the subject matter or for failure to state a cause of action, the allegations of the complaint should

be construed favorably to the pleader."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see

Leatherman v. Tarrant Cty. Narcotics and Coordination Unit, 507 U.S. 163, 164 (1993); Phillips

v. Bureau of Prisons, 591 F.2d 966, 968 (D.C. Cir. 1979).  Therefore, the factual allegations must

be presumed true, and plaintiff must be given every favorable inference that may be drawn from

the allegations of fact.  Scheuer, 416 U.S. at  236; Sparrow v. United Air Lines, Inc., 216 F.3d

---

[4]  This regulation provides: "Contractors shall be given a minimum of 30 days to submit
comments, rebutting statements, or additional information.  Agencies shall provide for review at
a level above the contracting officer to consider disagreements between the parties regarding the
evaluation.  The ultimate conclusion on the performance evaluation is a decision of the
contracting agency.  Copies of the evaluation, contractor response, and review comments, if any,
shall be retained as part of the evaluation."  48 C.F.R. § 42.1503(b).

1111, 1113 (D.C. Cir. 2000).  However, the Court need not accept as true "a legal conclusion couched as a factual allegation," nor inferences that are unsupported by the facts set out in the complaint.  Trudeau v. Federal Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Under Rule 12(b)(1), the party seeking to invoke the jurisdiction of a federal court -- plaintiffs here -- bears the burden of establishing that the court has jurisdiction.  See US Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000); see also Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) (a court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."); Pitney Bowes, Inc. v. United States Postal Serv., 27 F. Supp. 2d 15, 19 (D.D.C. 1998).  "'[P]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."  Grand Lodge, 185 F. Supp. 2d at 13-14 (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987)).  Additionally, a court may consider undisputed facts evidenced in the record in determining whether it has jurisdiction to hear the case.[5]  See Jerome Stevens Pharmaceuticals, Inc. v. FDA, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005); Coalition for Underground Expansion v. Mineta, 333 F.3d 193, 198 (D.C. Cir. 2003); EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 n.3 (D.C. Cir. 1997).

When the sufficiency of a complaint is challenged by a motion to dismiss under Rule 12(b)(6), the Court must determine whether the "[f]actual allegations . . . raise a right to relief

---

[5]  A court may also resolved disputed jurisdictional facts as long as any necessary procedural protections, such as discovery or an evidentiary hearing, are provided.  See Herbert v. National Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992).  No such factual disputes have been presented by the parties.

8

above the speculative level, on the assumption that all the allegations in the complaint are true."

See Bell Atlantic Corp. v. Twombly No. 05-1126, 540 U.S. ___, slip op. at 8 (U.S. May 21,

2007) (citations omitted).  All that the Federal Rules of Civil Procedure require of a complaint is

that it contain "'a short and plain statement of the claim' that will give the defendant fair notice of

what the plaintiff's claim is and the grounds upon which it rests." Dura Pharmaceuticals, Inc. v.

Broudo, 544 U.S. 336, 346 (2005) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).

## II.    Injunctive Relief

The standard for granting a permanent injunction is much like the standard for a

preliminary injunction, and requires consideration of the following factors:  (1) success on the

merits; (2) whether plaintiff will suffer irreparable injury absent an injunction; (3) whether,

balancing the hardships, there is harm to defendants or other interested parties; and (4) whether

the public interest supports granting the requested injunction.  See Nichols v. Truscott, 424 F.

Supp. 2d 124, 143 (D.D.C. 2006).  Actual success on the merits is required to obtain permanent

injunctive relief.  Id.  If a plaintiff has no likelihood of success on the merits, inquiry into the

remaining factors is unnecessary, for the injunctive relief must be denied on that ground alone.

See Trudeau, 456 F.3d at 182 n.2.

## DISCUSSION

The Court first considers the threshold issue of its subject matter jurisdiction over this

case.  Plaintiff alleges that DSCP's refusal to provide past performance evaluations and

information violates the APA because the refusal is arbitrary and capricious, violates federal

regulations (48 C.F.R. §§ 42.1502 and 42.1503), and results in constructive debarment without

due process of law in violation of the Fifth Amendment Due Process Clause.  Pl.'s Mem. at 13-

25.  In response, defendants contend that judicial review is not available in this Court because

Congress has established exclusive jurisdiction over plaintiff's claims in the Court of Federal

Claims pursuant to section 12 of the Administrative Dispute Resolution Act of 1996 ("ADRA"),

28 U.S.C. § 1491(b)(1) and note.  Defs.' Mem. at 5-9.  In defendants' view, plaintiff's allegations

are "object[ions] to . . . a violation of statute or regulation in connection with a procurement or a

proposed procurement" under section 1491(b)(1) -- a category of claims over which district court

jurisdiction terminated on January 1, 2001.  Id.  Plaintiff responds that its claims are not covered

by the ADRA and, thus, this Court retains jurisdiction over the claims.  Pl.'s Opp. at 3-10.

"'It is axiomatic that the United States may not be sued without its consent and that the

existence of consent is a prerequisite for jurisdiction.'"  United States v. Mitchell, 463 U.S. 206,

212 (1983); Webman v. Federal Bureau of Prisons, 441 F.3d 1022, 1025 (D.C. Cir. 2006); see

also United States v. Sherwood, 312 U.S. 584, 586 (1941) ("The United States, as sovereign, is

immune from suit save as it consents to be sued, and the terms of its consent to be sued in any

court define that court's jurisdiction to entertain the suit.").  The United States may waive its

sovereign immunity by statute, but that waiver "must be unequivocally expressed in statutory

text."  See Lane v. Pena, 518 U.S. 187, 192 (1996).  Any waiver of sovereign immunity must be

"strictly construed, in terms of its scope, in favor of the sovereign."  Id.; Webman, 441 F.3d at

1026.

The APA contains a limited waiver of sovereign immunity, providing that:

A person suffering legal wrong because of agency action . . . is entitled to judicial
review thereof.  An action in a court of the United States seeking relief other than
money damages and stating a claim that an agency or an officer or employee
thereof acted or failed to act in an official capacity . . . shall not be dismissed nor
relief therein denied on the ground that it is against the United States . . . .

5 U.S.C. § 702; see Fornaro v. James, 416 F.3d 63, 66 (D.C. Cir. 2005) (discussing the waiver of

sovereign immunity set forth in section 702).  This waiver is limited, however, because section

702 of the APA goes on to provide that "[n]othing herein . . . confers authority to grant relief <u>if</u> <u>any other statute that grants consent to suit expressly or impliedly forbids the relief which is</u> <u>sought</u>." <u>Fornaro</u>, 416 F.3d at 66 (quoting 5 U.S.C. § 702) (emphasis added); <u>City of</u> <u>Albuquerque v. United States Dep't of the Interior</u>, 379 F.3d 901, 907 (10th Cir. 2004).  The APA thus "excludes from its waiver of sovereign immunity . . . claims for which an adequate remedy is available elsewhere, and . . . claims seeking relief expressly or impliedly forbidden by another statute." <u>Fornaro</u>, 416 F.3d at 66 (quoting <u>Transohio Savings Bank v. Office of Thrift</u> <u>Supervision</u>, 967 F.2d 598, 607 (D.C. Cir. 1993); <u>see</u> <u>also</u> <u>City of Albuquerque</u>, 379 F.3d at 907.

Here, defendants contend that the ADRA "expressly or impliedly forbids" this Court from exercising jurisdiction over plaintiff's claims because the ADRA vests exclusive jurisdiction over those claims in the Court of Federal Claims.  Indeed, the parties agree, in principle, that the ADRA, rather than the APA, sets forth the scope of the government's waiver of sovereign immunity for those matters set forth in the ADRA.  The disagreement is instead over whether plaintiff's claims are within the types of claims enumerated by the ADRA as falling within the exclusive jurisdiction of the Court of Federal Claims.  Thus, the focus must be on the text of the ADRA.

The ADRA is an amendment to the Tucker Act, 28 U.S.C. § 1491, responding to the previous overlapping jurisdiction of the district courts and the Court of Federal Claims with respect to bid protest cases and other challenges to government contracts. <u>See</u> <u>Emery Worldwide</u> <u>Airlines v. United States</u>, 264 F.3d 1071, 1078-80 (Fed. Cir. 2001).  The ADRA addressed that overlapping jurisdiction by providing for a period of concurrent jurisdiction in those courts over challenges to government procurement actions, followed by consolidation of jurisdiction exclusively in the Court of Federal Claims.  <u>See</u> <u>id.</u>  Section 12(a) of the ADRA amended 28

U.S.C. § 1491(b) to provide, in relevant part:

> (b) (1) Both the Unite[d] States Court of Federal Claims and the
> district courts of the United States shall have jurisdiction to render
> judgment on an action by an interested party objecting to a
> solicitation by a Federal agency for bids or proposals for a
> proposed contract or to a proposed award or the award of a contract
> or any alleged violation of statute or regulation in connection with
> a procurement or a proposed procurement.  Both the United States
> Court of Federal Claims and the district courts of the United States
> shall have jurisdiction to entertain such an action without regard to
> whether suit is instituted before or after the contract is awarded.
>    (2) To afford relief in such an action, the courts may award any
> relief that the court considers proper, including declaratory and
> injunctive relief, except that any monetary relief shall be limited to
> bid preparation and proposal costs.

28 U.S.C. § 1491(b).  This provision afforded the Court of Federal Claims and the federal district

courts jurisdiction over "the full range of cases previously subject to review under either system."

See Emery Worldwide Airlines, 264 F.3d at 1079 (quoting 142 Cong. Rec. S11849 (daily ed.

Sept. 30, 1996) (Sen. Levin) and discussing legislative history).  Section 12(d) of the ADRA,

however, provides for the termination of the aforementioned district court jurisdiction in a sunset

provision:

> The jurisdiction of the district courts of the United States over the
> actions described in section 1491(b)(1) of title 28, United States
> Code (as amended by subsection (a) of this section) shall terminate
> on January 1, 2001 unless extended by Congress.

See Pub. L. No. 104-320, 110 Stat. 3875 (Oct. 19, 1996) (codified at 28 U.S.C. § 1491 note).

Congress did not extend the sunset date, and thus district court jurisdiction over claims

enumerated in section 1491(b)(1) terminated on January 1, 2001.[6]

---

[6] For a full discussion of the overlapping jurisdiction of the district courts and the Court
of Federal Claims prior to enactment of the ADRA, see Emery Worldwide Airlines, 264 F.3d at
1078-80, and Labat-Anderson, Inc. v. United States, 346 F. Supp. 2d 145, 149-50 (D.D.C. 2004).
Of particular note, prior to the ADRA, the Court of Federal Claims exercised jurisdiction over
(continued...)

Defendants contend that plaintiff's claims are covered by the last category of claims described in section 1491(b)(1) -- "object[ions] to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." Defs.' Mem. at 5-9. Plaintiff responds that, although it is admittedly objecting to a violation of the Federal Acquisition Regulations, its claims are nonetheless outside the ambit of section 1491(b)(1) because plaintiff does not challenge any specific contract solicitation or award, but instead challenges the action of a third-party agency not engaged in the bidding process. Pl.'s Opp. at 2- 9.

The meaning of the "violation of statute or regulation" clause has been addressed by the Federal Circuit and this Court on several occasions, albeit in factual contexts different from the present case. See RAMCOR Servs. Group v. United States, 185 F.3d 1286, 1288-90 (Fed. Cir. 1999); Labat-Anderson, 346 F. Supp. 2d at 149-54 (D.D.C. 2004); Advanced Systems Technology v. Barrito, No. 05-2080, 2005 WL 3211394, at *3-5 (D.D.C. 2005); OTI America v. United States, 68 Fed. Cl. 108, 113-15 (Fed. Cl. 2005). Those case are nonetheless instructive on the meaning of the statute because they are persuasive precedent on how to interpret the statutory

---

[6](...continued)
prospective bidder challenges to pre-award government contract procurement actions under the implied contracts provision of the Tucker Act, 28 U.S.C. § 1491(a), while district courts enjoyed broader jurisdiction to hear both pre- and post-award challenges to government procurement decisions under the APA and the "Scanwell" doctrine. See Emery Worldwide Airlines, 264 F.3d at 1078-80 (discussing history of overlapping jurisdiction under Tucker Act and Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970)); Labat-Anderson, 346 F. Supp. 2d at 149-53 (same). Congress intended to eliminate the Scanwell jurisdiction of the district courts and channel all procurement protests into the Court of Federal Claims when it enacted the ADRA. See Emery Worldwide Airlines, 264 F.3d at 1079-80 (observing that "[i]t is clear that Congress's intent in enacting the ADRA with the sunset provision was to vest a single judicial tribunal with exclusive jurisdiction to review government contract protest actions."); Labat-Anderson, 346 F. Supp. 2d at 152-53 (discussing legislative history indicating Congress' intent to overrule Scanwell jurisdiction).

language, notwithstanding plaintiff's attempts to distinguish the cases factually.

The starting point is the plain language of section 1491(b)(1) -- "any violation of statute or regulation in connection with a procurement or a proposed procurement."  The Federal Circuit has observed that the "operative phrase" of this text is the "in connection with" clause. RAMCOR Servs. Group, 185 F.3d at 1289.   The phrase "in connection with" is "very sweeping in scope," and will provide a basis for the Court of Federal Claims to exercise jurisdiction under the ADRA "[a]s long as a statute [or regulation] has a connection to a procurement proposal."  Id. The clause "does not require an objection to the actual contract procurement."  Id. Thus, the Federal Circuit held that a statute is "in connection with a procurement" where "an agency's actions under a statute . . . clearly affect the award and performance of a contract."  Id.  By this measure, the Subpart 42.15 performance information regulations would appear to be a "regulation . . . in connection with a procurement or a proposed procurement" because an agency's actions thereunder would affect the award of a future contract.

Much depends, however, on the meaning of the term "procurement" -- a term not defined in the ADRA.  The Court of Federal Claims has construed "procurement" as used in section 1491(b)(1) to encompass "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout," borrowing from Congress's definition of the term procurement at 41 U.S.C. § 403(2).[7] OTI America, 68 Fed. Cl. at 114; Labat-Anderson, Inc. v. United States, 50 Fed. Cl. 99, 104 (Fed. Cl. 2001); accord Labat-Anderson, 346 F. Supp. 2d at 151 (applying this

_____

[7]  Under this and related provisions, Congress established the Office of Federal Procurement Policy in the Office of Management and Budget to provide overall direction of federal procurement policies, regulations, procedures and forms.  See 41 U.S.C. §§ 401-20.

definition in construing section 1491(b)(1)).  Thus, a "statute or regulation in connection with a

procurement or a proposed procurement" includes, by definition, a regulation in connection with

any stage of the federal contracting acquisition process, including "contract completion and

closeout."

The requirement in the Federal Acquisition Regulations to provide contractors with

performance evaluations and information fits comfortably within the body of regulations that are

"in connection with a procurement or a proposed procurement."   First, a final performance

evaluation is encompassed by contract "closeout."  The closeout regulations state that closeout

procedures include "[a] statement that all required <u>contract administration</u> actions have been fully

and satisfactorily accomplished."  48 C.F.R. § 4.804-5(b)(10) (emphasis added).  According to

the Office of Federal Procurement Policy ("OFPP"), "Contract Administration involves <u>those</u>

<u>activities performed by government officials . . . to determine how well the government and the</u>

<u>contractor performed</u> to meet the requirements of the contract."  <u>See</u> OFPP, *A Guide to*

*Best Practices for Contract Administration* at 5 (Oct. 1994) *available at*

www.acquisition.gov/bestpractices/bestpcont.html (emphasis added).[8]  Clearly, a performance

evaluation is an activity performed by government officials to determine how well the contractor

performed.

Additionally, putting the closeout function aside, the performance information regulations

at Subpart 42.15 also fit easily within regulations that are "in connection with . . . a proposed

---

[8]  Plaintiff argued at the motions hearing that performance evaluations are separate and
independent from closeout, which is evidenced by its absence from the items enumerated in 48
C.F.R. § 4.804-5.  Hr'g Tr. at 31-32, 34-35.  This construction of "closeout" is not consistent with
the quoted provision of the regulation.  In any event, the closeout regulation provides that the list
is not exclusive, specifying that "these closeout actions may be modified to reflect the extent of
administration that has been performed."  <u>Id.</u> § 4.804-1(b).

procurement."  Subpart 42.15 recognizes at its outset that "[p]ast performance information is relevant information, for future source selection purposes."  48 C.F.R. § 42.1501.  The function of the information as "source selection" information for future procurements is repeated throughout Subpart 42.15.  Id. § 42.1503(b) ("The completed evaluation shall not be released to other than Government personnel and the contractor . . . during the period the information may be used to provide source selection information."); id. § 42.1503(c) ("Departments and agencies shall share past performance information with other departments and agencies when requested to support future award decisions.").  This constitutes further support for the conclusion that the Subpart 42.15 regulations are "in connection with a procurement or a proposed procurement."

Plaintiff contends, however, that "procurement" was intended by Congress to refer to a bid protest -- which plaintiff regards as a dispute over an individual contract solicitation or award -- and thus does not cover plaintiff's claims because it is not engaged in a bid protest with DSCP.  See Pl.'s Opp. at 1-2 ("[T]he ADRA applies to claims made 'in connection with' bid or procurement protests, and PWC has made no such protest. . . . Rather, PWC has lodged a complaint against DSCP as a *third party*, i.e., a government agency with which PWC is not engaged in the bid process."); Pl.'s Surreply at 2 ("Because a specific existing or specific proposed procurement is not the focus of PWC's complaint, the ADRA does not apply.").  Plaintiff underscores the use of the word "a" in "a procurement or a proposed procurement" in support of this argument.  See Pl.'s Surreply at 2.

But this "bid protest" limitation was squarely rejected in RAMCOR and Labat-Anderson, and is also rejected here.  Limiting the "violation of statute or regulation" prong to bid protest cases would render it superfluous.  See RAMCOR, 185 F.3d at 1289.  If section 1491(b)(1) were limited to claims challenging the merits of a specific solicitation or contract award, the "violation

of statute or regulation" clause would serve no purpose because the other clauses in section 1491(b)(1) vesting jurisdiction in the Court of Federal Claims would suffice -- that is, those clauses covering "a solicitation . . . for bids or proposals for a proposed contract" or "a proposed award," or "the award of a contract." See id.; see also Labat-Anderson, 346 F. Supp. 2d at 151 (rejecting contractor's argument that section 1491(b)(1) is limited to "bid protests," and noting, inter alia, that the first three clauses of the statute already cover bid protests). When construing a statute, the Court must give effect to all its parts.  See RAMCOR, 185 F.3d at 1289 (citing Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 633 (1973)); AT&T Corp. v. FCC, 292 F.3d 808, 813 (D.C. Cir. 2002).  Plaintiff's proposed reading would be inconsistent with this canon of construction.

Plaintiff also contends that the heading of section 12 of the ADRA -- "Jurisdiction of the United States Court of Federal Claims and the District Courts of the United States: Bid Protests" -- demonstrates that Congress intended the matters described therein to be limited to bid protests. See Pl.'s Opp. at 5.  But this reading is contrary to the canon of statutory construction that "the title of a statute or statutory section generally cannot be used to constrict the plain language of the statute." CDI Information Servs., Inc. v. Reno, 278 F.3d 616, 619 (6th Cir. 2002) (citing Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R., 331 U.S. 519, 528-29 (1941)); United States v. Buculei, 262 F.3d 322, 331 (4th Cir. 2001).  The Supreme Court has explained that "matters in the text which deviate from those falling within the general pattern are frequently unreflected in the headings and titles." Trainmen, 331 U.S. at 528.

Plaintiff finds it significant that all of the cases cited by defendants in support of exclusive jurisdiction in the Court of Federal Claims involved a bid protest or "some other challenge" to a contract award, and a defendant agency with which the plaintiff contractor was

17

bidding or that was involved in the contract award process.  Pl.'s Opp. at 7; Pl.'s Surreply at 2-3. But looked at another way, every court to address the "violation of statute or regulation" clause outside of a traditional bid protest setting -- in plaintiff's words, "some other challenge" -- has concluded that the breadth of that clause covers even non-traditional disputes arising from the procurement process as long as the violation is "in connection with a procurement or a proposed procurement."  See, e.g., RAMCOR, 185 F.3d at 1288-90 (challenge to agency decision overriding a statutory automatic stay of a contract award); Labat-Anderson, 346 F. Supp. 2d at 152-53 (challenge to agency decision not to exercise renewal option and instead convert services to in-house personnel); OTI America, 68 Fed. Cl. at 114-17 (contractor's challenge to its elimination from the intermediate stage of a multi-stage product development contract); Advanced Systems Tech., 2005 WL 3211394, at *5-6 (challenge to Small Business Administration code designation that prevented contractor from bidding for two Army solicitations).  Thus, although it is true that litigation under the ADRA traditionally has developed around pre- and post-award bid protests,[9] no inference can be drawn that the ADRA covers only those types of cases.  The plain language of section 1491(b) and the relevant judicial precedent reject such a narrow interpretation.

The Court concludes here that plaintiff's claims fall comfortably within the category of claims that object to "violation of a . . . regulation in connection with a procurement or a proposed procurement."  Plaintiff, a government contractor, alleges that DSCP has violated 48

_____

[9] Indeed, in RAMCOR, the Federal Circuit reversed the lower court's dismissal where the rationale for dismissal was that "the ADRA covers primarily pre- and post-award bid protests" and an attack on an underlying contract award was thus necessary to support jurisdiction under section 1491(b)(1).  185 F.3d at 1289.  See also OTI America, 68 Fed. Cl. at 113 (observing that pre- and post-award protests are "well-recognized and relatively standard proceedings," but that the "violation of statute or regulation" clause covers another body of claims).

C.F.R. §§ 42.1502 and 42.1503 -- the Federal Acquisition Regulations governing

the recording and maintenance of performance information -- in connection with three

procurement contracts.  The purpose of creating and maintaining those performance information

records, moreover, is to support future proposed procurement selections.  See 48 C.F.R. §

42.1501.  Thus, all of the performance information plaintiff seeks is necessarily in connection

with procurements (i.e., the PV1, PV Bridge, and PV2 contracts) and with future proposed

procurements.  Indeed, plaintiff has candidly acknowledged that the need for the evaluations in

connection with future proposed procurements lies at the heart of this lawsuit.  See Am. Compl. ¶

19 ("Because past performance information is so heavily weighted in a procurement agency's

award decision, DSCP's refusal to provide such information . . . has and will continue to have a

significant and negative impact on PWC's ability to win government contracts."); Switzer Decl.

¶¶ 9-10 ("PWC is currently in the process of preparing to bid on approximately fifty additional

government contracts. . . . PWC's proposal for the first of these contracts is due March 18.

Another proposal is due March 22. . . . Many other proposals are due over the next few

weeks . . . . PWC seeks to have DSCP provide past performance evaluations for PWC's work on

the PV Bridge contract and the PV2 contract.").  In short, when DSCP refuses to provide

performance information about performed or ongoing contracts -- or provides negative

performance information in the case of PV Bridge -- to requesting procurement agencies relating

to future contract bids, the alleged violation of the FAR is "in connection with a procurement or a

proposed procurement."[10]

---

[10]   Consistent with its position that section 1491(b)(1) is limited to bid protests, plaintiff
asserts that the Court of Federal Claims will not exercise jurisdiction over the alleged violation of
the FAR performance information regulations, and asks the Court to weigh that anticipated

(continued...)

Perhaps recognizing the breadth of the "violation of statute or regulation" clause, plaintiff attempts to avoid the reach of the ADRA by arguing that it is not an "interested party" that can bring an action under the ADRA.  Plaintiff submits that under the Federal Circuit cases defining "interested party" as an "actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract," it is not covered for purposes of this case because it has not filed a protest against DSCP in relation to a particular solicitation or award.  Pl.'s Opp. at 3-4 (quoting American Fed'n of Gov't Employees v.

---

[10](...continued)
outcome in the section 1491(b)(1) analysis.  The Court cannot base its decision on unsupported speculation that the Court of Federal Claims may reach a result at odds with the judicial precedent addressing the meaning of section 1491(b)(1) and the sunset provision.  The cases cited by plaintiff in support of its belief -- a decision of the Comptroller General on a bid protest and a Court of Federal Claims decision that was subsequently vacated -- are for self-evident reasons of little value in predicting decisions of the Court of Federal Claims.  See Pl.'s Opp. at 10 (citing Ocean Tech. Servs., Inc., B-288,659, 2001 CPD P 193, 2001 WL 1505946, at *3 (Comp. Gen. Nov. 27, 2001), and Bannum, Inc. v. United States, 60 Fed. Cl. 718, 729 (Fed. Cl. 2004), vacated, 126 Fed. Appx. 958 (Fed. Cir. 2005), on remand, 69 Fed. Cl. 311 (Fed. Cl. 2006)).  Nor do the handful of other decisions within the Federal Circuit addressing the requirements of 48 C.F.R. §§ 42.1502 and 42.1503 indicate that the Court of Federal Claims will find it lacks jurisdiction.  See, e.g., Bannum, Inc. v. United States, 404 F.3d 1346, 1353 (Fed. Cir. 2005); Bannum, 69 Fed. Cl. at 313-14.  All that they indicate is that a subsequent disappointed bidder protest is not the proper place to object to the contents of an evaluation or missing evaluations from a separate and unrelated contract.  See Bannum, Inc., 404 F.3d at 1353.  They shed no light on whether the Court of Federal Claims would construe its section 1491(b)(1) jurisdiction to encompass a contractor's lawsuit against an evaluating agency for refusing to provide performance evaluations or information in violation of §§ 42.1502 and 42.1503.

It bears noting that this Court's conclusion that plaintiff's claims lie within the exclusive jurisdiction of the Court of Federal Claims does not necessarily mean that plaintiff's claims will survive dismissal there.  Defendants contend that plaintiff lacks standing to sue based on lack of an imminent injury.  Defs.' Mem. at 9-14.  Defendants also contend that, regardless of who has jurisdiction, plaintiff fails to state a claim upon which relief can be granted because §§ 42.1502 and 42.1503 do not create rights that are legally enforceable by contractors.  Defs.' Mem. at 14-16.  Additionally, defendants suggest that, as to the PV Bridge evaluation, plaintiff has failed to exhaust its administrative remedies under 48 C.F.R. § 14.1503(b) and that, in any event, the substance of an evaluation is committed to the "sole and final discretion" of the evaluating agency.  Defs.' Reply at 5-6.  The determination of these issues remains for the Court of Federal Claims.

United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) ("AFGE"), and Banknote Corp. of Am. v.

United States, 365 F.3d 1345, 1352 (Fed. Cir. 2004)).  The term "interested party" does not,

however, define the types of claims that are covered by the ADRA, but rather, as the cited cases

emphasize, establishes who is within the "zone of interests" of the ADRA for standing purposes.

See AFGE, 258 F.3d at 1302. The cases that have concluded that a particular plaintiff was not an

"interested party" involved plaintiffs who stood entirely apart from the bidding process.  See

AFGE, 258 F.3d at 1298-1302 (holding that federal employees and their union did not have

standing under the ADRA to challenge agency decision to contract out work formerly performed

by employees where they were not actual or prospective bidders and thus not "interested parties"

under section 1491(b)(1)); City of Albuquerque, 379 F.3d at 910-11 (holding that a city that

desired to have an agency select office space in its central business area was not an "interested

party" under the ADRA where it had no prior, existing, or prospective procurement relationship

with the agency); see also Forest Serv. Employees for Envt'l Ethics v. United States Forest Serv.,

338 F. Supp. 2d 1135, 1142-43 (D. Mont. 2004) (holding that federal employees and their union

were outside the ambit of the ADRA, and thus claims were within district court's APA

jurisdiction, but dismissing for lack of a concrete injury).[11]  Here, plaintiff is more akin to a

typical bidder than a federal employees' union or a city wishing to expand its central business

district.  Plaintiff -- a government contractor --- is, without question, the winning actual bidder

with respect to all three Prime Vendor contracts, as well as a prospective bidder seeking past

performance information in furtherance of the award of future contracts.  Plaintiff is thus an

---

[11]  The court in Forest Service Employees for Envt'l Ethics also suggested, without
analysis or discussion of the relevant case law, that the "violation of statute or regulation" clause
should be narrowly construed.  338 F. Supp. 2d at 1142-43. This Court declines to give any
weight to that portion of the decision.

"interested party" within section 1491(b)(1).

Plaintiff attempts to avoid the impact of exclusive jurisdiction in the Court of Federal Claims under the ADRA by characterizing its due process claim as a distinct claim that is appropriate for this Court's jurisdiction. Plaintiff's due process claim is grounded upon the theory that the same actions that support its claims under the FAR -- DSCP's refusal to providing requesting procurement agencies with past performance evaluations and information and the allegedly improper PV Bridge evaluation -- also has resulted in plaintiff's constructive debarment. Pl.'s Mem. at 18-21.

Where there is a possible alternative basis for district court jurisdiction over claims that otherwise fall within the exclusive jurisdiction of the Court of Federal Claims, the determination of whether a claim belongs in the district court or in the Court of Federal Claims depends upon whether the claim is "at its essence" one covered by the relevant Court of Federal Claims statute -- here, the ADRA -- or is instead a constitutional or other statutory claim. See Megapulse, Inc. v. Lewis, 672 F.2d 959, 967-68 (D.C. Cir. 1982) ("Courts have not hesitated to look beyond the pleadings of a case brought in district court to determine if it involves a claim over which the Court of Claims has exclusive jurisdiction. . . . [A]n action against the United States which is at its essence a contract claim lies within the Tucker Act and . . . a district court has no power to grant injunctive relief in such a case."); see Albrecht v. Comm. on Employee Benefits of the Federal Reserve Employee Benefits Sys., 357 F.3d 62, 68-69 (D.C. Cir. 2004) (holding that, under Megapulse, where plaintiff's claim turned entirely upon the terms of its government contract, plaintiff's "breach of fiduciary duty claim is essentially a contract action" within the exclusive jurisdiction of the Court of Federal Claims). This determination depends upon both "'the source of the rights upon which the plaintiff bases its claims' and 'the type of relief sought

(or appropriate).'" <u>Albrecht</u>, 357 F.3d at 68 (quoting <u>Megapulse</u>, 672 F.2d at 968).

As to the first factor -- the source of the rights upon which plaintiff bases its claims -- it is clear that plaintiff's allegation of constructive debarment is premised entirely on its rights under the Federal Acquisition Regulations, 48 C.F.R. §§ 42.1502 and 42.1503, to receive performance evaluation information regarding the Prime Vendor contracts. <u>See</u> Pl.'s Opp. at 13 ("DSCP's violation of the FAR . . . is the direct and immediate cause of PWC's injury."). In other words, the success of plaintiff's due process claims does not depend upon some fact, document, or right peripheral to contract administration. Proper contract administration and interpretation of regulations "in connection with a procurement or a proposed procurement" lie at the core of this case. Thus, this factor indicates that the claim is "at its essence" one within the Court of Federal Claims jurisdiction.

The second factor -- the type of relief sought -- likewise supports that conclusion. In plaintiff's own words, the "injunction will require DSCP to comply with the Federal Acquisition Regulations, 48 C.F.R. § 42.1502-.1503, by providing other procurement agencies with past performance evaluations and information related to PWC." <u>See</u> Pl.'s Mot. for Prelim. Inj. at 2. Thus, the amended complaint seeks primarily (1) an order declaring that "DSCP's refusal to provide past performance information and evaluations . . . to requesting procurement agencies constitutes a violation of the FAR" and further declaring that "DSCP's reference to the [DOJ] investigation [in the PV Bridge evaluation] constitutes a constructive debarment of PWC because . . . this action will severely impact PWC's ability to compete for and be awarded government contracts"; (2) an injunction "requiring DSCP to provide other procurement agencies with past performance evaluations and information" pursuant to those same regulations; and (3) an injunction requiring DSCP to eliminate references to the pending DOJ investigation from

evaluations and past performance information -- all relief that may be available administratively

under 48 C.F.R. § 42.1503.  See Am. Compl. at 11-12.  Hence, the second factor indicates that

this claim is "at its essence" about violation of regulations "in connection with a procurement or a

proposed procurement" within the meaning of section 1491(b)(1), and thus comes under the

Court of Federal Claims exclusive jurisdiction.  Indeed, the few published cases addressing the

meaning of those regulations are decisions issued by the Federal Circuit and the Court of Federal

Claims -- which underscores the latter court's unique expertise over such claims.  See supra note

10.

　　　　Plaintiff next contends that the Court of Federal Claims has held that, as a general rule,

this type of constructive debarment claim is within the jurisdiction of a district court, not the

Court of Federal Claims, citing Medina Const., Ltd. v. United States, 43 Fed. Cl. 537, 557 (Fed.

Cl. 1999).  Plaintiff overstates the holding of Medina Construction.  In that case, the Court of

Federal Claims considered only whether an agency decision to debar a contractor pursuant to the

debarment regulation, 48 C.F.R. § 9.405, was within its jurisdiction, and concluded that it was

not.  Id. at 556-57.  The court did not have occasion to examine the circumstances under which it

would have jurisdiction over a claim of constructive debarment where no formal agency decision

existed and where the constructive debarment claim was intertwined with a claim falling within

its jurisdiction under section 1491(b)(1); indeed, there is no mention of section 1491(b)(1) at

all.[12]  Id.  Moreover, the Court of Federal Claims has a history of exercising jurisdiction over

---

[12]  It bears noting that Medina Construction was decided before the sunset provision of
the ADRA went into effect in 2001, and hence while Scanwell jurisdiction remained in effect.
Any broad generalizations by the Court of Federal Claims before that date on matters falling
within a district court's jurisdiction must be examined anew in light of the termination of district
court jurisdiction over matters within section 1491(b)(1).

constructive debarment claims where such claims are raised in connection with a bid protest

falling within section 1491(b)(1).  See, e.g., TLT Const. Corp. v. United States, 50 Fed. Cl. 212,

215-16 (Fed. Cl. 2001); CRC Marine Servs., Inc. v. United States, 41 Fed. Cl. 66, 84 (Fed. Cl.

1998)).  There is no reason to believe that it will act differently when a constructive debarment

claim is raised in connection with other claims falling within its section 1491(b)(1) jurisdiction.[13]

## CONCLUSION

For the foregoing reasons, the Court will grant defendants' motion to dismiss and deny

plaintiff's motion for preliminary and permanent injunction.  A separate order has been issued on

this date.


/s/
_____
JOHN D. BATES
United States District Judge

Dated:   May 22, 2007

---

[13]   Assuming arguendo that the constructive debarment claim were within the jurisdiction
of this Court, plaintiff would face formidable hurdles on this claim.  The standard for
constructive debarment (often referred to as de facto debarment) is high.  See TLT Const. Corp.,
50 Fed. Cl. at 215-16.  In the bid protest context, the contractor must show "a systematic effort by
the procuring agency to reject all of the contractor's bids."  Id. (emphasis added); CRC Marine
Servs., 41 Fed. Cl. at 84.  Adapted to the performance evaluation context, it follows that to
demonstrate constructive debarment, a plaintiff must show the same "systematic effort" to cause
the rejection of  "all of the contractor's bids."  Here, the record reveals no such systematic effort.
Indeed, there is undisputed evidence that DSCP has formally notified PWC of its intent to
exercise its option to renew the PV2 contract for an additional year.  See Mem. from Dlugokecki
to Switzer dated Mar. 22, 2007 (Defs.' Notice of Filing Ex. 1).  That action, in and of itself,
undercuts any assertion of a "systematic effort" to debar plaintiff from the government
contracting industry.